IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ELIZABETH HARING COOMES,

> *Plaintiff.*

v.

MICHAEL J. MORAN, et al.,

> *Defendants*.

Civil No. ELH-22-02639

**MEMORANDUM OPINION**

In this legal malpractice case, plaintiff Elizabeth Haring Coomes filed suit against defendants Michael J. Moran, Esquire ("Mr. Moran") and The Law Offices of Michael J. Moran, P.C. (the "Firm") (collectively, "Moran"). ECF 1.[1] In an Amended Complaint (ECF 35), plaintiff asserts "Professional Negligence" as to Mr. Moran (Count I) and the Firm (Count II). In addition, she claims that defendants are liable for a violation of the automatic stay that resulted from plaintiff's filing of a Chapter 13 bankruptcy petition (Count III).[2]

At the relevant time, Moran represented plaintiff with respect to a matter pending in the Maryland Court of Appeals ("COA"), now known as the Supreme Court of Maryland ("SCM").[3]

---

[1] Jurisdiction is predicated on diversity of citizenship under 28 U.S.C. § 1332. ECF 35, ¶ 5.

[2] The Amended Complaint fails to identify the provision of the Bankruptcy Code that defendants allegedly violated.

[3] In Maryland's general election of November 2022, the voters approved a constitutional amendment to change the name of the Maryland Court of Appeals to the Supreme Court of Maryland. The voters also approved changing the name of the Maryland Court of Special Appeals to the Appellate Court of Maryland. These changes went into effect on December 14, 2022. *See* Press Release, *Voter-Approved Constitutional Change Renames High Courts to Supreme and Appellate Court of Maryland*, MARYLAND COURTS (Dec. 14, 2022), https://perma.cc/K87C-UUCG. Nevertheless, I shall refer to the courts by the names they used at the relevant times.

It concerned plaintiff's challenge to a decision of the Maryland Insurance Administration ("MIA"), revoking Coomes's insurance producer's license. Because Moran failed to submit an appellate brief, the COA dismissed plaintiff's case. Plaintiff seeks millions in compensatory damages, as well as prejudgment interest, costs, punitive damages, and attorneys' fees. ECF 35 at 11, 12, 13.

Defendants have moved for summary judgment, pursuant to Fed. R. Civ. P. 56(a). ECF 74. The motion is supported by a memorandum (ECF 74-1) (collectively, "Defendants' Motion"), as well as sixteen exhibits. ECF 74-2 through ECF 74-17. As to Counts I and II, defendants contend that Coomes cannot prove that defendants were the proximate cause of her damages. ECF 74-1 at 6. Specifically, they argue that Coomes "would not have prevailed in her appeal" to the COA, and therefore "her claims for professional negligence fail as a matter of law." *Id.* With respect to Count III, defendants contend that they did not attempt to collect any pre-bankruptcy-petition debts with knowledge that plaintiff's case was subject to an automatic stay. *Id.* at 22. Moreover, defendants argue that Coomes's alleged damages are "speculative and not allowed under the Bankruptcy Code." *Id.* at 23.

In a combined submission, plaintiff opposes Defendants' Motion and moves for summary judgment as to Counts I and II. ECF 77. The filing is supported by a memorandum (ECF 77-1) (collectively, "Plaintiff's Motion"), as well as three exhibits. ECF 77-2; ECF 77-3; ECF 78. Plaintiff maintains that she would have prevailed before the COA had Moran filed a brief on her behalf. *See generally* ECF 77-1. Therefore, Coomes contends that she is entitled to judgment as to Counts I and II. *Id.* And, Coomes asserts that she told Mr. Moran of her bankruptcy filing, but he "continued to attempt to collect pre-petition fees and expenses." *Id.* at 19. Accordingly, plaintiff argues that defendants are not entitled to summary judgment as to Count III. *Id.* The parties replied. ECF 81 (defendants); ECF 82 (plaintiff).

2

No hearing is necessary to resolve the motions. *See* Local Rule 105.6. For the reasons that follow, I shall deny the motions.

## I. Statutory and Regulatory Framework

I begin with a review of the statutory and regulatory provisions that are pertinent to the case.

Maryland Code (2002, 2017 Repl. Vol.), § 1-101(u)(1) of the Insurance Article ("I.A.") defines "insurance producer" as "a person that, for compensation, sells, solicits, or negotiates insurance contracts, including contracts for nonprofit health service plans, dental plan organizations, and health maintenance organizations, or the renewal or continuance of these insurance contracts for:

(i) persons issuing the insurance contracts; or
(ii) insureds or prospective insureds other than the insurance producer."

Under I.A. § 10-126(a), the Maryland Insurance Commissioner (the "Commissioner") has the authority to revoke an insurance producer's license if the producer:

> (1) has willfully violated this article or another law of the State that relates to insurance;
>
> * * *
>
> (6) has committed fraudulent or dishonest practices in the insurance business;
>
> * * *
>
> (12) has failed or refused to pay over on demand money that belongs to an insurer, insurance producer, or other person entitled to the money; [or]
>
> (13) has otherwise shown a lack of trustworthiness or competence to act as an insurance producer[.]

I.A. § 10-126(f) is also relevant. It provides:

(f)(1) Within 30 days after the final disposition of the matter, an insurance producer shall report to the Commissioner any adverse administrative action taken against the insurance producer:
> (i) in another jurisdiction; or
> (ii) by another governmental unit in this State.

(2) The report shall include a copy of the order, consent order, and any other relevant legal documents.

Pursuant to I.A. § 2-210 and § 31.02.01.03 of the Code of Maryland Regulations ("COMAR"), a person aggrieved by a final order of the MIA has a right to request a hearing with respect to that order. *See* ECF 74-8 at 37. Under I.A. § 2-210(c)(1), a hearing "shall be conducted in accordance with Title 10, Subtitle 2 of the State Government Article." In turn, Md. Code (1984, 2014 Repl. Vol., 2016 Supp.), § 10-210 of the State Government Article ("S.G."), provides that a contested case may be disposed of by, *inter alia*, "summary disposition."

COMAR § 31.02.01.07(G) is also relevant. Titled "Motion for Summary Decision," it states:

(1) A party may move for summary decision on any appropriate issue in the case.
(2) A hearing officer may grant a proposed or final summary decision if the hearing officer finds that:
    (a) There is no genuine issue of material fact; and
    (b) A party is entitled to prevail as a matter of law.

As I discuss, *infra*, a motion for summary decision or for summary disposition is equivalent to a motion for summary judgment under Md. Rule 2-501(a). *See Brawner Builders, Inc. v. State Highway Admin.*, 476 Md. 15, 31, 258 A.3d 217, 226 (2021) ("The legal standard for granting summary disposition is the same as that for granting summary judgment under Maryland Rule 2-501(a).").

## II. Factual Background and Procedural History[4]

Coomes "became a licensed insurance producer in the Commonwealth of Virginia" in 2004. ECF 35, ¶ 7; ECF 74-8 at 40–49 (Coomes Affidavit to MIA, 6/30/14), ¶ 3. Also in 2004,

---

[4] In setting forth the facts, I rely on many of the allegations in the Amended Complaint, as they have been admitted by defendants. *See* ECF 50 (Defendants' Answer to Amended Complaint).

the MIA issued an insurance producer's license to Coomes, as a "nonresident producer."  ECF 35,

¶ 8; ECF 74-8 at 40, ¶ 2.  Coomes's Maryland license was renewed on June 4, 2012.  ECF 74-8 at

40, ¶ 2.  As a result, Coomes was authorized to act as an insurance producer in Maryland until

January 31, 2015.  *Id.*

From 2007 to 2011, Coomes provided insurance and financial services through her agency,

Old Town Insurance & Financial Services, Inc., located in Warrenton, Virginia.  ECF 74-9 at 24;

ECF 74-8 at 40, ¶ 3.  Coomes had a "sub-agent relationship" with Employee Benefit Corporation

of America ("EBCA").  ECF 74-8 at 42, ¶ 8; *see* ECF 74-9 at 24.  In approximately June 2011,

Anthem Blue Cross and Blue Shield ("Anthem") mistakenly sent Coomes two checks that were

payable to EBCA.  ECF 74-7 at 55; *see* ECF 35, ¶ 9.[5]  One check was in the amount of $13,740.00.

ECF 74-7 at 55.  The other was in the amount of $6,533.85.  *Id.*  Although neither check was

payable to Coomes, *id.*, both were deposited in her agency's bank account.  ECF 35, ¶ 10.  The

exact dates are unclear.  But, the MIA stated that Coomes deposited one check on or about June

20, 2011, and the other on or about July 5, 2011.  ECF 74-5 at 56, ¶¶ 3, 4.

On August 18, 2011, Anthem's account specialist, Lovely Johnson, told Coomes that she

needed to return the money as soon as possible.  ECF 74-7 at 55.  Coomes emailed Gail Blakely

of Anthem on August 23, 2011, and said, in part, ECF 74-9 at 47:

> I am an [EBCA] agent who writes a lot of insurance with Anthem.  It came
> to my attention recently that Anthem sent 2 checks in the amount of $13,740 and
> $6,533 to my Leesburg, VA office in error and they were deposited in error.

---

[5] The exact date that Anthem sent the checks to Coomes is unclear.  The MIA stated that
Anthem sent the checks to Coomes on or about June 8 and June 27, 2011.  ECF 74-5 at 56,
¶¶ 3, 4.  The Amended Complaint states that Coomes received the checks in September 2011.  ECF
35, ¶ 9.  But, Coomes testified that she "believed" she received the checks in June and/or July
2011.  ECF 74-4 at 25.

In speaking with Luke Russo, the EBCA commissions manger, he informed me that the checks contained in part my Anthem producer bonuses and also bonuses intended for other agents.  I also spoke to Mark Khatib, the manager of EBCA.

We had changed banks earlier this year and received more checks than normal while we were changing over everything to our new accounts.  The two checks in question were deposited in error.  I spoke to Ms. Lovely Johnson at Anthem last week and indicated to her that it is my intention to repay Anthem.  I asked Mr. Khatib if he could provide me with the total amount of my bonuses, since I am responsible to repay the difference between the checks and my bonuses.  I have not heard back from him yet.  I left a message for Ms. Lovely Johnson at Anthem yesterday but did not hear back from her.

The purpose of my correspondence is to reiterate that I would like to repay Anthem in the full net amount I owe, however, I need to know the correct amount (the amount of the two checks minus the amounts of my bonuses that were included in those checks).  Could you please let me know as soon as possible so that I will know how much exactly that I need to repay Anthem?

Coomes emailed Johnson again on September 5, 2011.  ECF 74-8 at 1.  She explained that she had "multiple offices" which "typically receive between $10-20,000 in cash currency per month and well over $50,000 in checks."  *Id.*  Coomes added, *id.*: "My employees and I promptly deposit funds and checks.  I don't handle the book-keeping and accounting myself.  This error first came to my attention after I got back from vacation."

Of import, Coomes stated that she "was not in a position at the present moment to send Anthem a check for $20,000."  *Id.*  The "primary reason" for this, said Coomes, was that she had "major water damage" at her house, for which her insurance had not yet paid her.  *Id.*  Coomes also indicated that she was going to make "a loan application at two banks" the following day.  *Id.* She stated that if she was unable to obtain a loan, she would provide Anthem "with 2 letters from two banks to that effect by Friday of this week."  *Id.*

In September 2011, Anthem made a regulatory complaint with the Virginia State Corporation Commission, Bureau of Insurance ("Virginia Bureau"), pertaining to Coomes's alleged mishandling of the two checks.  *See* ECF 74-8 at 40, ¶ 4.  The complaint prompted the

6

Virginia Bureau to investigate the incident. *Id.* at 34; ECF 35, ¶ 11. According to Coomes, Anthem's regulatory complaint was "false, defamatory and malicious" and had "absolutely no basis in fact." ECF 74-7 at 48 (Letter from Coomes to MIA, 12/4/13); *see also* ECF 74-8 at 41, ¶ 4 ("Anthem . . . contacted the Bureau and falsely accused me of fraud and conversion for allegedly forging an endorsement, allegedly cashing two commission checks that Anthem had sent directly to me, and allegedly spending the money on my house.").

On February 22, 2012, Anthem received two checks from Coomes that totaled $15,740.06. *See* ECF 74-8 at 4. And, on March 21, 2012, Anthem received another check from Coomes in the amount of $2,517.00. *Id.*

Through Johnson, Anthem sent a letter to Coomes on July 11, 2012. ECF 74-7 at 54. It stated, in part, *id.*: "We previously sent you email's [sic] requesting payment of the outstanding balance due of $20,273.80. Our records reflect the balance has not been paid in full. There is still a balance due in the amount of $995.29."[6] Further, the letter warned that if payment was not received within fifteen business days, the account "may be placed with a collection agency." *Id.*

On December 10, 2012, members of the Virginia Bureau met with Coomes, who was represented by counsel. ECF 74-9 at 33 (Affidavit of Raymond Anderson, Principal Insurance Market Examiner of the Virginia Bureau). At the conclusion of the meeting, the parties agreed that Coomes would be allowed to surrender her insurance producer license voluntarily for a period of one year, in lieu of a hearing before the Virginia Bureau. *Id.*

---

[6] The two checks that Anthem erroneously sent to Coomes totaled $20,273.80. ECF 74-7 at 54, 55. Coomes repaid $15,740.06 in February 2012, and an additional $2,517.00 in March 2012. *See* ECF 74-8 at 4. Thus, a balance of $2,016.74 remained after the payment in March 2012. Yet, Anthem only demanded repayment of "$995.29." ECF 74-7 at 54 (Johnson email to Coomes, 7/11/12). As far as I can determine, the record does not contain an explanation for the discrepancy.

That same day, Coomes signed a document titled "Voluntary Surrender of Insurance Agent or Consultant License Authority" ("Voluntary Surrender Agreement" or "VSA").  ECF 74-9 at 32. The VSA states, in pertinent part, *id.*:

> I, Elizabeth H. Coomes in lieu of a hearing before the State Corporation Commission, which I understand may result in revocation or suspension of my license authority as an insurance agent or consultant, as well as possible monetary penalty, do hereby voluntarily surrender all authority held by me to conduct the business of insurance or insurance consulting in the Commonwealth of Virginia. . . .

> I have been advised of my right to a hearing before the State Corporation Commission, my right to notice and my right to an opportunity to be heard with regard to any disciplinary action taken by the Commission, pursuant to §§ 38.2-1832 and 38.2-1844, as applicable, of the Code of Virginia, as amended.  After reviewing these laws, copies of which have been given to me, I voluntarily waive these rights.

> In consideration of the Commission's acceptance of this voluntary surrender of my license authority in lieu of a hearing before the Commission at this time, I agree that I will not make application to transact the business of insurance in Virginia for a period of one year from this date, and not until I have resolved all of my financial obligations resulting from my insurance activities.

> I understand that in the event that I choose to re-apply for license authority after the expiration of the one-year period, the Commission reserves the right to re-open the matters giving rise to this voluntary surrender, or any other matters relevant to my activities as an insurance agent or consultant, and to require that any and all such matters be resolved to the Commission's satisfaction before any consideration will be given to my license application.  I also understand that the Commission has in no manner promised or undertaken to issue any such licenses to me at the expiration of the one-year period.

> I understand that notification of this matter, which may include personal information about me including, but not limited to my name, residence address, social security number (subject to state or federal limitations), date of birth, license and appointment status, and investigation or disciplinary action summary data, may be reported to the National Association of Insurance Commissioners and to other state insurance regulatory authorities or other interested parties. . . .

Coomes's voluntary surrender was "final on December 10, 2012," the day that she executed the VSA. ECF 74-9 at 33 (Anderson Affidavit, 4/28/14).[7] But, it was "effective on April 1, 2013." *Id.*[8] "Acceptance of Coomes's Voluntary Surrender was the final act involved in the [Virginia] Bureau's administrative action against Coomes." *Id.* Plaintiff states, ECF 74-8 at 45, ¶ 18: "I understood that a voluntary surrender would not be a 'black mark' (adverse administrative action) on my record, which, along with my serious health problems, is why I ultimately decided to take that course of action."

In March 2013, Coomes sent a letter to the MIA in which she requested that her Maryland license be changed from nonresident producer to resident producer. ECF 35, ¶ 15. She provided her Maryland producer number, as well as updated business and residence addresses. ECF 74-10 at 7. Coomes also stated, *id.*: "I have notified the Virginia Insurance Bureau of my address change and have requested a voluntary surrender of my Virginia resident license. Please update my Maryland license status from non-resident producer to resident producer effective March 28, 2013."

On May 2, 2013, the MIA received notice from the National Association of Insurance Commissioners ("NAIC") Regulatory Information Retrieval System ("RIRS"), advising that Coomes voluntarily surrendered her Virginia license, effective April 1, 2013. ECF 74-9 at 48; *see* ECF 74-9 at 39–40 (Affidavit of Lawrence Jeffrey Gross, MIA Enforcement Officer for the

---

[7] At some point in 2012, the Virginia Bureau prepared a show cause order, alleging that plaintiff violated several different Virginia insurance laws. ECF 74-9 at 23–31. But, the Virginia Bureau apparently "did not need to file the document because [Coomes] entered the VSA." *Id.* at 10 n.2. Coomes avers that she was never provided with a copy of the show cause order until the proceeding before the MIA. ECF 74-8 at 48, ¶ 23.

[8] In his Affidavit of April 28, 2014, Raymond Anderson, of the Virginia Bureau, stated, ECF 74-9 at 33: "The Bureau accepted Coomes's Voluntary Surrender, which originally had an effective date of March 11, 2013. The Bureau later delayed the effective date of the Voluntary Surrender to April 1, 2013 after Coomes requested additional time."

Compliance and Enforcement Unit, 4/30/14), ¶¶ 4, 5.  The RIRS notice said, *id.* at 48: "DEMONSTRATED LACK OF FITNESS OR TRUSTWORTHINESS FIDUCIARY VIOLATION IMPROP. W/HOLDING; MISAPPROPR. OR CONVERT. MONEY."  And, on May 2, 2013, the NAIC webpage indicated the same disposition for the same reasons.  *Id.* at 49.

The MIA sent an order to Coomes on May 13, 2013, titled "Order to Appear and Produce." *Id.* at 41 (emphasis omitted).[9]  It directed Coomes to "appear before the Maryland Insurance Commissioner . . . on May 31, 2013 . . . and, to bring . . . a copy of all records associated with the surrender of your Virginias [sic] producer license, and documentation to establish your place of residence."  *Id.*  Further, the Order to Appear and Produce advised, *id.*: "Failure to appear or comply with any portion of this Order, will be considered a violation of this Order and a violation of the Insurance Article, Annotated Code of Maryland and may subject you to administrative action."  However, the record does not reflect that Coomes appeared on May 31, 2013.  *See* ECF 74-6 at 23, ¶¶ 28–29; ECF 74-8 at 47, ¶ 22; ECF 74-9 at 39–40, ¶¶ 10–11, ECF 74-9 at 42–45; ECF 74-10 at 54.

Coomes met with Lawrence Gross and Anthony Rinuado, Enforcement Officers for the Compliance and Enforcement Unit of the MIA, on August 13, 2013.  ECF 74-8 at 47, ¶ 22; ECF 74-9 at 39, ¶ 11.  Coomes avers that she produced the Voluntary Surrender Agreement at that time and also brought "a stack approximately 10 inches high of all documents that could possibly be relevant."  ECF 74-8 at 47, ¶ 22; *see also* ECF 74-10 at 54.  According to Gross, however,  Coomes "did not provide a copy of the VSA."  ECF 74-9 at 39, ¶ 10.  Gross also avers that Coomes admitted

---

[9] The number of filings before the MIA is voluminous.  I limit my focus to those filings that are pertinent here.

that she voluntarily surrendered her Virginia license and failed to notify the Commissioner or provide a copy of the VSA.  *Id.*

On November 25, 2013, the Commissioner issued an order revoking Coomes's Maryland insurance producer's license and levying a $500 administrative penalty against her.  ECF 74-8 at 37.  The Commissioner found that Coomes violated I.A. §§ 10-126(a)(13) and (f), because she did not report to the MIA the "adverse administrative action" taken against her in Virginia.  *See id.* at 34–36.  As noted, I.A. § 10-126(a)(13) provides the Commissioner with the authority to revoke an insurance producer's license if that producer has "shown a lack of trustworthiness or competence to act as an insurance producer[.]"  And, § 10-126(f) requires an insurance producer to report any "adverse administrative action . . . ."  The order also advised Coomes that she had the right to request a hearing.  *Id.* at 37.

Coomes maintained that she did not owe Anthem the outstanding balance, totaling approximately $1,000.  In a letter from Coomes to the MIA of December 4, 2013, Coomes claimed that Anthem owed her approximately $2,000 for unrelated "advertising co-op funds."  ECF 74-7 at 48.  Plaintiff viewed "these two monetary issues as intertwined" and believed that Anthem "intended to stiff" her of "the advertising funds [for which] they had committed to reimburse" her.  *Id.*  She also stated that "some of the funds were used by [Coomes's] business for ordinary business expenses."  *Id.*  Further, Coomes advised the MIA, *id.* at 49: "Let me be very clear, I will not pay Anthem $900 because I do not owe them it.  It is well documented that Anthem owed me those funds."[10]  As far as the record reflects, Coomes never paid that money to Anthem.

In addition, Coomes said, *id.* at 48:

---

[10] Internal correspondence between Anthem employees suggests that, according to Anthem, Coomes was only owed $150, and that the amount had been paid.  ECF 74-8 at 3 (email from Johnson to William Lisanty).

. . . Anthem falsely accused me of fraud and conversion.  Anthem alleged that I cashed two commission checks they sent to me in error, even though neither check was cashed.  Anthem accused me of forging an endorsement, even though neither check was endorsed.  Anthem also falsely alleged that I deposited these checks into my personal checking account and Anthem falsely alleged that I converted these funds to my personal use and spent the funds on my house.  In fact, the commission checks in question were deposited into the agency operating/checking account because they were assumed to be intended for the agency and some of the funds were used by the business for ordinary business expenses.

Coomes requested a hearing.  ECF 35, ¶ 18.  The matter was assigned to Michelle Oshman, Associate Deputy Commissioner of the MIA.  *See* ECF 74-4 at 7; *see also* I.A. § 2-210(d).

On April 30, 2014, the MIA filed a motion for summary decision, pursuant to COMAR § 31.02.01.07(G).  ECF 74-9 at 7, 8.  Then, on May 8, 2014, Ioannis Laskaris, counsel for the MIA, sent an email to Coomes.  ECF 74-5 at 7–8.  Laskaris said, in part, *id.* at 8 (emphasis added):

If, through a consent order, you consent to voluntarily surrender your license by May 15, 2014 and agree to not apply or reapply for a license issued by the [MIA] for a period of 2 years, the [MIA] will rescind the November 25, 2013 Order that was issued against you and enter the consent order with no findings of fact and no violations.  *A surrender of your license does not constitute an adverse administrative action by the Commissioner*.

Coomes, through counsel, filed an opposition to the summary decision motion on June 30, 2014 (ECF 74-8 at 14–25), with exhibits, including her Affidavit (ECF 74-8 at 40–49).  She averred, in part, *id.* at 41, ¶ 6: "The checks were used to pay business expenses of the agency, including *inter alia* pre-pay $3,600 for a 3 year tail policy for a retiring agent, payoff the retiring agent's $3,000 bank loan,[11] pre-pay $1,500 on an agency bank loan I inherited from the previous agency owner, pre-pay auto insurance premiums for the year, upgrade the agency's computers, particularly with regard to security and privacy, etc."  In addition, Coomes averred that Gross and

---

[11] At the hearing before the Commissioner, the MIA disputed that payment of a retiring agent's $3,000 bank loan constituted an "ordinary business expense."  ECF 74-4 at 29.

Rinaudo of the MIA told her at a meeting on August 13, 2013, "that Maryland does not consider a voluntary surrender to be an adverse administrative action." *Id.* at 47–48, ¶ 22.

The Commissioner issued an amended order on June 30, 2014, which added facts and additional violations. ECF 74-5 at 55–56; ECF 74-6 at 1–2; ECF 35, ¶ 16. In addition to the violations of I.A. §§ 10-126(a)(13) and (f), stemming from Coomes's failure to report the Virginia action, the Commissioner found that Coomes violated I.A. §§ 10-126(a)(1), (6), and (12), based on the mishandling of the Anthem checks. ECF 74-6 at 1. As discussed, those subsections provide that the Commissioner may revoke an insurance producer's license if he or she willfully violates the Insurance Article, I.A. § 10-126(a)(1); commits "fraudulent or dishonest practices in the insurance business," I.A. § 10-126(a)(6); or fails or refuses to pay on demand money that belongs to another person, I.A. § 10-126(a)(12). The Commissioner concluded, ECF 74-6 at 2: "In view of the gravity of the violations and considering that insurance producers are in a position of trust and responsibility, revocation is the appropriate disciplinary action in this case." Coomes was also ordered to pay an administrative penalty of $1,250. *Id.*

On September 18, 2014, in light of the amended order, the MIA filed a supplement to its motion for summary decision. ECF 74-7 at 39–46. It does not appear that Coomes responded. *See* ECF 74-4 at 8, 18, 27; ECF 74-6 at 24, ¶ 35.

In the meantime, on July 25, 2014, the MIA sent Coomes a letter advising her that a hearing was scheduled for November 5, 2014. ECF 74-8 at 5. A "notice of hearing" was appended. *Id.* at 7. The notice advised Coomes that she had "the right to call witnesses and present documents and other evidence," as specified in S.G. § 10–213(f). *Id.*

The hearing on the MIA's motion for summary decision was held on November 5, 2014. ECF 74-4 at 6–55 (hearing transcript). Coomes testified at the hearing. She stated that she had

been a licensed insurance producer for over ten years and had never before been the subject of an order of violation of any insurance administration. *Id.* at 19.

Further, Coomes testified that both of the checks that Anthem mistakenly sent to her were deposited in her agency's bank account, not her personal account. *Id.* She acknowledged that she "may have" deposited one of the checks. *Id.* at 20. However, Coomes claimed that she did not realize that the checks were not payable to her or her agency. *Id.* at 21. She explained that it was not unusual for her company to receive substantial sums of money from Anthem. *Id.* at 20. And, she claimed that she only used the money to pay "ordinary business expenses." *Id.* at 21; *see also id.* at 22.

Plaintiff acknowledged that it took her "[a]pproximately six months" to repay Anthem. *Id.* at 21. But, she testified that she did everything she could to repay the money as soon as possible, *id.* at 22, including taking out a loan. *Id.* at 20. She claimed that, after discovering the issue, she indicated to Anthem that she could repay between $6,000–$10,000 immediately, and Anthem could then withhold the outstanding balance from her "next two commission checks." *Id.* But, Anthem "wanted the payment in one lump sum and immediately." *Id.* Coomes explained that this "wasn't possible." *Id.* She also testified that when her husband mistakenly received money from Anthem, the company agreed to accept repayment from him over a six month period. *Id.* at 21.

Moreover, plaintiff testified that in September 2011 she had a discussion with Lovely Johnson of Anthem and Johnson's supervisor, and that they reached the following agreement: "The agreement was that I would take the cash on hand," between $6,000–$10,000, "and apply for a small loan to supplement the difference and I would give [Anthem] one lump sum payment at that time." *Id.* at 20. Therefore, Coomes was "very surprised" when Anthem made the regulatory complaint with the Virginia Bureau, "because this would have been resolved very shortly had . . .

14

everything come to pass as we had planned." *Id.* Coomes attributed Anthem's change of heart and regulatory complaint to a mistaken belief that she "had spent the money on [her] house and put it in [her] personal bank account." *Id.* at 21.

Plaintiff maintained that she did not know that she had to report the VSA to the MIA. *Id.* at 23. She claimed that the Virginia Bureau told her that the VSA did not constitute an adverse administrative action. *Id.*

Shortly before closing arguments, Coomes discharged her attorney. *Id.* at 26. She made her own closing argument and raised, for the first time, a double jeopardy argument. *See id.* at 26–29.[12]

On December 5, 2014, the MIA sent Coomes a letter (ECF 74-6 at 43) with an enclosed "Memorandum and Final Order." ECF 74-6 at 44 through ECF 74-7 at 9. Then, on December 9, 2014, the MIA sent another letter to plaintiff (ECF 74-6 at 13), along with a "Memorandum and Revised Final Order." *Id.* at 14–34 ("Summary Disposition Order").[13] The Summary Disposition

___

[12] Coomes also submitted supplemental authorities to Commissioner Oshman in support of her double jeopardy argument. ECF 74-7 at 10–12, 16–21.

[13] As noted, COMAR § 31.02.01.07(G) is titled "Motion for Summary **Decision**." (Emphasis added). And, the MIA titled its dispositive motion as "Maryland Insurance Administration's Motion For Summary **Decision**." ECF 74-9 at 8 (emphasis added).

However, the relevant statute uses the term "summary **disposition**." *See* S.G. § 10-210 (stating that a contested case may be disposed of, *inter alia*, by "summary **disposition**.") (emphasis added). The case law generally refers to "**disposition**." *See, e.g.*, *Webb v. Giant of Maryland, LLC*, 477 Md. 121, 135, 266 A.2d 339, 347 (2021) ("It is well-settled that the propriety of granting a motion for summary disposition is a legal question which we review *de novo*."); *Brawner Builders, Inc.*, 476 Md. at 42, 258 A.3d at 233 (stating that "it is often inappropriate to grant summary disposition where there are factual issues related to knowledge, motive, or intent because such issues may require 'greater than usual factual development[.]'") (citation omitted); *id.* at 31, 258 A.3d at 226 ("The legal standard for granting summary disposition is the same as that for granting summary judgment under Maryland Rule 2-501(a)."); *Hicks v. The Royer House, LLC*, 2022 WL 304911, at *4 (Md. Ct. Spec. App. Feb. 1, 2022) (referring to "summary disposition" as "the administrative equivalent of summary judgment in judicial proceedings.").

Order, signed by Commissioner Oshman, granted the MIA's motion for "summary disposition" (*id.* at 14) and affirmed the MIA's Amended Order (*id.* at 1–2), revoking Coomes's license and assessing a $1,250.00 administrative penalty. *Id.* at 14. The letter also advised Coomes of her right to judicial review in the circuit court. *Id.* at 13.

In the Summary Disposition Order, the Commissioner said, *id.* at 34: "A review of the undisputed facts here, established in large part by [Coomes's] own words via her Affidavit, testimony and correspondence show that [Coomes] violated several subsections of [I.A.] § 10-126, and that the MIA was warranted in revoking Respondent's license and assessing an administrative penalty." Further, the Commissioner stated, ECF 74-6 at 26: "There is no genuine dispute as to the material facts relating to whether [Coomes] failed to report the Virginia Bureau action to the Commissioner as required by § 10-126(f). Ms. Coomes did not report that matter to the Commissioner within 30 days of entering into the agreement in December 2012 or even within 30 days of the agreement's April 1, 2013 extended effective date."

In addition, the Commissioner said, *id.*: "[T]he question is whether the Virginia action was an adverse administrative action such that [Coomes] had an obligation to comply with § 10-126(f),

---

[FN 13 cont'd]

Moreover, the Commissioner utilized the term "summary **disposition**." *See*, *e.g.*, ECF 74-6 at 33 n.2 ("Even if there are genuine issues of material facts related to the violation of §§ 10-126(a)(1), (6), and (12), the revocation and administrative penalty are supported by Respondent's violation of §§ 10-126(a)(13) and 10-126(a)(13) [sic], and the MIA is still entitled to summary **disposition** in this matter.") (emphasis added). Similarly, the CSA referred to the motion as one for "summary **disposition**." *See Coomes*, 232 Md. App. at 307, 157 A.3d at 377 ("There were no material facts in dispute regarding the Commissioner's findings that Coomes violated I.A. §§ 10-126(a)(13) and (f), and the MIA was entitled to summary **disposition** as a matter of law.") (emphasis added).

The terms appear interchangeable. And, I have used them interchangeably in the Memorandum Opinion.

16

which is a question of law." In the Commissioner's view, the Voluntary Surrender Agreement qualified as an "adverse administrative action," for several reasons.

First, the Commissioner said, ECF 74-6 at 28: "Applying the ordinary, popular understanding of the English language word 'adverse,' [Coomes] giving up her producer license, a key requirement in her employment, for a year was adverse to her interests . . . ." Second, the Commissioner rejected Coomes's argument that the term "action" is "limited only to instances where administrative proceedings have taken place." *Id.* at 27. The Commissioner reasoned, *id.*: "If licensees were required to report only final dispositions of formal administrative charges, rather than any action taken by a regulator that was adverse to the licensee, the Legislature could have written § 10-126(f) that way, but it did not." Third, the Commissioner determined that "the reporting of a 'final disposition' is also required where an adverse action is initiated by a regulator and the final disposition involves . . . settlement of the matter without admission by the licensee." *Id.* Fourth, the Commissioner determined that the VSA was a "contractual agreement" that qualified as a "relevant legal document" for purposes of I.A. § 10-126(f). *Id.* at 28. The Commissioner explained, *id.*: "On a practical note, under [Coomes's] theory, a producer with a Maryland license could always avoid regulatory oversight in Maryland for improper activities done in every other state by voluntarily giving up her license in that other state. Certainly, the Maryland insurance regulatory framework does not envision such an outcome."

In addition, the Commissioner rejected Coomes's argument that her letter of March 27, 2013, to the MIA constituted notice to the MIA of the Virginia action. *Id.* at 29. The Commissioner said, *id.*: "The information regarding the voluntary surrender of Ms. Coomes' Virginia license was tucked in the middle of a letter which updated her business address, asked that her residence address be updated and asked that her Maryland license status be updated from

non-resident producer to resident producer.  A reader of the letter could conclude that Ms. Coomes merely surrendered the Virginia license because she had moved her residence to Maryland."  The Commissioner continued, *id.*: Coomes's "letter did not include any mention that the surrender resolved a disputed matter with the Virginia Bureau resulting from an investigation including allegations of mishandling of an insurer's money or fraud.  In the letter, [Coomes] did not reveal provide [sic] any details about the investigation by the Virginia Bureau, the checks that were sent in error by Anthem or her failure to refund the money she had received in error on demand."  According to the Commissioner, Coomes's "letter looks like an attempt by [Coomes] to downplay the information about the Virginia Bureau action and to shift the burden onto the MIA to uncover facts that related to the surrender, which is what ultimately happened."  *Id.* at 29–30.

Moreover, the Commissioner determined, *id.* at 30: "[Coomes] failed to provide the MIA with a copy of the Voluntary Surrender Agreement in response to the Order to Appear and Produce and therefore specifically did not comply with the requirement of providing the required relevant legal document under [I.A.] § 10-126(f) even when specifically asked for the documents."

The Commissioner also found that Coomes violated I.A. § 10-126(a)(13), which permits license revocation if a licensee has shown a lack of trustworthiness or competence to act as an insurance producer.  *Id.* at 30.  The Commissioner reasoned that Coomes's "failure to report the Virginia Bureau matter to the Commissioner in violation of [I.A.] § 10-126(f) and her attempt to downplay the Virginia action by disclosing the surrender of her Virginia license in the middle of an otherwise unrelated letter show a lack of trustworthiness to act as an insurance producer, or at least a lack of competence."  *Id.* at 30–31.  And, in the Commissioner's view, Coomes's "failure or refusal to provide a copy of the Voluntary Surrender Agreement when asked by the MIA for

documents related to the Virginia action also shows untrustworthiness or incompetence." *Id.* at 31.

Further, the Commissioner concluded that the MIA was entitled to summary disposition as to Coomes's violations of I.A. §§ 10-126(a)(1), (6), and (12), which pertained to the mishandling of the Anthem checks. *Id.* The Commissioner acknowledged that Coomes offered "justifications for her actions" (*id.*), but concluded that the "underlying material facts" were not in dispute. *Id.* at 31–32. As the Commissioner put it, *id.* at 32 (internal citations omitted):

> Ms. Coomes' own words in her Affidavit, testimony and correspondence show that the money belonged to EBCA and/or Anthem and not to Ms. Coomes or her agency. She further concedes that Anthem demanded the immediate payment of the money and that she failed to pay the money back on demand. In fact, she admits that she withheld $2000, contending that Anthem otherwise owed her that amount, and averred to the MIA that she will never pay Anthem $900 that it seeks from her.

The Commissioner added: "Even after acknowledging that the funds rightfully belonged to Anthem, Ms. Coomes purposefully kept some of it because she felt that Anthem owed it to her for an unrelated reason." *Id.*

The Commissioner also rejected Coomes's double jeopardy contention. She reasoned that double jeopardy protections guarantee that a "**criminal** defendant will be not subjected to a second trial," and that the violations at issue involved Coomes's failure to comply with Maryland insurance law, and not Virginia's insurance laws. *Id.* at 33 (emphasis in original).

Coomes filed several motions for reconsideration. ECF 74-5 at 26–28; *id.* at 33–34. The MIA filed an opposition. *Id.* at 44–48. The Commissioner denied the motions. ECF 74-4 at 51–52.

Thereafter, on January 7, 2015, Coomes filed a petition for judicial review in the Circuit Court for Baltimore City. ECF 74-10 at 25–26 (petition). On or about May 27, 2015, Coomes

retained Mr. Moran and the Firm to represent her.   ECF 35, ¶ 23.   Plaintiff "executed an engagement agreement and paid a retainer."  *Id.* ¶ 24.

Moran submitted a brief to the circuit court.  *Id.* ¶ 25.[14]  And, Mr. Moran also filed a "motion for leave to offer additional evidence," pursuant to S.G. § 10–222(f).  ECF 74-10 at 58–61 ("Additional Evidence Motion").  S.G. § 10-222(f) provides a circuit court with discretion to remand an administrative appeal to the agency to consider additional evidence if the evidence is "material" and there were "good reasons" for the failure to have previously presented the evidence to the agency.

The Additional Evidence Motion sought to remand the case to the Commissioner, ECF 74-10 at 59, ¶ 3, so that the Commissioner could consider the Affidavit of Caren Taylor Pressley Brown, an insurance producer formerly licensed in Virginia.  *Id.* at 63–66 ("Brown Affidavit"). The Brown Affidavit, attached as an exhibit to the Additional Evidence Motion, is supported by several exhibits.  *See id.* at 67–71.  These include: (1) a Virginia Bureau voluntary surrender agreement executed by Brown (*id.* at 67–68); and (2) Brown's National Insurance Producer Registry ("NIPR") report.  *Id.* at 69–71.

Brown avers that in 2008 she "was arrested and charged with two counts of felony Attempted Capital Murder: Killing for Hire . . . ."  *Id.* at 64, ¶ 7.  While Brown was incarcerated, Brown signed a voluntary surrender agreement.  *Id.* ¶¶ 11–12; *see id.* at 67.  It is almost identical to the one executed by Coomes.  Brown avers that the Virginia Bureau did not "take administrative action against" her.  *Id.* at 65, ¶ 14.  Further, Brown states that she spoke to a representative of the NIPR, and he indicated to her that "there were no adverse administrative actions on [her] record." *Id.* at 65, ¶ 16; *see also id.* at 69–71 (NIPR report).

---

[14] The brief was not submitted as an exhibit.

The Additional Evidence Motion also explains that the Brown Affidavit was not submitted during the administrative proceedings because of Brown's incarceration, "which ended well after the conclusion of the administrative proceedings." *Id.* at 59, ¶ 8. And, according to Coomes, if Brown's voluntary surrender agreement was not considered an "adverse administrative action," as exemplified by the NIPR representative's statement to that effect and the lack of an adverse administrative action on the NAIC database, then the same should apply to Coomes. *Id.* at 59, ¶ 6. Therefore, Coomes argued that the Brown Affidavit is "probative and material upon the contested issue" of whether her Voluntary Surrender Agreement constituted an adverse administrative action. *Id.* at 59, ¶ 7.

On November 9, 2015, Mr. Moran "appeared on behalf of Ms. Coomes for oral arguments" in the circuit court. ECF 35, ¶ 26; *see* ECF 74-10 at 28, 30 (hearing transcript excerpt). On November 10, 2015, the Circuit Court for Baltimore City (Geller, J.) affirmed, "for the reasons set forth on the record in open court . . . ." ECF 74-10 at 57 (order); *see* ECF 74-10 at 27–56 (hearing transcript); ECF 74-13 at 25–31 (remainder of the hearing transcript).

The court concluded that the Commissioner properly determined that the VSA was an adverse administrative action that Coomes was required to report to the MIA, pursuant to I.A. § 10-126(f). ECF 74-13 at 27. The court also determined that there was substantial evidence to support the Commissioner's conclusion that Coomes violated I.A. § 10-126(a)(13), because her letter to the MIA notifying the MIA of her address change was "an attempt to pull the wool over the eyes of the [MIA] by sidestepping the issue of what happened in Virginia." *Id.* at 29. Based on those same facts, the court concluded that there was substantial evidence that Coomes willfully violated the Insurance Article, in violation of I.A. § 10-126(a)(1). *Id.* at 29–30. The circuit court also found that the Commissioner's decision as to I.A. § 10-126(a)(6), which concerns fraudulent

or dishonest practices, was supported by substantial evidence. *Id.* at 30. In particular, the court found that "a reasonable person could conclude based on the withholding of the funds belonging to EBCA or Anthem" that Coomes violated I.A. § 10-126(a)(6). *Id.* In addition, the court found that the violation of I.A. § 10-126(a)(12), concerning the failure to repay Anthem on demand, was "on its face . . . established by the facts." *Id.* And, the circuit court rejected Coomes's Double Jeopardy defense, because the proceedings before the MIA were civil in nature. *Id.* at 26–27.

With respect to the Additional Evidence Motion, the court assumed, *arguendo*, that Coomes had a valid reason for not submitting the Brown Affidavit during the administrative proceedings. ECF 74-10 at 36. Nevertheless, the court denied the Additional Evidence Motion on the ground that the Brown Affidavit was "not material." *Id.*

Coomes, through counsel, noted an appeal to the Maryland Court of Special Appeals ("CSA"), now the Appellate Court of Maryland ("ACM"). ECF 35, ¶ 28. Moran raised the following issues, ECF 74-3 at 6-7; *see also* ECF 35, ¶ 30:

1. Did the Hearing Officer commit reversible error when she failed to rule upon Appellant's objections to jurisdiction and exercised jurisdiction over the Virginia matter?

2. Did the Hearing Officer violate petitioner's procedural rights and thus commit reversible error when she granted the Agency's Motion for Summary Disposition and summarily affirmed the Agency's Amended Order summarily revoking Petitioner's Maryland producer license, finding that Petitioner had committed fraud or other dishonest conduct, where the Commissioner made that finding without the benefit of an evidentiary hearing to determine whether Petitioner had the requisite intent to commit the fraud or dishonest conduct alleged by the Administration?

3. Did the Hearing Officer commit reversible error when she found in a case of first impression, without citation of authority, that Petitioner's voluntary surrender of her Virginia producer's license was an "adverse administrative action," despite the fact that the voluntary surrender was not the result of any formal or informal, final Virginia administrative agency proceeding that

included fact finding or resolution of disputed facts, administrative charges, any action, admissions of guilt, findings of fact, conclusions of law or Order?

4.  Did the Hearing Officer commit reversible error when she declined to apply the law of Double Jeopardy, the doctrine of Merger or the Rule of Lenity to the Administrative Proceeding?

5.  Did the Circuit Court err when it denied the Appellant's Motion for Leave to Offer Additional Evidence?

Mr. Moran appeared for oral argument on January 6, 2017.  ECF 35, ¶ 31.  On March 30, 2017, in a reported opinion authored by Judge Stuart Berger, the CSA affirmed.  *See Coomes v. Maryland Insurance Administration*, 232 Md. App. 285, 157 A.3d 364 (2017).

The CSA framed the issues as follows, *id.* at 291, 157 A.3d at 367–68:

1.  Whether the Commissioner erred as a matter of law by finding that Coomes's voluntary surrender of her Virginia insurance producer's license was an "adverse administrative action" requiring her to report it to the Maryland Insurance Administration.

2.  Whether there is substantial evidence in the record to support the Commissioner's conclusion as a matter of law that Coomes violated Md. Code (2002, 2011 Repl. Vol.), § 10-126(a)(1), (6), (12), (13), and (f) of the Insurance Article ("I.A.").

3.  Whether Double Jeopardy applies to shield Coomes from having her Maryland producer's license revoked after previously voluntarily surrendering her Virginia producer's license based on the same underlying set of facts.

4.  Whether the circuit court abused its discretion under Md. Code (1984, 2014 Repl. Vol., 2016 Supp.), § 10-222(f)(2) of the State Government Article ("S.G.") when it denied Coomes's motion to offer additional evidence on the basis that the evidence was not material.

The CSA concluded that the Commissioner "did not err" in "finding that Coomes's voluntary surrender of her producer's license was an 'Adverse Administrative Action'" under I.A. § 10-126(f), and that Coomes's failure to report it to the MIA and to provide the MIA with a copy of the VSA constituted a violation of I.A. §§ 10-126(a)(13) and (f).  *Id.* at 297, 157 A.3d at 371 (some capitalization and boldface removed); *see id.* at 298, 157 A.3d at 372.  Given that Coomes

had voluntarily waived the right to a hearing in Virginia, the CSA rejected Coomes's claim that there was no adverse administrative action merely because no evidentiary hearing had been held in Virginia. *Id.* at 299–302, 157 A.3d at 372–73.

As to the summary disposition granted by the Commissioner, the CSA stated, *id.* at 307, 157 A.3d at 377: "There were no material facts in dispute regarding the Commissioner's findings that Coomes violated I.A. §§ 10-126(a)(13) and (f), and the MIA was entitled to summary disposition as a matter of law." The CSA said, *id.* at 298, 157 A.3d at 372: "[S]ubstantial evidence of Coomes's actions leading to the Commissioner's finding that Coomes violated I.A. § 10-126(f) also supported the Commissioner's finding that Coomes had violated I.A. § 10-126(a)(13)—i.e., that Coomes 'otherwise show[ed] a lack of trustworthiness or competence to act as an insurance producer.'" (Quoting I.A. § 10-126(a)(13)) (alteration in *Coomes*). In addition, the court concluded that the Commissioner's finding that Coomes violated I.A. §§ 10-126(a)(1), (6), and (12) was supported by substantial evidence in the record. *Id.* at 307–08, 157 A.3d at 377. In particular, the CSA reasoned that I.A. §§ 10-126(a)(1), (6), and (12) were "implicated by the same set of facts," *i.e.*, "Coomes's handling of Anthem's checks," which she erroneously deposited into her Agency's account, her failure to return the proceeds "immediately," and "for which she ultimately surrendered her Virginia producer's license." *Id.* at 308, 157 A.3d at 377.

Further, the CSA opined that Coomes's "intent and subjective belief were immaterial" with respect to the violations of I.A. §§ 10-126(a)(13) and (f). *Id.* at 307, 157 A.3d at 377 (capitalization and boldface omitted). With respect to I.A. § 10-126(f), the court reasoned that the statute does not require the licensee to "hold the subjective belief that the action in another jurisdiction was 'adverse.'" *Id.* Moreover, the CSA stated that I.A. § 10-126(a)(12) "provides no exceptions for the license holder's state of mind, subjective belief, or for disputes over who is the rightful owner

of the money." *Id.* at 308, 157 A.3d at 378.  And, the court noted that the Commissioner found, among other things, that Coomes "'purposefully kept'" some of the money because she believed Anthem owed her money "'for an unrelated reason.'" *Id.* at 309, 157 A.3d at 378.

Moreover, the CSA concluded that the law of double jeopardy does not apply.  Therefore, "the MIA had the authority to revoke Coomes's ability to act as an insurance producer in the State of Maryland regardless of whether she had already experienced consequences from her earlier actions in Virginia.[]" *Id.* at 312, 157 A.3d at 380.  And, citing S.G. § 10-222(f), the CSA ruled that "the Circuit Court did not err" or abuse its discretion in denying Coomes's Additional Evidence Motion.  *Id.* at 313, 157 A.3d at 380 (capitalization omitted).

Thereafter, on or about May 15, 2017, Moran filed a Petition for Writ of Certiorari to the Maryland Court of Appeals.  ECF 53-1 at 2–14; ECF 35, ¶ 41.  The Petition contained the following questions, ECF 53-1 at 3 (alteration added):

1. Did the Hearing Officer violate Appellant's procedural rights and commit reversible error when she granted the Agency's Motion for Summary Disposition and summarily affirmed the Agency's Amended Order summarily revoking Petition's Maryland producer license, finding that Appellant had committed fraud or other dishonest conduct, where the Commissioner made that finding without the benefit of an evidentiary hearing to determine whether Appellant had the requisite intent to commit the fraud or dishonest conduct alleged by the Administration?

2. Did the Hearing Officer commit reversible error when she found in a case of first impression, without citation of authority, that Appellant's voluntary surrender of her Virginia producer's license was an "adverse administration action["]?

3. Did the Hearing Officer commit reversible error when she declined to apply the law of Double Jeopardy, the doctrine of Merger or the Rule of Lenity to the Administrative Proceeding?

4. Did the Circuit Court err when it denied the Appellant's Motion for Leave to Offer Additional Evidence?

By order of July 31, 2017, the COA granted certiorari. ECF 53-1 at 75. But, the order did not specify the particular question(s) for which certiorari was granted. *See id.* Accordingly, I shall assume that the COA granted certiorari as to all four questions posed in the petition. *Id.* at 3, 75.

Pursuant to the order, petitioner's brief was due on or before September 5, 2017. *Id.* at 75; *see also* ECF 35, ¶ 47. However, Mr. Moran was unable to prepare Coomes's appellate brief due to "other trial and appellate commitments . . . ." ECF 74-14 at 7, ¶ 2 (Second Consent Motion to Amend Briefing Schedule and Reschedule Oral Argument); *see also* ECF 35, ¶ 48. Therefore, he moved for an extension of time to file the brief, and the court extended the deadline to October 17, 2017. ECF 35, ¶¶ 49, 50.

On October 13, 2017, Mr. Moran filed a second motion for extension of time (ECF 74-14 at 7–11), which the COA granted by order of October 16, 2017. *Id.* at 15 (order). The court extended the filing date for Coomes's opening brief until February 20, 2018. *Id.* Mr. Moran filed a third motion for extension of time on February 19, 2018 (*id.* at 17–20), which the COA denied on February 20, 2018. ECF 35, ¶¶ 59, 60.

In the meantime, on or about October 17, 2017, Coomes filed a chapter 13 bankruptcy petition in the United States Bankruptcy Court for the Eastern District of Virginia. ECF 78 (Coomes Affidavit, 10/23/24), ¶ 6; ECF 35, ¶ 51. Coomes avers that defendants were her creditors, ECF 78, ¶ 8, and therefore defendants "were subject to the automatic stay of the United States Bankruptcy code." ECF 35, ¶ 55. But, Coomes did not list defendants as her creditors on her bankruptcy schedules. *See generally* ECF 74-15. Nor do defendants appear on Coomes's creditor matrix. *See* ECF 74-16.

According to Coomes, after she filed for bankruptcy on October 17, 2017, she advised Mr. Moran of the filing. ECF 77-2 at 1, ¶¶ 2, 3.[15] However, she does not specify the date on which she allegedly conveyed the information to Mr. Moran. But, Mr. Moran disputes that he was informed of the filing. He avers, ECF 74-17 (Mr. Moran Affidavit, 9/5/24), ¶ 4: "At no time prior to January 2018 did Ms. Coomes inform me that she had filed for bankruptcy." Further, Mr. Moran states that he "did not receive any notices, from either Ms. Coomes or the Bankruptcy Court, regarding Ms. Coomes' Chapter 13 Bankruptcy filing." *Id.* ¶ 5.

In the Amended Complaint, Coomes alleges that, as of October 11, 2017, she owed defendants a pre-bankruptcy-petition debt of $1,120.00. ECF 35, ¶ 56. Coomes asserts, ECF 78, ¶ 9: "Defendants refused to prepare and file the opening brief in my [COA] appeal unless and until I paid a modest balance due for pre-petition legal fees and also insisted I also replenish the $2,500 retainer as a condition to prepare and file the opening brief." Further, Coomes avers: "Not withstanding [sic] informing defendants I was in bankruptcy then and was unable to fully pay my debt to them and also replenish the retainer at that time, defendants refused to begin preparing my opening brief." *Id.* ¶ 11; *see also* ECF 77-2, ¶ 4 (stating that after Coomes advised Mr. Moran of the bankruptcy filing "Defendants continued his [sic] efforts to collect pre-petition fees that I owed to him and demanded that I also replenish the retainer as well as a condition to prepare and file my brief" with the COA). She adds, ECF 78, ¶ 12: "When I inquired again about the status of the opening brief, [Mr.] Moran emailed me an invoice for outstanding pre-petition legal fees, and wrote, 'This is what I have so far' (referring to the invoice)."[16] Coomes states that she "begged"

---

[15] The Affidavit submitted by Coomes contains several handwritten notations that are not legible. *See* ECF 77-2 at 2.

[16] Coomes has not submitted the email as an exhibit.

defendants to work with her and file the opening brief in the COA, but defendants refused "again and again." *Id.* ¶ 13; *see also id.* ¶¶ 16, 17, 19, 24, 28 30.  Further, she asserts, *id.* ¶ 28: "Defendants also refused to send me the Word document file of the brief they filed in MD intermediate appeals Court, so I was unable to recycle it and file the brief myself."

According to Coomes, Mr. Moran advised her sometime after October 16, 2017, that the bankruptcy filing "would stay the appeal."  ECF 77-2, ¶ 3.  Coomes also alleges that Mr. Moran advised her that (1) filing a brief was unnecessary "because the [COA] could rule on her case by reviewing what had already been filed with the" CSA; and (2) the COA "did not intend to dismiss her appeal because it had scheduled oral arguments."  ECF 35, ¶¶ 66, 67.

Mr. Moran did not file a brief by the deadline of February 20, 2018.  *Id.* ¶ 61; *see* ECF 74-14 at 15.  Then, on March 2, 2018, the MIA moved to dismiss Coomes's appeal for failure to file an opening brief.  ECF 74-14 at 24–26 (motion).  On March 7, 2018, Moran filed a response in opposition to the motion to dismiss.  ECF 35, ¶ 70.[17]  But, on March 8, 2018, the COA granted the MIA's motion and dismissed Coomes's "appeal with prejudice for failure to file the brief."  *Id.* ¶ 71; *see* also ECF 74-14 at 43.

Moran moved for reconsideration on March 16, 2018, arguing that Coomes's appeal was protected by the automatic bankruptcy stay.  ECF 74-14 at 27–28.  That same day, at the request of Coomes, Moran filed a "Motion to Withdraw."  *Id.* at 33–35.  The MIA opposed Coomes's motion for reconsideration.  *Id.* at 36–41.  On March 27, 2018, the COA granted Moran's motion to withdraw.  *Id.* at 42.  And, the COA also "issued an amended order of dismissal of Ms. Coomes's appeal for failure to timely file the brief."  ECF 35, ¶ 72.  On March 29, 2018, the COA denied the

---

[17] The brief has not been submitted as an exhibit.

motion for reconsideration and issued a "revised final order of dismissal" of Coomes's appeal. *Id.* ¶ 73. The mandate issued on April 9, 2018. *Id.* ¶ 74; *see* ECF 74-14 at 43–44.

On October 13, 2022, Coomes filed suit against Moran. ECF 1. Defendants moved to dismiss the Complaint, pursuant to Fed. R. Civ. P. 12(b)(5) and 4(m), as well as Local Rule 103.8, claiming plaintiff failed to serve defendants within the requisite 90 days. ECF 24. By Memorandum (ECF 27) and Order (ECF 28) of June 6, 2023, I denied the motion.

Then, on June 29, 2023, defendants moved to dismiss, pursuant to Fed. R. Civ. P. 12(b)(6), or in the alternative, for a more definite statement, pursuant to Fed. R. Civ. P. 12(e). ECF 32. Before responding to the motion, plaintiff filed the Amended Complaint. ECF 35.

On August 28, 2023, defendants moved to dismiss the Amended Complaint. ECF 40. Coomes opposed the motion (ECF 43) and defendants replied (ECF 46). By Memorandum (ECF 47) and Order (ECF 48) of January 9, 2024, I denied the motion to dismiss.

As indicated, the COA had granted certiorari but ultimately never considered the issues in the certiorari petition. This Court must now decide questions of Maryland law that the COA did not address. Therefore, after conferring with counsel (*see e.g.*, ECF 52, Memorandum to Counsel of 1/31/24; ECF 55, telephone conference on 2/27/24), I certified questions to the SCM.

Specifically, on May 15, 2024, pursuant to the Maryland Uniform Certification of Questions of Law Act, § 12-601 *et seq.* of the Courts and Judicial Proceedings Article of the Maryland Code (2020 Repl. Vol.), I certified the following questions to the SCM, ECF 58 at 1:

1. Did the Maryland Insurance Commissioner, the Circuit Court for Baltimore City, and the Court of Special Appeals err in concluding that Ms. Coomes's voluntary surrender of her Virginia producer's license, in lieu of an adversary hearing, constituted an adverse administrative action that Ms. Coomes was required to report to the Maryland Insurance Administration, pursuant to Maryland Code (2002, 2017 Repl. Vol.), § 10-126(f) of the Insurance Article ("I.A.")?

29

> 2. Does the record contain substantial evidence to support the conclusions of the Maryland Insurance Commissioner, the Circuit Court for Baltimore City, and the Court of Special Appeals that Ms. Coomes's conduct violated I.A. §§ 10-126(a)(1), (6), (12), and (13)?

On June 10, 2024, the SCM declined certification. ECF 62. No explanation was provided.

Thereafter, on September 5, 2024, defendants moved for summary judgment. ECF 74. As noted, Defendants' Motion is supported by sixteen exhibits. ECF 74-2 through ECF 74-17.[18] They include the record extract filed with the CSA (ECF 74-4 through ECF 74-10); the briefs filed by Coomes and the MIA in the CSA (ECF 74-3; ECF 74-11; ECF 74-12); a certification of authenticity as to the record extract and briefs filed in the CSA (ECF 74-2); a copy of the docket entries before the COA (ECF 74-13); a copy of the appeal docket from the COA (ECF 74-14); records from plaintiff's Chapter 13 Bankruptcy case (ECF 74-15; ECF 74-16); and an Affidavit of Mr. Moran (ECF 74-17).

As noted, Coomes opposes Defendants' Motion and has also moved for summary judgment as to Counts I and II (ECF 77). Coomes's Motion is supported by a memorandum (ECF 77-1) and two affidavits of Coomes: (1) an undated Affidavit (ECF 77-2); and (2) an Affidavit of October 23, 2024, filed under seal (ECF 78). In the Affidavit of October 23, 2024, Coomes addresses the damages she has allegedly suffered as a result of defendants' alleged violations of the automatic stay and failure to file an appellate brief in the COA. *See* ECF 78. Among other things, this includes "mental anguish and emotional distress"; physical harm, such as "heart palpitations", "chest pain", and "panic attacks"; "great difficulty and discrimination when trying to secure new employment"; the inability to "clear [her] name" and "recover [her] personal and professional reputation or recover [her] professional license"; "tuition and related expenses", as Coomes was

---

[18] It does not appear that either side has conducted any discovery.

forced to change careers; and being "shunned" or "canceled" by "personal friends and associates as well as former colleagues and professionals." *Id.* ¶¶ 14, 37, 44, 45, 46.

### III.  Standards of Review

### A.  Summary Judgment

As indicated, both sides have moved for summary judgment.  ECF 74 (defendants); ECF 77 (plaintiff).  Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *see also Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020); *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018); *Iraq Middle Mkt. Dev. Found v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017).  To avoid summary judgment, the nonmoving party must demonstrate that there is a genuine dispute of material fact so as to preclude the award of summary judgment as a matter of law.  *Ricci v. DeStefano*, 557 U.S. 557, 585–86 (2009); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986); *Gordon v. CIGNA Corp.*, 890 F.3d 463, 470 (4th Cir. 2018).

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion.  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Id.* at 248.

There is a genuine dispute as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*; *see CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647,

658 (4th Cir. 2020); *Variety Stores, Inc.*, 888 F.3d at 659; *Sharif v. United Airlines, Inc.*, 841 F.3d

199, 2014 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).  On

the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party

must prevail as a matter of law."  *Anderson*, 477 U.S. at 252; *see McAirlaids, Inc. v. Kimberly-

Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014).  But, "the mere existence of a scintilla of evidence

in support of the plaintiff's position will be insufficient; there must be evidence on which the jury

could reasonably find for the plaintiff."  *Anderson*, 477 U.S. at 252.  "When opposing parties tell

two different stories, one of which is blatantly contradicted by the record, so that no reasonable

jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a

motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Pursuant to Fed. R. Civ. P. 56(c)(1), where the moving party bears the burden of proof on

the issue at trial, he must support his factual assertions by "citing to particular parts of materials in

the record, including depositions, documents, electronically stored information, affidavits or

declarations, stipulations . . ., admissions, interrogatory answers, or other materials . . . ."  But,

where the nonmovant bears the burden of proof at trial, the moving party may show that he is

entitled to summary judgment by citing to evidence in the record, or "by 'showing'—that is,

pointing out to the district court—that there is an absence of evidence to support the nonmoving

party's case."  *Celotex Corp.*, 477 U.S. at 325; *see also* Fed. R. Civ. P. 56(c)(1)(B).

"A party opposing a properly supported motion for summary judgment 'may not rest upon

the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing

that there is a genuine issue for trial.'"  *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514,

522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004)

(alteration in *Bouchat*); *see Celotex*, 477 U.S. at 322–24.  And, the court must view all of the facts,

including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *Ricci*, 557 U.S. at 585–86; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *accord Brown v. Wal-Mart Stores E., LP*, ___ F.4th ___, 2025 WL 1571824, at *3 (4th Cir. June 4, 2025); *Knibbs v. Momphand*, 30 F.4th 200, 206 (4th Cir. 2022); *Walker v. Donahoe*, 3 F.4th 676, 682 (4th Cir. 2021); *Hannah P. v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019); *Variety Stores, Inc.*, 888 F.3d at 659; *Gordon*, 890 F.3d at 470; *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017).

But, the nonmovant "must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015) (internal quotation marks omitted). Rather, "there must be evidence on which the jury could reasonably find for the nonmovant." *Thompson v. Virginia*, 878 F.3d 89, 97 (4th Cir. 2017) (alteration and internal quotation marks omitted).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Brown v. Lott*, 2022 WL 2093849, at *1 (4th Cir. June 10, 2022) (per curiam); *Knibbs*, 30 F.4th at 207, 213; *Betton v. Belue*, 942 F.3d 184, 190 (4th Cir. 2019); *Wilson v. Prince George's Cty., Md.*, 893 F.3d 213, 218–19 (4th Cir. 2018); *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *In re French*, 499 F.3d 345, 352 (4th Cir. 2007). Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is not appropriate, because it is the function of the factfinder to resolve factual disputes, including matters of witness

credibility.  *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002).

Notably, "a party's 'self-serving opinion . . . cannot, absent objective corroboration, defeat summary judgment.'" *CTB, Inc.*, 954 F.3d at 658–59 (quoting *Williams v. Giant Food Inc.*, 370 F.3d 423, 433 (4th Cir. 2004)).  But, if testimony of a nonmovant is based on personal knowledge or firsthand experience, it can be evidence of disputed material facts, even if it is uncorroborated and self-serving.  *Lovett v. Cracker Barrel Old Country Store, Inc.*, 700 F. App'x 209, 212 (4th Cir. 2017).  Indeed, "'a great deal of perfectly admissible testimony fits'" the "'description'" of "'self-serving.'"  *Cowgill v. First Data Technologies, Inc.*, 41 F.4th 370, 383 (4th Cir. 2022) (citing *United States v. Skelena*, 692 F.3d 725, 733 (7th Cir. 2012)).

On the other hand, "[u]nsupported speculation is not sufficient to defeat a summary judgment motion."  *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987); *see also Reddy v. Buttar*, 38 F.4th 393, 403–04 (4th Cir. 2022); *CTB, Inc.*, 954 F.3d at 659; *Harris v. Home Sales Co.*, 499 F. App'x 285, 294 (4th Cir. 2012).  "[T]o avoid summary judgment, the non-moving party's evidence must be of sufficient quantity and quality as to establish a genuine issue of material fact for trial. Fanciful inferences and bald speculations of the sort no rational trier of fact would draw or engage in at trial need not be drawn or engaged in at summary judgment."  *Local Union 7107 v. Clinchfield Coal Co.*, 124 F.3d 639, 640 (4th Cir. 1997).

When, as here, the parties have filed cross motions for summary judgment, the court must "'consider each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law.'"  *Def. of Wildlife v. N.C. Dep't of Transp.*, 762 F.3d 374, 392 (4th Cir. 2014) (citation omitted); *see Belmora LLC v. Bayer Consumer Care AG*, 987 F.3d 284, 291 (4th Cir. 2021).  Simply because opposing parties have moved for summary judgment

does not mean that summary judgment to one side or the other is necessarily appropriate.  Indeed, "[b]oth motions must be denied if the court finds that there is a genuine dispute of material fact."  10A C. WRIGHT, A. MILLER, & M. KANE, FEDERAL PRACTICE & PROCEDURE § 2720 (4th ed. Suppl. 2022).  And, as noted, the court "'resolve[s] all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion.'"  *Defs. of Wildlife*, 762 F.3d at 393 (quoting *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003), *cert. denied*, 540 U.S. 822 (2003)); *see Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003).

## B.  Judicial Review of an Administrative Agency Decision

As I discuss, *infra*, based on the "trial-within-a trial doctrine," this Court, in effect, stands in the shoes of the Supreme Court of Maryland.  In turn, I employ the standards of review applicable under Maryland law.

S.G. § 10-222 provides for judicial review of an administrative agency's decision.  It states, in relevant part, S.G. § 10-222(h):

(h) In a proceeding under this section, the court may:

(1) remand the case for further proceedings;

(2) affirm the final decision; or

(3) reverse or modify the decision if any substantial right of the petitioner may have been prejudiced because a finding, conclusion, or decision:

(i) is unconstitutional;

(ii) exceeds the statutory authority or jurisdiction of the final decision maker;

(iii) results from an unlawful procedure;

(iv) is affected by any other error of law;

(v) is unsupported by competent, material, and substantial evidence in light of the entire record as submitted;

(vi) in a case involving termination of employment or employee discipline, fails to reasonably state the basis for the termination or the nature and extent of the penalty or sanction imposed by the agency; or

(vii) is arbitrary or capricious.

It is well settled in Maryland that an appellate court reviewing the decision of an administrative agency evaluates the decision of the agency, and not the lower court. *See, e.g.*, *Maryland Ins. Com'r v. Kaplan*, 434 Md. 280, 297, 75 A.3d 298, 308 (2013) (stating that, in the context of an administrative order subject to judicial review, "we directly evaluate the Commissioner's administrative determination, not the decision of the Circuit Court."); *Motor Vehicle Admin. v. Carpenter*, 424 Md. 401, 413, 36 A.3d 439, 446 (2012) (same); *Maryland Ins. Com'r v. Cent. Acceptance Corp.*, 424 Md. 1, 14, 33 A.3d 949, 957 (2011) (same). As to judicial review of an administrative agency's factual determinations, the substantial evidence standard applies. *Carpenter*, 424 Md. at 412–13; 36 A.3d at 446; *see also Kaplan*, 434 Md. at 298, 75 A.3d at 308 ("[T]he application of the correct legal standard to the facts of a particular case must be supported by substantial evidence—that is, we assess 'whether a reasoning mind reasonably could have reached the factual conclusion the agency reached.'"). But, as to questions of law, including matters of statutory interpretation, the standard of review is de novo. *See, e.g.*, *People's Ins. Couns. Div. v. Allstate Ins. Co.*, 424 Md. 443, 457, 36 A.3d 464, 472 (2012) ("[W]e 'are under no constraint to affirm an agency decision premised solely upon an erroneous conclusion of law.'") (citation omitted); *Cent. Acceptance Corp.*, 424 Md. at 16, 33 A.3d at 958 ("When considering a question of statutory interpretation by an agency, we review the agency's interpretation according to a non-deferential standard of review."); *see also Coomes*, 232 Md. App. at 296–97, 157 A.3d at 371 ("Notwithstanding 'some deference' to 'an agency's legal interpretation of the statute it

36

administers,' issues of statutory interpretation are legal issues for which the standard of review is *de novo*.") (citations omitted).[19]

As explained, S.G. § 10-210 provides for summary disposition and COMAR § 31.02.01.07(G) is titled "Motion for Summary Decision." The MIA moved for summary decision, and the Commissioner granted summary disposition. *See* ECF 74-9 at 7, 8; ECF 74-6 at 14. The decision that was subject to appellate review is an order of the MIA Commissioner granting summary disposition in the MIA's favor. The parties agree that the substantial evidence standard applies to questions of fact. ECF 74-1 at 12; ECF 77-1 at 7. And, that is also the standard of review that the CSA applied. *See generally Coomes*, 232 Md. App. at 285, 157 A.3d at 364.

A motion for summary disposition under S.G. § 10-210 and a motion for summary decision pursuant to COMAR § 31.02.01.07(G) are equivalent to a motion for summary judgment under Md. Rule 2-501. *See*, *e.g.*, *Brawner Builders, Inc.*, 476 Md. at 31, 258 A.3d at 226 ("The legal standard for granting summary disposition is the same as that for granting summary judgment under Maryland Rule 2-501(a)."); *Hicks v. The Royer House, LLC*, 2022 WL 304911, at *4 (Md. Ct. Spec. App. Feb. 1, 2022) (referring to "summary disposition" as "the administrative equivalent of summary judgment in judicial proceedings."). Notably, summary judgment is not proper if

---

[19] In certain circumstances, Maryland's appellate courts accord deference to the statutory interpretations advanced by the agency responsible for administering the statute. *See Maryland Dep't of Env't v. Anacostia Riverkeeper*, 447 Md. 88, 122, 134 A.3d 892, 912 (2016); *People's Ins. Couns. Div.*, 424 Md. at 457, 36 A.3d at 472; *Cent. Acceptance Corp.*, 424 Md. at 16, 33 A.3d at 958; *Magan v. Med. Mut. Liab. Ins. Soc. Of Md.*, 331 Md. 535, 546, 629 A.2d 626, 631–32 (1993). As I discuss in detail, *infra*, one of the central issues in this case, as it would have been before the COA, is whether plaintiff's VSA constitutes an "adverse administrative action" within the meaning of I.A. § 10-126(f). The parties dispute whether the COA would have accorded deference to the Commissioner's conclusion that the VSA is an "adverse administrative action" within the meaning of the statute. *See* ECF 74-1 at 9; ECF 77-1 at 8. If so, under the trial-within-a-trial doctrine, I, in turn, would also be required to accord deference to the Commissioner's interpretation. But, I need not resolve that dispute, because I reach the same result as the Commissioner, without according deference to her decision.

material facts are in dispute. And, a trial court's grant of a motion for summary judgment is subject to de novo review on appeal. *Webb v. Giant of Maryland, LLC*, 477 Md. 121, 135, 266 A.3d 339, 347 (2021). Similarly, "the propriety of granting a motion for summary disposition is a legal question" that the Maryland appellate courts "review *de novo*." *Brawner Builders, Inc.*, 476 Md. at 30–31, 258 A.3d at 226.

In sum, given that the matter was heard on a motion equivalent to a summary judgment motion, I must review, de novo, whether the Commissioner properly granted the MIA's motion for summary decision. In resolving the question, I am mindful that the hearing officer was not entitled to resolve conflicting evidence. Moreover, the hearing officer was required to view the evidence in the light most favorable to Coomes as the non-moving party. *See Rowhouses, Inc. v. Smith*, 446 Md. 611, 631, 133 A.3d 1054, 1066 (2016). If it had been a hearing on the merits, a reviewing court would be required to defer to an agency's findings of fact; "'it is the agency's province to resolve conflicting evidence and to draw inferences from that evidence.'" *Carpenter*, 424 Md. at 413, 36 A.2d at 446 (citation omitted). But, the Commissioner was not conducting a hearing on the merits. Therefore, application of the substantial evidence standard would be misplaced.

## IV. Discussion

### A. Counts I and II (Professional Negligence)

In Counts I and II, Coomes asserts nearly identical claims of professional negligence against Mr. Moran (Count I) and the Firm (Count II).

As a preliminary matter, a federal court sitting in diversity must apply the law of the state in which the court is located, including the forum state's choice of law rules. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Brown*, 2025 WL 1571824, at *3; *Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007). The law of the forum state, Maryland, guides this

Court's choice-of-law analysis. *See Baker v. Antwerpen Motorcars Ltd.*, 807 F. Supp. 2d 386, 389 n.13 (D. Md. 2011).

In tort cases, Maryland applies the principle of *lex loci delicti*, meaning "'the law of the place of the wrong.'" *Doctor's Weight Loss Centers, Inc. v. Blackston*, 487 Md. 476, 492–93, 319 A.3d 1102, 1111 (2024) (quoting *Colgan Air, Inc.*, 507 F.3d at 275); *see Proctor v. Wash. Metro. Area Transit Auth.*, 412 Md. 691, 726, 990 A.2d 1048, 1068 (2010); *Erie Ins. Exch. v. Heffernan*, 399 Md. 598, 625, 925 A.2d 636, 651 (2007). Because the underlying incident occurred in Maryland (*see* ECF 35, ¶¶ 2–4), Maryland's substantive tort law governs plaintiff's claims of negligence. *See Hauch v. Connor*, 295 Md. 120, 123–24, 453 A.2d 1207, 1209 (1983).[20]

"In Maryland, professional malpractice is a type of negligence action." *Pisner v. McCarthy*, 630 F. Supp. 3d 690, 704 (D. Md. 2022), *motion for relief from judgment denied*, SAG-22-00019, 2023 WL 2648791 (D. Md. Mar. 27, 2023). To prevail on a negligence claim, the plaintiff must prove "'(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty.'" *100 Inv. Ltd. P'ship v. Columbia Town Ctr. Title Co.*, 430 Md. 197, 212–13, 60 A.3d 1, 10 (2013) (quoting *Lloyd v. Gen'l Motors Corp.*, 397 Md. 108, 131–32, 916 A.2d 257, 270–71 (2007)) (emphasis omitted); *see Schultz v. Bank of Am., N.A.*, 413 Md. 15, 27, 990 A.2d 1078, 1086 (2010) ("In a negligence case, there are four elements that the plaintiff must prove to prevail: 'a duty owed to

---

[20] Although the substantive law of Maryland governs plaintiff's claims, the federal rules of procedure apply to determine "whether there is sufficient evidence to create a jury issue of those essential substantive elements of the action, as defined by state law[.]" *Fitzgerald v. Manning*, 679 F.2d 341, 346 (4th Cir. 1982); *accord Brown*, 2025 WL 1571824, at *7 n.9; *Jordan v. Iverson Mall Ltd. P'ship*, GJH-14-37, 2018 WL 2391999, at *5 (D. Md. May 25, 2018); *Osunde v. Lewis*, 281 F.R.D. 250, 260 (D. Md. 2012); *Young v. United States*, 667 F. Supp. 2d 554, 561 (D. Md. 2009).

him [or her] (or to a class of which he [or she] is a part), a breach of that duty, a legally cognizable causal relationship between the breach of duty and the harm suffered, and damages.'") (quoting *Jacques v. First Nat. Bank of Maryland*, 307 Md. 527, 531, 515 A.2d 756, 758 (1986)) (alterations in *Schultz*).

"The elements required to [assert] a cause of action for professional negligence are equivalent to the elements required in a standard negligence action; the professional, however, is held to the standard of care that prevails in his or her profession." *Balfour Beatty Infra., Inc. v. Rummel Klepper & Kahl, LLP*, 226 Md. App. 420, 438, 130 A.3d 1024, 1035 (2016). In Maryland, "[t]o prevail on a claim for legal malpractice, a former client must prove '(1) the attorney's employment, (2) the attorney's neglect of a reasonable duty, and (3) loss to the client proximately caused by that neglect of duty.'" *Suder v. Whiteford, Taylor & Preston, LLP*, 413 Md. 230, 239, 992 A.2d 413, 418 (2010) (quoting *Thomas v. Bethea*, 351 Md. 513, 528–29, 718 A.2d 1187, 1195 (1998)); *see Cavacos v. Sarwar*, 313 Md. 248, 253, 545 A.2d 46, 48 (1988); *Kendall v. Rogers*, 181 Md. 606, 611, 31 A.2d 312, 314 (1943).

The central allegation here is that "Mr. Moran failed to prepare and file Ms. Coomes's appellate brief," which led to the dismissal of her case by the COA. ECF 35 at 8. And, according to plaintiff, the COA "would have reversed the rulings of the ACM, the Circuit Court and the MIA," *id.* ¶ 89, and "the rulings of the MIA revoking her license would have been reversed and her license been reinstated." *Id.* ¶ 90.

In Count I, plaintiff alleges that "Mr. Moran breached the duty of care owed to Ms. Coomes when he failed to timely file the appellate brief" with the COA, *id.* ¶ 84, and "when he failed to provide her with the opportunity and means to file the appellate brief on her own behalf." *Id.* ¶ 85. Further, plaintiff alleges that "Mr. Moran breached the standard of care when he advised Ms.

Coomes that the SCM appeal was subject to the automatic stay," *id.* ¶ 86; "when he advised Ms. Coomes that she did not need to file an appellate brief with the SCM," *id.* ¶ 87; and "when he engaged in aggressive collection efforts, actions against Ms. Coomes, and actions against her bankruptcy estate without moving for or obtaining relief from the automatic stay." *Id.* ¶ 88.

Further, plaintiff alleges that, "[i]f Mr. Moran had not breached the standard of care owed to Ms. Coomes," she would have prevailed. *Id.* ¶¶ 89, 90. Thus, plaintiff alleges that, "[a]s a direct and proximate result of the negligence of Mr. Moran, Ms. Coomes has suffered and continues to suffer substantial and irreversible damages in that she can no longer operate as an insurance producer, operate her insurance business, or hold another high paying job." *Id.* ¶ 91.

The allegations against the Firm in Count II are nearly identical to those contained in Count I. Plaintiff alleges, *id.* ¶ 93: "Standards of care prevail under which the Law Firm is required to practice." She asserts that the Firm breached its duty and standard of care "through its agents." *Id.* ¶¶ 94–101.

It seems obvious that, in failing to file a brief in the COA on behalf of Coomes, defendants breached the standard of care. Mr. Moran was well aware of the deadline set by the COA, as he sought and obtained two extensions. Indeed, Moran does not contend otherwise. But, the determination that defendants breached the standard of care does not end the matter. Even if the brief had been filed, this does not mean that plaintiff would have prevailed. And, as discussed below, whether plaintiff would have prevailed is the critical question.

In *Fishow v. Simpson*, 55 Md. App. 312, 323, 462 A.2d 540, 546 (1983), focusing on the proximate cause element of a legal malpractice claim, the Maryland Court of Special Appeals stated that, unless the client "has a good cause of action against the party proposed to be sued, the first party loses nothing by the conduct of his attorney even though the latter were guilty of gross

negligence." In support of this proposition, the court cited the case of *Niosi v. Aiello*, 69 A.2d 57, 60 (D.C. 1949). There, the court explained, *id.*:

> The rule to be applied in a case where an attorney is accused of negligence in the conduct of litigation is that such attorney is not liable for negligence if, notwithstanding the negligence, the client had no cause of action or meritorious defense as the case may be; or that if conduct of an attorney with respect to litigation results in no damage to his client the attorney is not liable.[]

Thus, in order to prevail, the client must establish that, but for the lawyer's negligence, she probably would have prevailed in the underlying action, and was thus harmed by the lawyer's conduct. *Berringer v. Steele*, 133 Md. App. 442, 473, 758 A.2d 574, 591 (2000) (Hollander, J.). And, the Fourth Circuit has said: "In a long line of decisions in this circuit, we have emphasized that proof of causation must be such as to suggest 'probability' rather than mere 'possibility,' precisely to guard against raw speculation by the fact-finder. Where . . . resolution of the causation issue is dependent upon expert opinion testimony, it must meet that standard." *Sakaria v. Trans World Airlines*, 8 F.3d 164, 172–73 (4th Cir. 1993) (internal citations omitted); *see also Suder*, 413 Md. at 241, 992 A.2d at 420 (stating that "plaintiff must prove by a preponderance of the evidence that, but for the defendant lawyer's misconduct, the plaintiff would have obtained a more favorable judgment in the previous action."); *Riordan v. Jones*, 793 F. Supp. 650, 651 (D. Md. 1992) ("[T]he matter for which the attorney was engaged must have had sufficient merit that any malpractice actually caused damages to the plaintiff. This requires that the malpractice plaintiff demonstrate merit in the underlying claim . . . .") (citing *Fishow*, 55 Md. App. at 323, 462 A.2d at 546), *aff'd*, 989 F.2d 494 (4th Cir. 1993); *see also Brown v. E.W. Bliss Co.*, 72 F.R.D. 198, 200 (D. Md. 1976) (stating that to recover under a malpractice theory against their attorney, the plaintiffs need "prove that they had a proper claim and are entitled to damages, and further allege and show that their failure to recover on their claim was due to the negligence of their attorney").

In essence, to determine whether the client would have prevailed, but for the lawyer's negligence, the court must conduct a trial within a trial. The trial-within-a-trial doctrine is "unique to legal malpractice cases" and "provides a mechanism . . . to resolve a proximate cause query." *Suder*, 413 Md. at 232, 992 A.2d at 414. The COA has explained: "When the doctrine is applicable, the litigants reconstruct the underlying action, absent the supposed breach of duty. The tribunal must not only determine how the parties would have proceeded had there been no breach, but must also assume the role of the earlier adjudicator in order to ascertain the probable outcome of the action. Simply put, the court must try a case within a case." *Id.* at 233, 992 A.2d at 414.

The trial-within-a-trial doctrine exposes "'what the result 'should have been' or what the result 'would have been' had the lawyer's negligence not occurred." *Id.* at 242, 992 A.2d at 420 (quoting Ronald E. Mallen & Jeffrey M. Smith, *Legal Malpractice* § 35:12 (2010)). This is an objective standard. Ronald E. Mallen, *Legal Malpractice* § 37:87 (2025 ed.). In other words, "the fact-finder need not attempt to discern 'what a particular judge would have decided' based on the facts before him but only 'what a *reasonable judge* would have decided.'" *Hickey v. Scott*, 796 F. Supp. 2d 1, 4 (D.D.C. 2011) (citation omitted; emphasis in *Hickey*). This framework is applicable when the court reviews the disposition of a motion for summary judgment. *See, e.g.*, *Saunders v. Markey*, No. 1439, Sept. Term 2020, 2021 WL 5112505 (Md. Ct. Spec. App. Nov. 3, 2021); *Old Republic Nat'l Title Ins. Co. v. Shulman, Rogers, Gandal, Pordy & Ecker, P.A.*, TDC-18-3695, 2019 WL 6840729, at *1 (D. Md. Dec. 16, 2019), *aff'd*, 855 F. App'x 862 (4th Cir. 2021); *Suder*, 413 Md. 230, 992 A.2d 413; *Berringer*, 133 Md. App. 442, 758 A.2d 574; *Fishow*, 55 Md. App. 312, 462 A.2d 540.

Although I am not aware of any Maryland case applying the trial-within-a-trial doctrine with regard to a legal malpractice action based on a lawyer's failure to file an appellate brief, courts

in other jurisdictions have applied the doctrine in this scenario or similar ones. *See, e.g.*, *MSR Recycling, LLC v. Weeks & Hutchins, LLC*, 214 A.3d 1 (Me. 2019), *holding modified on other grounds by Reppucci v. Nadeau*, 238 A.3d 994 (Me. 2020); *Lanham v. Fleenor*, 429 P.3d 1231 (Idaho 2018); *Kidd v. Georgia Ass'n of Educators, Inc.*, 587 S.E.2d 289 (Ga. App. 2003); *S. Farm Bureau Cas. Ins. Co. v. Daggett*, 118 S.W.3d 525 (Ark. 2003); *Charles Reinhart Co. v. Winiemko*, 513 N.W.2d 773 (Mich. 1994); *Goldstein v. Kaestner*, 413 S.E.2d 347, 349 (Va. 1992) (citing cases); *Oteiza v. Braxton*, 547 So. 2d 948 (Fla. Dist. Ct. App. 1989); *Daugert v. Pappas*, 704 P.2d 600 (Wash. 1985); *see also* Restatement (Third) of the Law Governing Lawyers § 53 cmt. b (2000) ("Restatement").    In *Suder*, 413 Md. at 243, 992 A.2d at 421, the Court of Appeals said: "Ultimately, the triggering mechanism for the trial-within-a-trial doctrine is a dispute over proximate cause . . . ."

Therefore, I conclude that the trial-within-a-trial doctrine is applicable here.  Defendants agree, ECF 74-1 at 1, and plaintiff does not contend otherwise.

The proximate cause inquiry is at the heart of the dispute between Coomes and Moran.  It is well established that, "where issues of causation in a legal malpractice action hinge upon the possible outcome of an appeal, such issues are to be resolved by the trial judge as questions of law." *Phillips v. Clancy*, 733 P.2d 300, 306 (Ariz. Ct. App. 1986); *see also Lanham*, 429 P.3d at 1235–36 (concluding that the potential success of a hypothetical appeal is a question of law for the court to decide; noting that 27 states and the District of Columbia have concluded the same, and that only New Mexico has considered the question to be one of fact); *S. Farm Bureau Cas. Ins. Co.*, 118 S.W.3d at 529 (explaining that "the matter of proximate cause for failure to file an appeal is a question of law to be determined by a judge, not a jury."); *Daugert*, 704 P.2d at 603 (citing cases and explaining that the inquiry of whether an appellate court "would have rendered a

judgment more favorable to the client" is a matter "within the exclusive province of the court, not

the jury, to decide."); Restatement § 53 cmt. b ("What would have been the result of a previous

trial presenting issues of fact normally is an issue for the factfinder in the negligence . . . action.

What would have been the result of an appeal in the previous action is, however, an issue of law

to be decided by the judge in the negligence . . . action.").

Thus, this Court must place itself in the shoes of the COA with respect to consideration of

the rulings of the lower tribunals. This includes application of the proper scope of review,

discussed earlier. *See, e.g.*, *S. Farm Bureau Cas. Ins. Co.*, 118 S.W.3d at 530 (noting that, under

the trial-within-a-trial doctrine, it is "incumbent on the trial court to act as an appellate court would

act and review the decision under the same standard the appellate court would use.").[21]

### 1.  I.A. § 10-126(f)(1)

A principal issue here, as it was on certiorari to the COA, is whether Coomes's voluntary

surrender of her Virginia insurance license constitutes an "adverse administrative" action within

the meaning of I.A. § 10-126(f)(1). As noted, I.A. § 10-126(f) provides (emphasis added):[22]

---

[21] As noted, because the COA previously granted certiorari, but dismissed the case without ruling, I certified questions to the SCM. ECF 58. But, the SCM rejected the certification. ECF 62. Therefore, it is left to this Court, or a jury, to resolve the issue of proximate causation.

[22] This language was added to the Insurance Article in 2001, in connection with the Insurance Producer Licensing Act. 2001 Maryland Laws Ch. 731 (S.B. 576). In 1999, Congress enacted the Financial Services Modernization Act (also known as the Gramm-Leach-Bliley ("GLB") Act), which, *inter alia*, gave states three years to enact and implement laws that allow multi-state reciprocity and uniformity in insurance agent and broker licensing laws. *See* Pub. L. 106-102. If a majority of the states failed to do so, the GLB Act required the "creation of a nonprofit corporation known as the National Association of Registered Agents and Brokers . . . to provide for the uniform nationwide licensing of agents and brokers." *Bill Analysis, Senate Bill 576*, Economic Matters Committee at 1 (2001). Accordingly, the NAIC developed the Model Producer Licensing Act as a template that states could use to comply with the GLB Act. "Senate Bill 576 reflects the standards adopted by the [NAIC] in its model act." *Id.* at 2. Relevant here, Maryland adopted the "[u]niform reasons for the denial, suspension, or revocation" of an insurance producer's license set forth in the Model Producer Licensing Act. Steven B. Larsen, *Testimony of*

(f)(1) Within 30 days after the final disposition of the matter, an insurance producer shall report to the Commissioner any *adverse administrative action* taken against the insurance producer:

> (i) in another jurisdiction; or
>
> (ii) by another governmental unit in this State.

(2) The report shall include a copy of the order, consent order, and any other relevant legal documents.

Of import, the term "adverse administrative action" is not defined in the statute or COMAR. Aside from the CSA decision in the underlying case, I am not aware of any reported Maryland case that has interpreted this language. And, of course, the CSA's ruling post-dates the conduct of Coomes that is at issue, as well as the Commissioner's rulings.

The meaning of "adverse administrative action" implicates principles of statutory interpretation.

 "The goal of statutory construction is to discern and carry out the intent of the Legislature." *Blue v. Prince George's County*, 434 Md. 681, 689, 76 A.3d 1129, 1133 (2013); *see Lockshin v. Semsker*, 412 Md. 257, 274, 987 A.2d 18, 28 (2010) ("The cardinal rule of statutory interpretation is to ascertain and effectuate the real and actual intent of the Legislature."). "To ascertain the intent of the General Assembly, we begin with the normal, plain meaning of the language of the statute." *Lockshin*, 412 Md. at 275, 987 A.2d at 28; *see Breslin v. Powell*, 421 Md. 266, 286, 26 A.3d 878, 891 (2011) ("In attempting to discern the intent of the Legislature, courts 'look first to the plain language of the statute, giving it its natural and ordinary meaning.'") (citation omitted).

---

*the Maryland Insurance Administration on the Insurance Producer Licensing Act (Senate Bill 576)* at 2 (February 28, 2001).

If the language of the statute is "clear and unambiguous, courts will give effect to the plain meaning of the statute and no further sleuthing of statutory interpretation is needed." *Breslin*, 421 Md. at 286–87, 26 A.3d at 891.  On the other hand, "[w]here the words of a statute are ambiguous and subject to more than one reasonable interpretation, or where the words are clear and unambiguous when viewed in isolation, but become ambiguous when read as part of a larger statutory scheme, a court must resolve the ambiguity by searching for legislative intent in other indicia, including the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process." *Lockshin*, 412 Md. at 276, 987 A.2d at 29.  Such sources include "the derivation of the statute, comments and explanations regarding it by authoritative sources during the legislative process, and amendments proposed or added to it.'" *Boffen v. State*, 372 Md. 724, 737, 816 A.2d 88, 95 (2003) (quoting *Goldberg v. Miller*, 371 Md. 591, 602, 810 A.2d 947, 953 (2002)); *see also Bledsoe v. Bledsoe*, 294 Md. 183, 189, 448 A.2d 353, 356 (1982) (the court may examine "the history of the passage of the law, the reports of committees and commissions, the introduction of amendments and testimony given before legislative committees" to divine legislative intent).

If a statutory term is not defined, it is "'proper to consult a dictionary or dictionaries for a term's ordinary and popular meaning.'" *Montgomery County v. Deibler*, 423 Md. 54, 67, 31 A.3d 191, 198 (2011) (citation omitted).  Nonetheless, the plain language of a statute "must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute." *Lockshin*, 412 Md. at 276, 987 A.2d at 29.  To this end, a court must ensure that "'no word, clause, sentence, or phrase is rendered surplusage, superfluous, meaningless, or nugatory.'" *Breslin*, 421 Md. at 287, 26 A.3d at 891 (citation omitted).

Notably, a court may "'neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute, and we do not construe a statute with forced or subtle interpretations that limit or extend its application.'"  *State v. Bey*, 452 Md. 255, 265, 156 A.3d 873, 878 (2017) (citation and some internal quotations omitted).  Moreover, "[i]n every case, the statute must be given a reasonable interpretation, not one that is absurd, illogical, or incompatible with common sense." *Lockshin*, 412 Md. at 276, 987 A.2d at 29; *see also Breck v. Maryland State Police*, 452 Md. 229, 248, 156 A.3d 858, 869 (2017); *Polek v. J.P. Morgan Chase Bank, N.A.*, 424 Md. 333, 351, 36 A.3d 399, 409 (2012).  When one interpretation of statutory language would produce such a result, a court will reject that interpretation in favor of one that does not suffer the same flaw.  *See Bell v. Chance*, 460 Md. 28, 53, 188 A.3d 930, 944 (2018).

Coomes argues that the language of I.A. § 10-126(f) "unambiguously requires that the 'final disposition of the matter' of an 'adverse administrative action' culminate in an order."  ECF 77-1 at 9.  Specifically, plaintiff observes, *id.*: "The statute specifically states that the reporting licensee 'shall include a copy of the order, consent order, *and* any other relevant legal documents.'" (Emphasis in ECF 77-1).  Coomes contends that the "legislative intent is that only administrative actions that result in an order and are adverse to the licensee are required to be reported." *Id.*  She posits, ECF 82 at 2: "The [Virginia Bureau] did not (i) file charges, (ii) issue a show cause order,[23] (iii) make any findings of fact, (iv) require admissions of liability, [or] (v) enter an order

_____

23 Coomes correctly asserts that "no show cause order was issued" by the Virginia Bureau. ECF 77-1 at 5 n.1; *see also id*. at 10; ECF 82 at 2.  But, a show cause order was prepared.  ECF 74-9 at 23–31. It sets forth in detail the factual allegations against Coomes—including some relating to a separate incident involving alleged mishandling of insurance premium payments never addressed by the MIA—and the alleged violations of Virginia insurance law. *See id.*  The

48

or consent order."  Therefore, Coomes maintains that "a mere investigation ending in a voluntary surrender of a license is not a reportable action."  ECF 77-1 at 9.

Plaintiff also points out that the COA has defined an "action" as a "'civil or criminal judicial proceeding.'"  *Id.* at 11 (citation omitted).  Relying on this definition, Coomes argues that the Virginia Bureau's "investigation was not a judicial proceeding."  *Id.*  Further, Coomes notes that counsel for the MIA wrote to Coomes on May 8, 2014, and expressly advised: "'A surrender of your license does not constitute an adverse administrative action by the Commissioner.'"  *Id.* at 12 (quoting ECF 74-5 at 8).

Defendants' arguments largely parrot the CSA's opinion.  In defendants' view, the CSA was "legally correct when it held that '[t]he reasonable interpretation of the terms of the [VSA] as a whole is that it was adverse in nature.'"  ECF 74-1 at 10 (quoting *Coomes*, 232 Md. App. at 300–01, 157 A.3d at 373).  Defendants also argue, ECF 74-1 at 7–8: "[T]he [CSA] correctly held that, '[r]egardless of how the termination of [plaintiff's] license was titled, the language and consequences of the voluntary surrender agreement demonstrate that [plaintiff] agreed to the surrender as a way to avoid further investigation into her conduct and avoid even greater consequences if she were to pursue a hearing' and therefore, 'the Commissioner did not err in his interpretation and application of the term 'adverse administrative action' . . . .'"  (Quoting *Coomes*, 232 Md. App. at 304, 157 A.3d at 375) (some alterations in ECF 74-1).

Moran also maintains that the Commissioner's finding, to the effect that plaintiff's voluntary surrender was an adverse administrative action, should be given "'considerable weight.'"  ECF 74-1 at 9 (citation omitted).  And, defendants point out that the Virginia Bureau

---

Virginia Bureau apparently "did not need to file" the show cause order because Coomes "entered the VSA."  *Id.* at 10 n.2.

also considered plaintiff's voluntary surrender to be an adverse administrative action and "went so far as to report" it to the NAIC. *Id.* at 9–10.

According to defendants, Coomes's theory would allow a Maryland licensee to "'always avoid regulatory oversight in Maryland for improper activities done in every other state by voluntarily giving up her license in that other state.'" *Id.* at 8 n.6 (quoting *Coomes*, 232 Md. App. at 300, 157 A.3d at 373). Defendants also posit, ECF 74-1 at 10 n.9: "'[N]owhere in the language of the statute . . . does it explicitly or implicitly require that a hearing and final order occur alongside an 'adverse administrative action' in order for the action to constitute one that the license-holder must report.'" (Quoting *Coomes*, 232 Md. App. at 302, 157 A.3d at 374).

The Record Extract contains the Affidavit of Raymond Anderson, dated April 28, 2014. ECF 74-9 at 33–36. It was an exhibit to the MIA's motion for summary decision. Anderson was the "Principal Insurance Market Examiner" for the Virginia Bureau, where he had been employed for approximately thirty years at the time of his Affidavit. *Id.* at 33, ¶ 4, and 34. He averred, in part, *id.* at 34, ¶¶ 13–15 (second emphasis added):

> The *Voluntary Surrender* that Coomes executed is an adverse administrative action and was reported as such through the State RIRS (Regulatory Information Retrieval System) as an alert notification . . . . In the Commonwealth of Virginia, there is a separate mechanism that permits licensees to withdraw from the business of insurance that is not an adverse administrative action. For example, if an insurance producer wishes to retire from the business and give up her license, she can withdraw her license. Such an action is not an adverse administrative action and is not reported as such through RIRS. Withdrawal of a license, however, is not usually offered as an option in lieu of surrender, suspension, or revocation (all of which are considered adverse administrative actions by the Bureau) when a licensee is under investigation by the Bureau. *Based on the investigation against Coomes, Coomes was not given the option of withdrawing her license.*

Anderson indicates that Virginia distinguishes between a license "withdrawal" and a license "surrender." *Id.* at 34, ¶ 14. Coomes did not withdraw her license.

Lawrence Gross, Enforcement Officer for the Compliance and Enforcement Unit of the MIA, also provided an Affidavit, dated April 30, 2014.  ECF 74-9 at 39–41.  He averred, *id.* at 40, ¶¶ 12–14 (emphasis added): "In Maryland, an insurance producer may give up her license by completing a service request form and requesting 'cancellation.'  In Maryland, a cancellation is not subject to rejection by the Commissioner.  *A cancellation in Maryland, which does not preclude the licensee from reapplying for licensure, is not considered an adverse administrative action by the Commissioner and is not reported as such to RIRS."*

As mentioned, when, as here, a statutory term is not defined, the Court may consult a dictionary.  *Deibler*, 823 Md. at 67, 31 A.3d at 198.[24]  Merriam-Webster's Dictionary defines "adverse" as "opposed to one's interests", especially "unfavorable."  *Adverse*, Merriam-Webster, available at https://perma.cc/6KD9-JGQ9.  And, Black's Law Dictionary defines "adverse action" as "[a] decision or event that unfavorably affects a person, entity, or association."  *Adverse Action*, Black's Law Dictionary (12th ed. 2024).

It is true that Coomes did not admit fault or liability in the VSA.  But, there can be no reasonable dispute that the voluntary surrender of Coomes's Virginia insurance producer's license was "unfavorable" to Coomes's interests or "unfavorably affect[ed]" her.  Specifically, per the terms of the VSA, ECF 74-9 at 32: (1) Coomes relinquished her ability "to conduct the business of insurance or insurance consulting" in Virginia, where her agency was located, for one year; (2) Coomes waived her right to a hearing, at which she could have contested the facts alleged against her; (3) even after the passage of one year, the Virginia Bureau could reopen the investigation into plaintiff's actions if Coomes chose to reapply for licensure; (4) Coomes could not reapply to be an

---

[24] To my knowledge, the legislative bill file does not shed light on whether a voluntary surrender of an insurance producer's license in another state qualifies as an "adverse administrative action."

insurance producer in Virginia unless and until she "resolved all" of her "financial obligations resulting from" her "insurance activities"; and (5) Coomes agreed that the matter "may be reported to the National Association of Insurance Commissioners and to other state insurance regulatory authorities or other interested parties."

Moreover, Coomes acknowledges that a consent order would constitute an adverse administrative action, even if it does not require an admission of fault or liability. ECF 77-1 at 9; *see Trusted Sci. & Tech., Inc. v. Evancich*, 262 Md. App. 621, 654 n.20, 320 A.3d 474, 493 n.20 (2024) (defining a "consent order" as a "'valid contract between the parties that is judicially enforceable.'"), *cert. denied*, 489 Md. 253, 327 A.3d 115 (2024); *see also Long v. Maryland*, 371 Md. 72, 82, 807 A.2d 1, 6 (2002) (defining a "consent order" as "an agreement of the parties with respect to the resolution of the issues in the case or in settlement of the case, that has been embodied in a court order and entered by the court, thus evidencing its acceptance by the court.[]").

It is also clear that the Virginia Bureau considered the VSA to be adverse, as that is how it reported the matter to the NAIC. *Id.* at 34, ¶ 13. And, as indicated, Anderson, an employee of the Virginia Bureau, represented that the VSA was adverse in nature. *Id.*

Accordingly, I am amply satisfied that the VSA was "adverse" to plaintiff's interests. The question remains whether Coomes's voluntary surrender of her license constituted an "administrative action."

Black's Law Dictionary defines "action" as a "civil or criminal justice proceeding." *Action*, Black's Law Dictionary (12th ed. 2024). It also defines "action" as, *inter alia*, "[t]he process of doing something; conduct or behavior" and "[a] thing done." *Id.* And, as noted earlier, it defines the term "adverse action" as "[a] decision or event that unfavorably affects a person, entity, or association." *Adverse Action*, Black's Law Dictionary (12th ed. 2024). "Common

52

examples of adverse actions include a decrease in one's pay by an employer or a denial of credit by a lender." *Id.*  Black's Law Dictionary defines "administrative action" as a "decision or an implementation relating to the government's executive function or a business's management." *Administrative Action*, Black's Law Dictionary (12th ed. 2024).

By analogy, the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, is instructive.  It defines "agency action" to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(B).  Judge Bredar recently explained: The term "'agency action' is a capacious term, 'cover[ing] comprehensively every manner in which an agency may exercise its power.'"  *Maryland, et al. v. United States Dep't of Agriculture, et al.*, JKB-25-0748, 2025 WL 800216, at *11 (D. Md. Mar. 13, 2025) (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001)) (alteration in *Dep't of Agriculture*).

As the above cited authorities make clear, the term "action" has a broad definition.  The VSA is a contractual agreement between the Virginia Bureau and Coomes, in which Coomes stated, ECF 74-9 at 32: "This *action* is taken of my own volition without duress . . . ."  (Emphasis added).  Coomes also said, *id.*: "In consideration of the Commission's acceptance of this voluntary surrender of my license authority in lieu of a hearing before the Commission at this time, I agree that I will not make application to transact the business of insurance in Virginia for a period of one year from this date, and not until I have resolved all of my financial obligations resulting from my insurance activities."

The Virginia Bureau accepted the VSA.  *See id.* at 33, ¶¶ 6–9.  Doing so was a "decision" relating to "executive function . . . ."  *Administrative Action*, Black's Law Dictionary (12th ed. 2024).  It was also "[a] thing done," *Action*, Black's Law Dictionary (12th ed. 2024), and a

"decision or event that unfavorably affect[ed]" Coomes. *Adverse Action*, Black's Law Dictionary (12th ed. 2024).

Still, Coomes argues that there was no administrative action because the plain language of the statute makes clear that, to constitute an "administrative action," there must be an agency order, and it is undisputed that the Virginia Bureau did not issue an "order" or a "consent order." ECF 77-1 at 9. Defendants fail to respond to the contention.

In particular, I.A. § 10-126(f)(1) requires an insurance producer to "report" an adverse administrative action within 30 days. And, I.A. § 10-126(f)(2) states: "The report shall include a copy of the order, consent order, *and* any other relevant legal documents." (Emphasis added). Emphasizing the word "and," Coomes argues that section (f)(2) contemplates that an adverse administrative action requires either an "order" or a "consent order." ECF 77-1 at 9.

In interpreting the plain language of a statute, the court must "pay attention to the statute's grammar and sentence structure." *Spiegel v. Bd. of Educ. of Howard Cnty.*, 480 Md. 631, 639, 281 A.3d 663, 667 (2022). The COA explained in *SVF Riva Annapolis LLC v. Gilroy*, 459 Md. 632, 642, 187 A.3d 686, 692 (2018): "'And' and 'or' are both conjunctions used to link other words, phrases, or clauses. 'Or' has a disjunctive meaning while 'and' has a conjunctive meaning." The COA also explained: "'Under the conjunctive/disjunctive canon, *and* combines items while *or* creates alternatives. . . . With a conjunctive list, all . . . things are required—while with the disjunctive list, at least one of the [things] is required, but any one . . . satisfies the requirement.'" *Id.* at 642 n.5, 187 A.3d at 692 n.5 (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 12, at 116 (2002)) (italics in *Reading Law*).

To be sure, "[i]t is ordinarily presumed that the word 'and' should be interpreted according to its plain and ordinary meaning and that it is not interchangeable with the word 'or.'"

*Comptroller of Treasury v. Fairchild Indus., Inc.*, 303 Md. 280, 285–86, 493 A.2d 341, 343–44 (1985).  However, "'and' and 'or' may be used interchangeably when it is reasonable and logical to do so."  *SVF Riva Annapolis LLC*, 459 Md. at 643, 187 A.3d at 693 (citation and internal quotations omitted); *see Reier v. State Dep't of Assessments & Tax'n*, 397 Md. 2, 32, 915 A.2d 970, 987 (2007) ("The term 'or' may be read in the conjunctive when the context reasonably supports the inference that such a construction is necessary to effectuate the intent of the Legislature."); *Fairchild Indus., Inc.*, 303 Md. at 286, 493 A.2d at 344 ("[C]ircumstances may require courts to construe the word 'and' to mean 'or' whenever such a conversion is mandated by the context of the words used; the principle is applicable to legislative enactments where it is necessary to effectuate the obvious intention of the legislature.").

As written, I.A. § 10-126(f)(2) identifies two items, followed by the conjunctive "and", and then a third item: "The report shall include a copy of the order, consent order, and any other relevant legal documents."  Under an ordinary grammatical interpretation and the conjunctive/disjunctive cannon, discussed above, the statute arguably requires a report to include all three items listed in I.A. § 10-126(f)(2), *i.e.*, an order, a consent order, and any other pertinent documents.  *See United Bank v. Buckingham*, 472 Md. 407, 426, 247 A.3d 336, 347–48 (2021) (concluding that the "consistent use of commas" between terms in a list, "without the presence of a conjunction" in between the terms of the list, means that "each item in the string of terms is to be read" in accordance with the conjunction at the end of the list); *Germantown Tr. & Sav. Bank v. U.S. Bank*, No. 19-CV-352-JPG, 2020 WL 8082408, at *4 (S.D. Ill. June 9, 2020) ("Basic grammar rules say that a list of items separated by commas with an 'and' prior to the last item is conjunctive, that is, it includes all the items jointly.  Under that rule, 'A, B and C' or 'A, B, and

C' (if you are a fan of the ["Oxford" or "serial" comma[25]]) refers to all the items jointly rather than alternatively."); *SVF Riva Annapolis LLC*, 459 Md. at 642, 187 A.3d at 692 (explaining that "'and' is a conjunction meaning '[t]ogether with or along with; in addition to; as well as[; u]sed to connect words, phrases, or clauses that have the same grammatical function in a construction.'") (quoting *And*, American Heritage Dictionary of the English Language 66 (4th ed. 2006)) (alterations in *SVF Riva*).

But, such a construction here is obviously nonsensical.  If the Court were to interpret the series of words in the conjunctive, the statute would purport to require every adverse administrative action to include both an "order" *and* a "consent order," along with other relevant documents.  It would mean that if, after a contested hearing, the Virginia Bureau entered an order revoking an insurance producer's license, the producer would not be required to notify the MIA because the Virginia Bureau did not also issue a consent order.  That could not have been the intent of the Maryland General Assembly.

Notably, the Producer Licensing Model Act developed by the NAIC, on which Maryland's statute is based, states: "This report shall include a copy of the order, consent to order *or* other relevant legal documents."  PRODUCER LICENSING MODEL ACT, § 17(a) (NAT'L ASS'N. INS. COMM'RS 2005) (emphasis added).  Many jurisdictions also use "or" instead of "and" in their version of the statute.[26]  Under this interpretation, lack of a formal order or consent order does not

---

[25] The Oxford or serial comma is the comma placed immediately before the coordinating conjunction in a series of three or more terms. *See, e.g.*, The Chicago Manual of Style § 6.19, at 245 (15th ed. 2003). I.A. § 10-126(f)(2) features an Oxford comma: "The report shall include a copy of the order, consent order**,** and any other relevant legal documents."  (Boldface added).

[26] *See, e.g.*, OHIO REV. CODE ANN. § 3905.22(A) ("The notice shall include a copy of the order, consent to order, *or* any other relevant legal document.") (emphasis added); N.J. STAT. ANN. § 17:22A-47(c) ("The report shall include a copy of the order, consent order *or* other relevant legal documents.") (emphasis added); MINN. STAT. ANN. § 60K.54(1) ("This report must include a copy

vitiate the existence of an adverse administrative action. Therefore, the Court will interpret the words "order, consent order" in the disjunctive. In addition, I will interpret the word "and" in I.A. § 10-126(f)(2) to mean "or." *See Fairchild Indus., Inc.*, 303 Md. at 286, 493 A.2d at 344. This is the only logical interpretation.

In other words, the report of an adverse administrative action must include a copy of either an order, *or* a consent order, *or* "any other relevant legal documents." And, the criteria in I.A. § 10-126(f)(2), *i.e.*, that the report include "any other relevant legal documents," would clearly encompass the VSA.

In any event, the VSA is tantamount to a consent order. As indicated, a consent order is "an agreement of the parties with respect to the resolution of the issues in the case or in settlement of the case, that has been embodied in a court order and entered by the court, thus evidencing its acceptance by the court.[]" *Long*, 371 Md. at 82, 807 A.2d at 6. The VSA meets that definition because, to be effective, it had to be accepted by the Virginia Bureau.

Coomes's focus on the label of the VSA is misguided. It is the content that matters. *Cf.* 5 U.S.C. § 551(B) (broadly defining "agency action" to include, *inter alia*, any agency "order . . . or the equivalent . . . thereof"). The CSA aptly said in *Coomes*, 232 Md. App. at 303–04, 157 A.3d at 375: "Regardless of how the termination of Coomes's license was entitled, the language and the consequences of the voluntary surrender agreement demonstrate that Coomes agreed to the

---

of the order, consent to order, *or* other relevant legal documents.") (emphasis added); 40 PA. STAT. ANN. § 310.78 ("This report shall include a copy of the order, consent order *or* other relevant legal documents.") (emphasis added); ME. REV. STAT. ANN. tit. 24-A, § 1420-P(1) ("This report must include a copy of the order, consent to order *or* other relevant legal documents.") (emphasis added); *see also* ARIZ. REV. STAT. ANN. § 20-301 ("The report shall include a copy of the order, consent to order or other relevant dispositive document."); TENN. CODE ANN. § 56-6-119 ("This report shall include a copy of any order entered or other relevant legal documents."); *but see* IOWA CODE ANN. § 522B.16 ("This report shall include a copy of the order, consent to the order, *and* other relevant legal documents.") (emphasis added).

surrender as a way to avoid further investigation into her conduct and avoid even greater consequences if she were to pursue a hearing."

Other jurisdictions appear to treat the voluntary surrender of an insurance producer's license as an administrative action. *See, e.g.*, Mississippi Commissioner of Insurance, *Agreed Order for Voluntary Surrender of License*, at 2, available at https://perma.cc/5VDA-5C87 ("This voluntary surrender of my privilege license is being tendered in lieu of *other* possible administrative action that may be taken by the Mississippi Commissioner of Insurance.") (emphasis added); *In re Troy A. Handke*, Case No. 72567 (Iowa Ins. Div. 2011), available at https://perma.cc/TJ7A-ZY3Q (insurance producer did not admit "to the truth or falsity of the allegations made against" him, but agreed "to the voluntary surrender" of his license and further agreed "not to reapply" for two years; although the document is titled "order" and "consent to order and agreement," its terms are essentially the same as the terms of plaintiff's VSA, and the order is considered a "final administrative action"). Similarly, Gross, an Enforcement Officer with the MIA, averred, ECF 74-9, at 40, ¶ 16: "I have reviewed the terms and conditions in the VSA that Coomes executed . . . and find that if a document with similar terms and conditions had been entered in Maryland, it would be considered an adverse administrative action by the [MIA]. Such an agreement would likely be entered as a consent order and reported as an adverse administrative action."

It is also noteworthy that other fields of endeavor consider the voluntary surrender of a license to be an adverse action under certain circumstances. *See, e.g.*, *Reporting Federal Licensure and Certification Actions*, U.S. DEP'T OF HEALTH AND HUM. SERVS., available at https://perma.cc/NKD5-ELYF (discussing federal licensing agencies' obligation to report adverse actions taken against health care professional; defining "final adverse actions" to include "[a]ny

other loss of the license . . . or the right to apply for, or renew a license, . . . whether by operation of law [or] *voluntary surrender* . . . .") (emphasis added). For example, attorneys in Maryland are required to report to Bar Counsel a voluntary resignation in another jurisdiction if they resign while under investigation. *See* Md. Rule 19-737(a) ("An attorney who in another jurisdiction . . . resigns from the bar while disciplinary or remedial action is threatened or pending in that jurisdiction . . . shall inform Bar Counsel promptly of the . . . resignation . . . ."); *see also* COMAR § 13A.12.06.02(c)(9) (permitting the State Superintendent of Schools to "suspend, deny, or revoke" an educator's license if the license holder or applicant "has had a license suspended, revoked, denied, or *voluntarily surrendered* in another state for a cause which would be grounds for suspension or revocation under this regulation.") (emphasis added).

As indicated, Coomes also relies on the representation of Laskaris, counsel for the MIA, who wrote to Coomes on May 8, 2014. Laskaris advised: "'A surrender of your license does not constitute an adverse administrative action by the Commissioner.'" ECF 77-1 at 12 (quoting ECF 74-5 at 8).

Plaintiff alludes to an equitable estoppel defense. *See* ECF 77-1 at 12; ECF 82 at 2. "Equitable estoppel operates as a technical rule of law to prevent a party from asserting his rights where it would be inequitable and unconscionable to assert those rights." *Salisbury Beauty Schs. v. State Bd. of Cosmetologists*, 268 Md. 32, 62, 300 A.2d 367, 385 (1973). The elements of equitable estoppel are: "(1) a voluntary representation of one party; (2) that is relied upon by the other party; (3) to the other party's detriment." *Matter of Cash-N-Go, Inc.*, 256 Md. App. 182, 204, 286 A.3d 53, 66 (2022); *see also Reichs Ford Rd. Joint Venture v. State Rd. Comm'n of the State Highway Admin.*, 388 Md. 500, 524, 880 A.2d 307, 321 (2005); *Salisbury Beauty Schs.*, 268 Md. at 62, 300 A.2d at 384–85.

The doctrine of equitable estoppel does not support plaintiff's position for at least two reasons. First, the Supreme Court of Maryland has explained that it is "'universally recognized' that a 'State cannot be estopped by the acts and conduct of its officers or agents in the performance of' actions undertaken in its governmental capacity." *Matter of Smart Energy Holdings, LLC*, 486 Md. 502, 575, 311 A.3d 919, 962 (2024) (citation omitted). "'The reason for the rule is obvious: no administrative officer is vested with the power to abrogate the statute law [sic] of the State, nor to grant to an individual an exemption from the general operation of the law.'" *Id.* (citation omitted). Therefore, "the State should not be estopped from 'applying an otherwise valid law or regulation because of the prior statements or conduct of public employees, upon which the claimant detrimentally relied, which led the claimant to assume that the applicable law was otherwise.'" *Matter of Cash-N-Go, Inc.*, 256 Md. App. at 206, 286 A.3d at 67–68 (citation omitted). To do so would "'deprive the public of the protection of a statute because of mistaken action . . . on the part of public officials.'" *Salisbury Beauty Schs.*, 268 Md. at 64–65, 300 A.2d at 386 (quoting *National Labor Relations Board v. Baltimore Transit Co.*, 140 F.2d 51, 55 (4th Cir. 1944)).

Second, Coomes cannot satisfy the second or third elements of the legal standard. Mr. Laskaris represented to Coomes that a voluntary surrender does not constitute an adverse administrative action well after Coomes was required to report the VSA to the MIA. *See* I.A. § 10-126(f)(1) (requiring the insurance producer to report the adverse action within "30 days after the final disposition of the matter"); ECF 74-9 at 33 (Anderson Affidavit, 4/28/14; stating that Coomes's voluntary surrender was "final on December 10, 2012" and "effective on April 1, 2013"); ECF 74-5 at 8 (email of May 8, 2014, from Laskaris to Coomes). Therefore, Coomes did not rely on Laskaris's statement to her detriment; the statement was made to Coomes on May 8,

2014, over a year after the deadline of May 1, 2013, set forth in I.A. § 10-126(f)(1).  *See Salisbury*

*Beauty Schs.*, 268 Md. at 62–63, 300 A.2d at 385 ("It is essential for the application of the doctrine

of equitable estoppel that the party claiming the benefit of the estoppel must have been misled to

his injury and changed his position for the worse, having believed and relied on the representations

of the party sought to be estopped.").

In sum, I conclude that the term "adverse administrative action" encompasses plaintiff's

voluntary surrender of her Virginia producer's license while she was under investigation by the

Virginia Bureau.  Therefore, the COA likely would have upheld the Commissioner's conclusion

that Coomes violated I.A. § 10-126(f).

## 2.  I.A. § 10-126(a)

As indicated, I.A. § 10-126(a) identifies conduct that can support the suspension or

revocation of an insurance producer's license in Maryland.  The Commissioner concluded that

Coomes violated four provisions, set forth below:

> (a) The Commissioner may deny a license to an applicant under §§ 2-210 through
> 2-214 of this article, or suspend, revoke, or refuse to renew or reinstate a license
> after notice and opportunity for hearing under §§ 2-210 through 2-214 of this article
> if the applicant or holder of the license:
>
>> (1) has willfully violated this article or another law of the State that relates to
>> insurance;
>> * * *
>> (6) has committed fraudulent or dishonest practices in the insurance business;
>>
>> * * *
>> (12) has failed or refused to pay over on demand money that belongs to an
>> insurer, insurance producer, or other person entitled to the money; [or]
>>
>> (13) has otherwise shown a lack of trustworthiness or competence to act as
>> an insurance producer[.]

61

Under I.A. § 2-210(c)(1), a hearing "shall be conducted in accordance with Title 10, Subtitle 2 of the State Government Article." S.G. § 10-210, in turn, provides that a contested case may be disposed of by, *inter alia*, "summary disposition."

### a. I.A. §§ 10-126(a)(1), (12)

Pursuant to I.A. § 10-126(a)(12), the Commissioner may revoke an insurance producer's license if the insurance producer "failed or refused to pay over on demand money that belongs to an insurer, insurance producer, or other person entitled to the money . . . ." In granting the MIA's motion for summary decision as to I.A. § 10-126(a)(12), the Commissioner said, ECF 74-6 at 32 (internal citations omitted):

> Ms. Coomes' own words in her Affidavit, testimony and correspondence show that the money belonged to EBCA and/or Anthem and not to Ms. Coomes or her agency. She further concedes that Anthem demanded the immediate payment of the money and that she failed to pay the money back on demand. In fact, she admits that she withheld $2000, contending that Anthem otherwise owed her that amount and averred to the MIA that she will never pay Anthem $900 that it seeks from her.

In my view, the COA would have affirmed the Commissioner's decision as to I.A. § 10-126(a)(12), in part.

There is no dispute that Coomes "failed . . . to pay on demand money that belong[ed]" to Anthem. *See* I.A. § 10-126(a)(12). Anthem mistakenly sent approximately $20,000 to Coomes. Coomes never claimed a right to most of the money. And, Coomes admitted under oath that she failed to repay Anthem, "on demand," the money that Anthem mistakenly sent to her. She testified before the MIA, ECF 74-4 at 20: "Anthem wanted the payment in one lump sum and immediately and it wasn't possible." She also acknowledged that it took "[a]pproximately six months" for her to repay Anthem. *Id.* at 21; *see also* ECF 74-8 at 42–44, 46, ¶¶ 10, 13, 19 (Coomes Affidavit, 6/30/14). Her lawyer conceded the same during the hearing on the MIA's motion for summary decision on November 5, 2014. ECF 74-4 at 15 ("So I think that in this case there's no dispute

she didn't repay immediately . . . ."); *see also* ECF 77-1 at 16 (acknowledging that there is "no dispute that [Coomes] was not able to" repay "monies owed" to Anthem on demand).  For these reasons, the MIA was entitled to summary disposition as to the violation of I.A. § 10-126(a)(12).

Nevertheless, to the extent that the Commissioner determined that the MIA was entitled to summary disposition based on the failure of Coomes to immediately repay the entirety of the money that Anthem mistakenly sent to Coomes, I am of the view that the COA would have found error.  There is a dispute of material fact as to whether all of the funds in question constitute "money that *belongs to*" Anthem, within the meaning of I.A. § 10-126(a)(12).  Moreover, the statute is silent as to whether a set off is permissible.

Coomes repeatedly claimed the right to withhold a portion of the money, on the ground that Anthem owed her money.  From the outset, Coomes made clear to Anthem that she intended to offset the money when she repaid Anthem.  In an email from Coomes to Anthem on August 23, 2011, Coomes stated, ECF 74-9 at 47: "The purpose of my correspondence is to reiterate that I would like to repay Anthem in the full net amount I owe, however, I need to know the correct amount (the amount of the two checks minus the amounts of my bonuses that were included in those checks)."  In correspondence of December 4, 2013, from Coomes to Gross of the MIA (*id.* at 42–46), Coomes said, *id.* at 44: "Let me be very clear, I will not pay Anthem $900 because I do not owe them it.  It is well documented that Anthem owed me those funds."  The record is replete with other evidence to the same effect.  *See*, *e.g.*, ECF 74-8 at 44, ¶ 13: ("Ultimately, on behalf of the agency, I repaid Anthem the full amount of the funds which had been erroneously deposited, minus approximately $2,000 that was owed to me by Anthem for advertising co-op costs under its contract with me."); *id.* at 46, ¶ 19 ("I had deducted approximately $2,000 from the amount I owed Anthem because Anthem had intertwined the check issue with my advertising co-op

reimbursement in September 2011.  Anthem owed me the $2,000 for my co-op reimbursement.");
ECF 74-9 at 43 (Coomes letter to Gross of 12/4/13, stating: "Suspecting that Anthem intended to
stiff me [of] the advertising funds they had committed to reimburse me and because Anthem had
now made these two monetary issues intertwined, I deducted nearly $2,000 Anthem owed me from
the nearly $20,000 the agency owed Anthem.").

The issue may appear insignificant, given that Coomes violated I.A. § 10-126(a)(12) by
failing to repay, on demand, the undisputed portion of $20,000, *i.e.*, about $18,000.  However, the
finding as to I.A. § 10-126(a)(12) is directly tied to the Commissioner's conclusion that plaintiff
also violated I.A. § 10-126(a)(1).  Pursuant to I.A. § 10-126(a)(1), the Commissioner may revoke
an insurance producer's license if the producer "has willfully violated [the Insurance] article or
another law of the State that relates to insurance."  In other words, the insurance producer must
first commit a predicate violation of the Insurance Article, and that predicate violation must have
been willful.

The Commissioner concluded that Coomes violated I.A. § 10-126(a)(1), stating: "*Even
after acknowledging that the funds rightfully belonged to Anthem*, Ms. Coomes purposefully kept
some of it because she felt that Anthem owed it to her for an unrelated reason."  ECF 74-6 at 32
(emphasis added).  Thus, as to § 10-126(a)(1), the Commissioner relied on the finding that Coomes
violated I.A. § 10-126(a)(12) by withholding the $2,000 that she claimed Anthem owed to her.
But, Coomes never acknowledged that *all of* "the funds rightfully belonged to Anthem . . . ."  *Id.*
Indeed, she vigorously maintained that $2,000 of the money belonged to her, not Anthem.

Additionally, viewed in the light most favorable to Coomes, she did not willfully withhold
$18,000.  Instead, she maintained that she was unable to pay that amount on demand.  ECF 74-4
at 20 (hearing transcript, 11/5/14); ECF 74-8 at 1 (Coomes email to Anthem, 9/5/11).  A finding

that Coomes failed to pay on demand money owed to Anthem because she did not have the funds to do so is quite different from the finding of the Commissioner—that Coomes refused to pay on demand money that she had on hand and owed to Anthem. Therefore, I conclude that the Commissioner erred in finding that the MIA was entitled to summary disposition as to I.A. § 10-126(a)(1).

### b.  I.A. § 10-126(a)(6)

Pursuant to I.A. § 10-126(a)(6), the Commissioner may revoke an insurance producer's license if the producer "has committed fraudulent or dishonest practices in the insurance business." The Commissioner found that Coomes violated this provision by mishandling the Anthem checks. As noted, the Commissioner reasoned that, "[e]ven after acknowledging that the funds rightfully belonged to Anthem, Ms. Coomes purposefully kept some of it because she felt that Anthem owed it to her for an unrelated reason." ECF 74-6 at 32. The Commissioner added, *id.* at 33: "Ms. Coomes' own words establish that the money belonged to Anthem, that she did not pay it back to Anthem on demand and that she kept some of it for herself." The two sentences quoted above are the extent of the Commissioner's reasoning as to the violation of I.A. § 10-126(a)(6).

Coomes argues, ECF 77-1 at 15: "The term 'practices in the insurance business' speaks to engaging in a pattern of actions that constitute 'practices.'" In Coomes's view, that "is not what occurred here." *Id.* Instead, she argues that she "mistakenly deposited and spent monies intended for someone else," which was a "single event, not a pattern of conduct that would constitute 'practices.'" *Id.* at 15–16.

Moreover, plaintiff contends that the "fact that she disputed the amount that she was required to pay back is not an act of fraud or dishonesty.[]" *Id.* at 16. She asserts, *id.*: "There are no facts [t]o support an inference that Ms. Coomes acted with the intent to deceive or lie to anyone.

In fact, there are facts supporting the opposite inference." As Coomes puts it, *id.*: "After learning of the mistake, Ms. Coomes was transparent with everyone as to her efforts to repay the monies. The cashing of the check was inadvertent, as was the sending of the checks by Anthem and the honoring of the checks by her bank. When she learned of the mistakes, she acted openly[,] honestly, and as promptly as she could with her efforts to repay the amounts." She adds, *id.* at 16 n.4: "[I]ssues of intent and state of mind are not appropriate in summary judgment."

Defendants argue, ECF 74-1 at 14: "Plaintiff cannot, and does not, dispute that she took six months to repay most of the money to Anthem and, in fact, *deliberately* kept approximately $2,000 as funds she believed to be owed to her in an independent matter." (Emphasis in ECF 74-1). Moreover, defendants maintain that "the Commissioner did not need to find that Plaintiff had the requisite intent" to violate I.A. ¶ 10-126(a)(6) because the "'statute provides no exceptions for the license holder's state of mind, subjective belief, or for disputes over who is the rightful owner of the money.'" *Id.* at 15 (citation omitted). Therefore, defendants argue that the Commissioner "was not required to hold an evidentiary hearing to determine whether Plaintiff had the requisite intent to commit fraud and/or dishonest conduct." *Id.*

The matter was before the Commissioner on a motion for summary disposition. Therefore, as discussed, the Commissioner was required to view the evidence and all inferences drawn therefrom in the light most favorable to Coomes, the party opposing the motion for summary disposition. *Rowhouses, Inc.*, 446 Md. at 631, 133 A.3d at 1066. As mentioned, "[t]he legal standard for granting summary disposition is the same as that for granting summary judgment under Maryland Rule 2-501(a)." *Brawner Builders, Inc.*, 476 Md. at 31, 258 A.3d at 226.

Notably, the COA has said that "'cases that primarily raise issues of fraud or intent are . . . generally ill-suited for summary judgment due to the need for greater than usual factual

development.'" *Gross v. Sussex Inc.*, 332 Md. 247, 256, 630 A.2d 1156, 1160 (1993) (citation omitted).  Moreover, "it is often inappropriate to grant summary disposition where there are factual issues related to knowledge, motive, or intent because such issues may require 'greater than usual factual development[.]'" *Brawner Builders, Inc.*, 476 Md. at 42, 258 A.3d at 233 (citation omitted; alteration in *Brawner Builders, Inc.*); *see also Eng'g Mgmt. Servs., Inc. v. Maryland State Highway Admin.*, 375 Md. 211, 230, 825 A.2d 966, 977 (2003) ("We consistently have held that 'summary judgment generally is inappropriate when matters—such as knowledge, intent or motive—that ordinarily are reserved for resolution by the fact-finder are essential elements of the plaintiff's case or defense.'") (citation omitted).

Neither the statute nor COMAR defines the terms "dishonest" or "fraudulent."  Therefore, I shall again consult the dictionary.  Merriam Webster's Dictionary defines "dishonest" as "characterized by lack of truth, honesty, or trustworthiness: unfair, deceptive."  *Dishonest*, Merriam Webster, available at https://perma.cc/4RXJ-NCRT.  Black's Law Dictionary defines "fraudulent act" as "[c]onduct involving bad faith, dishonesty, a lack of integrity, or moral turpitude."  *Fraudulent Act*, Black's Law Dictionary (12th ed. 2024).  And, Merriam Webster's Dictionary defines fraudulent as "characterized by, based on, or done by fraud: deceitful."  *Fraudulent*, Merriam Webster, available at https://perma.cc/X3Q4-QADN.    Fraud, in turn, is defined as "deceit, trickery", "an act of deceiving or misrepresenting," or "intentional perversion of truth in order to induce another to part with something of value or to surrender a legal right."  *Fraud*, Merriam Webster, available at https://perma.cc/G9H8-GFR7.  Thus, fraud inherently requires some sort of intentional dishonesty or deceit.

Here, in or about June 2011, Anthem mistakenly sent two checks to Coomes.  There is no indication that the checks were deposited by Coomes or her agency with knowledge that the agency

was not the payee. Thereafter, Coomes used the funds to pay ordinary business expenses. Coomes sent an email to Anthem on August 23, 2011, expressing a desire to repay what she owed, "minus" money that Anthem owed her. ECF 74-9 at 47. But, Coomes could not repay the $20,000 in a lump sum. Even when Coomes agreed to repay the money, however, she retained approximately $2,000 of the money, claiming that Anthem owed that sum to her pursuant to an unrelated matter. Plaintiff appears to have believed that she was entitled to deduct from the money that she owed Anthem the money that Anthem allegedly owed her. And, she did just that when she sent Anthem two checks, totaling about $18,000. ECF 74-8 at 4.

Given the posture of the case, the Commissioner was not entitled to infer that Coomes acted with fraudulent intent when the checks were deposited. Moreover, crediting Coomes's version of events, a factfinder could conclude that Coomes's decision to retain $2,000 of the money did not amount to deceit or intentional dishonesty. Viewing the evidence in the light most favorable to plaintiff, as required, the COA likely would have concluded that there were disputes of material fact pertaining to whether Coomes engaged in "fraudulent" or "dishonest practices in the insurance business." I.A. § 10-126(a)(6). That determination was improperly made on summary disposition.

Even assuming, *arguendo*, that plaintiff's conduct amounted to fraud or dishonesty, the Commissioner erred in concluding that the MIA was entitled to summary disposition as to the violation of I.A. § 10-126(a)(6). As noted, the statute states that disciplinary action may be taken against an insurance producer who engages in "fraudulent or dishonest *practices* in the insurance business." I.A. § 10-126(a)(6) (emphasis added). But, the statute does not define the word "practices." Coomes contends that the "term 'practices in the insurance business' speaks to

engaging in a pattern of actions that constitute 'practices,'" and that "is not what occurred here." ECF 77-1 at 15.

Merriam Webster's Dictionary defines "practice" as "to do or perform often, customarily, or habitually" and "a repeated or customary action." *Practice*, Merriam Webster's Dictionary, available at https://perma.cc/L75G-S6ET. Black's Law Dictionary defines "practice" as "[a]n established custom or prescribed usage", as well as a "customary action or procedure." *Practice*, Black's Law Dictionary (12th ed. 2024). And, the Random House College Dictionary defines "practice" as "to perform or do habitually or usually." *Practice*, Random House College Dictionary 1040 (1980 rev. ed.).

There is no evidence that Coomes "habitually", "usually", or "customarily" engaged in fraudulent or dishonest conduct in the insurance business. The Anthem check episode was an isolated occurrence. As Coomes puts it, ECF 77-1 at 15–16, plaintiff "mistakenly deposited and spent monies intended for someone else," which was a "single event, not a pattern of conduct that would constitute 'practices.'"

For the foregoing reasons, I conclude that the COA likely would have determined that the MIA was not entitled to summary disposition as to the alleged violation of I.A. § 10-126(a)(6).

### c. I.A. § 10-126(a)(13)

Pursuant to I.A. § 10-126(a)(13), the Commissioner may revoke an insurance producer's license if the insurance producer has "shown a lack of trustworthiness or competence to act as an insurance producer." In the Summary Disposition Order, the Commissioner found that Coomes was incompetent or untrustworthy to act as an insurance producer for three reasons. ECF 74-6 at 30–31. The Commissioner said, *id.*:

> Respondent's failure to report the Virginia Bureau matter to the Commissioner in violation of § 10-126(f) and her attempt to downplay the Virginia action by

disclosing the surrender of her Virginia license in the middle of an otherwise unrelated letter show a lack of trustworthiness to act as an insurance producer, or at least a lack of competence. Further, Respondent's failure or refusal to provide a copy of the Voluntary Surrender Agreement when asked by the MIA for the documents related to the Virginia action also shows untrustworthiness or incompetence.

The Commissioner found that Coomes violated I.A. § 10-126(f), which required her to report within 30 days an adverse administrative action. And, on that basis, the Commissioner also found that, under I.A. § 10-126(a)(13), Coomes was incompetent or untrustworthy to act as an insurance producer. But, as discussed, the statute does not define "adverse administrative action." Moreover, at the relevant time, there were no reported Maryland decisions indicating that a voluntary surrender of an insurance producer license constitutes an adverse administrative action. Nor did the MIA ever point to any agency precedent establishing that a voluntary license surrender constitutes an adverse administrative action. Moreover, counsel for the MIA advised Coomes in May 2014 that a license surrender does not constitute an adverse administrative action. ECF 74-5 at 8.[27] And, Coomes testified that employees of the Virginia Bureau also told her that the VSA was not an adverse action. ECF 74-4 at 23. For these reasons, I disagree with the Commissioner's conclusion that Coomes's failure to report the VSA, in violation of I.A. § 10-126(f), demonstrates a lack of trustworthiness or competence to act as an insurance producer within the meaning of I.A. § 10-126(a)(13).

I also reject the Commissioner's finding that Coomes attempted to "downplay the Virginia action" in her letter to the MIA requesting to change her Maryland producer's license from nonresident to resident. ECF 74-6 at 30. Given the posture of the case, it was improper for the

---

[27] As discussed, counsel for the MIA made this statement to Coomes in an email of May 8, 2014 (ECF 74-5 at 8), long after Coomes was required to have reported the VSA to the MIA. But, it is pertinent with respect to Coomes's omission

Commissioner to find that, in the letter to the MIA, Coomes acted with the intent to "downplay the Virginia action." *Id.* Coomes's testimony and sworn statements, if credited, would establish that Coomes, who is not a lawyer, did not know that she had to report the VSA to the MIA. *See, e.g.*, ECF 74-8 at 45, ¶ 18; ECF 74-4 at 22. Indeed, in the light most favorable to Coomes, it is difficult to understand why she would have intended to downplay something that she did not believe she was under any obligation to report. As Coomes puts it, ECF 77-1 at 13: "The Commissioner's language is replete with inferences drawn adversely to Ms. Coomes, which was improper at this stage of MIA's proceeding."

To be sure, others may have been more forthcoming than Coomes in disclosing what occurred. But, the Commissioner was not entitled to draw inferences adverse to Coomes, so as to conclude that Coomes was incompetent or untrustworthy.

As mentioned, the Commissioner also found that Coomes failed or refused to produce the VSA to the MIA upon request. But, that is a questionable interpretation of the evidence. The Order to Appear and Produce issued by the MIA ordered Coomes to appear before the Commissioner on May 31, 2013, and to "bring . . . a copy of all records associated with the surrender of your Virginias [sic] producer license . . . ." ECF 74-9 at 41. And, the order advised Coomes that "[f]ailure to appear or comply with any portion of this Order, will be considered a violation of this Order and a violation of the Insurance Article, Annotated Code of Maryland and may subject you to administrative action." *Id.* Gross, an Enforcement Officer at the MIA, avers that, despite the Order to Appear and Produce, Coomes did not provide a copy of the VSA. ECF 74-9 at 39, ¶ 10.

The Order to Appear and Produce only directed Coomes to bring the documents to the proceeding on May 31, 2013. It did not otherwise direct Coomes to deliver the documents to the

MIA.  And, Coomes did not appear before the Commissioner on May 31, 2013.  The Court cannot find in the record an explanation for Coomes's absence.  However, the MIA never complained that Coomes failed to appear, which suggests that there was a legitimate reason for Coomes's absence.

In any event, Coomes met with Gross on August 13, 2013.  ECF 74-8 at 47, ¶ 22.  Coomes avers that she produced the VSA at that time and also brought "a stack approximately 10 inches high of all documents that could possibly be relevant."  *Id.*  On the record before me, I cannot say that Coomes showed a lack of "trustworthiness or competence" by failing to produce the VSA prior to the meeting of August 13, 2013.  Simply put, there is no evidence that Coomes violated the Order to Appear and Produce.

Defendants also argue that Coomes's "*deliberate* decision to withhold $2000 owed to Anthem . . . demonstrated a 'lack of trustworthiness' and/or 'competence to act as an insurance producer' . . . ."  ECF 81 at 2 (emphasis in ECF 81).  The MIA specifically argued in its motion for summary disposition that plaintiff violated I.A. § 10-126(a)(13) by failing to "timely repay the money she admits she owed Anthem . . . ."  ECF 74-9 at 19.  The Commissioner granted the MIA's motion for summary decision as to § 10-126(a)(13).  But, the Commissioner never mentioned the Anthem checks in support of her conclusion that the MIA was entitled to summary disposition as to § 10-126(a)(13).  *See generally* ECF 74-6 at 14–34.

It is well established that an "appellate court generally may not affirm an administrative agency . . . on grounds on which the agency itself did not rely in making its decision."  *People's Couns. for Baltimore Cnty. v. Surina*, 400 Md. 662, 687 n.26, 929 A.2d 899, 913 n.26 (2007) (citing cases); *see Green v. Church of Jesus Christ of Latter-Day Saints*, 430 Md. 119, 132, 59 A.3d 1001, 1009 (2013) ("'[W]e may not uphold the final decision of an administrative agency on grounds other than the findings and reasons set forth by the agency.'") (citation omitted; alteration

in *Green*); *Unger v. State*, 427 Md. 383, 404 n.9, 48 A.3d 242, 254 n.9 (2012) ("A reviewing court ordinarily will not affirm an agency decision on a different ground even if the ground is adequately shown by the record."); *Motor Vehicle Admin. v. Shepard,* 399 Md. 241, 260, 923 A.2d 100, 111 (2007) ("[T]he reviewing court, restricted to the record made before the administrative agency, may not pass upon issues presented to it for the first time on judicial review and that are not encompassed in the final decision of the administrative agency.").

Stated differently, "an appellate court will review an adjudicatory agency decision solely on the grounds relied upon by the agency." *Id.*; *see also Dep't of Health & Mental Hygiene v. Campbell*, 364 Md. 108, 112 n.26, 771 A.2d 1051, 1053 n.26 (2001) ("An administrative agency may be affirmed only on the basis of the grounds on which it decided the case."); *Ins. Comm'r v. Equitable Life Assurance Soc'y of the United States,* 339 Md. 596, 634, 664 A.2d 862, 881 (1995) ("[J]udicial review of administrative decisions is limited to the issues or grounds dealt with by the administrative agency."); *Anderson v. Dep't of Pub. Safety & Correctional Servs.,* 330 Md. 187, 213 n. 2, 623 A.2d 198, 211 n. 2 (1993) ("[I]n judicial review of agency action the court may not uphold the agency order unless it is sustainable on the agency's findings and for the reasons stated by the agency."). Therefore, I am of the view the COA would not have addressed the question for the first time on appeal.

For the reasons stated above, I conclude that the COA likely would have determined that the Commissioner erred in granting summary disposition to the MIA as to the alleged violation of I.A. § 10-126(a)(13).

### 3. Double Jeopardy, Doctrine of Merger, and Rule of Lenity

As noted, when the COA granted certiorari, the questions included, ECF 53-1 at 3: "Did the Hearing Officer commit reversible error when she declined to apply the law of Double Jeopardy, the doctrine of Merger or the Rule of Lenity to the Administrative Proceeding?"

Defendants persuasively argue that double jeopardy principles, the doctrine of merger, and the rule of lenity do not apply in the context of a civil administrative proceeding. *See* ECF 74-1 at 17–21. Coomes advances no argument whatsoever with respect to any of these principles.

I need not spill ink to consider contentions that are waived. *See, e.g.*, *United Supreme Council v. United Supreme Council of Ancient Accepted Scot. Rite for 33 Degree of Freemasonry*, 329 F. Supp. 3d 283, 292 (E.D. Va. 2018) ("Failure to respond to an argument made in a dispositive pleading results in a concession of that claim."); *McRae v. Westcor Land Title Ins.*, RWT-16-2332, 2017 WL 1239682, at *3 (D. Md. Mar. 17, 2017) ("Plaintiffs ignore Defendant's statute of limitations argument and fail to address the issue whatsoever. In failing to respond, they have conceded the point."); *Stenlund v. Marriott Int'l, Inc.*, 172 F. Supp. 3d 874, 887 (D. Md. 2016) ("In failing to respond to this argument[,] Plaintiff concedes the point."); *Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 777 (D. Md. 2010) ("By her failure to respond to this argument, the plaintiff abandons any discriminatory discharge claim."); *Kissi v. Panzer,* 664 F.Supp.2d 120, 123 (D.D.C. 2009) ("Because the plaintiff's opposition fails to address the defendants' arguments, the Court may treat the defendants' motion as conceded.").[28]

---

[28] Coomes did not include a rule of lenity argument in her opening brief before the CSA, *see generally* ECF 74-3 at 1–37, and the CSA did not address the issue. *See generally Coomes*, 232 Md. App. 285, 157 A.2d 364; *see also, e.g.*, *Scott v. Maryland*, 454 Md. 146, 188–89, 164 A.3d 177, 202 (2017) ("Under Maryland Rule 8–131(b)(1), to preserve an issue for this Court's review, a party must raise the issue in the Court of Special Appeals if the case came before that Court."); *Lockett v. Blue Ocean Bristol, LLC*, 446 Md. 397, 418, 132 A.3d 257, 269 (2016); *Maryland v. Earp*, 319 Md. 156, 168 n.4, 571 A.2d 1227, 1233 n.4 (1990).

Even if the arguments are not waived, however, I conclude that the COA would have affirmed as to this issue. The Double Jeopardy Clause of the United States Constitution provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb[.]" U.S. CONST., AMEND. V. The "United States Supreme Court has made clear that the Double Jeopardy Clause only protects 'against the imposition of multiple *criminal* punishments for the same offense.'" *Garrity v. Maryland State Bd. of Plumbing*, 447 Md. 359, 383, 135 A.3d 452, 467 (2016) (quoting *Hudson v. United States,* 522 U.S. 93, 99 (1997)) (emphasis in *Garrity*). A penalty or sanction is considered criminal if (1) the statute that authorizes it indicates a preference for it to be criminal; or (2) even if the statute indicates that it is a civil penalty or sanction, the penalty or sanction is nevertheless "'so punitive in form and effect as to render [it] criminal.'" *Garrity*, 447 Md. at 385, 386, 135 A.3d at 468, 469 (quoting *Hudson*, 522 U.S. at 104) (alteration in *Garrity*).

The statute that authorizes the license revocation and monetary penalty does not indicate a preference for these disciplinary actions to be criminal. *See generally* I.A. § 10-126. And, in analogous cases, the COA has stated that disciplinary actions taken by regulatory agencies against licensees are meant to protect the public, making them remedial, as opposed to punitive. For example, in *Garrity*, 447 Md. at 387, 125 A.3d at 469, the COA said: "We have held that penalties imposed on licensed individuals for violating provisions attendant to that license are outside of the reach of the Double Jeopardy Clause because those penalties are directed toward protecting the public, and are therefore remedial, rather than punitive." *See also Spencer v. Maryland State Bd. of Pharmacy*, 380 Md. 515, 534, 846 A.2d 341, 352 (2004) ("The Board [of Pharmacy]'s enforcement of its licensing and disciplinary requirements serve purposes essential to the protection of the public, which are deemed remedial, rather than punitive, and therefore are not subject to double jeopardy principles."); *McDonnell v. Comm'n on Med. Discipline*, 301 Md. 426,

436, 483 A.2d 76, 81 (1984) ("The purpose of disciplinary proceedings against licensed professionals is not to punish the offender but rather as a catharsis for the profession and a prophylactic for the public."); *Nuger v. State Ins. Comm'r*, 238 Md. 55, 69, 207 A.2d 619, 626 (1965) ("The licensing provisions of the [Insurance Article] are for the protection of the public."); *Culver v. Maryland Ins. Com'r*, 175 Md. App. 645, 656, 931 A.2d 537, 544 (2007) (stating that, "as a regulatory body, the MIA is charged with protecting consumers from untrustworthy insurance producers by revoking or denying their licenses."); *cf. In re Barton*, 273 Md. 377, 381, 329 A.2d 102, 104 (1974) ("The principal purpose of disbarment [of a lawyer] is to protect the public.").

As indicated, Coomes was charged with failing to report to the MIA the adverse administrative action taken against her in Virginia and for failing to produce to the MIA the Voluntary Surrender Agreement when ordered to do so. These are violations of *Maryland's* insurance law, that are separate and independent from the alleged violations of *Virginia's* insurance law. Therefore, I conclude that double jeopardy principles do not apply here.

I also conclude that the doctrine of merger does not apply here. "Merger is the common law principle that derives from the protections afforded by the Double Jeopardy Clause." *Maryland v. Frazier*, 469 Md. 627, 641, 231 A.3d 482, 490 (2020). The COA has required merger "'when: (1) the *convictions* are based on the same act or acts, and (2) under the required evidence test, the two offenses are deemed to be the same, or one offense is deemed to be the lesser included offense of the other.'" *Id.* (citation omitted; emphasis added). Again, plaintiff's offenses are not criminal convictions.

Moreover, the rule of lenity also does not aid plaintiff. As the COA explained in *Oglesby v. State*, 441 Md. 673, 681, 109 A.3d 1147, 1151 (2015): "The 'rule of lenity' is not a rule in the

usual sense, but an aid for dealing with ambiguity in a *criminal* statute." (Emphasis added). "Under the rule of lenity, a court confronted with an otherwise unresolvable ambiguity in a *criminal* statute that allows for two possible interpretations of the statute will opt for the construction that favors the defendant." *Id.* (emphasis added). The Insurance Article is not a criminal statute; therefore, the rule of lenity is inapplicable.

### 4. The Additional Evidence Motion

The COA appears to have granted certiorari on the following question: "Did the Circuit Court err when it denied the Appellant's Motion for Leave to Offer Additional Evidence?" ECF 53-1 at 3.

As noted, pursuant to S.G. § 10-222(f), Coomes sought a remand from the circuit court to the MIA so that the MIA could consider the Brown Affidavit. *See* ECF 74-10 at 58–59. Brown averred that she was charged with two counts of felony attempted capital murder and agreed to the voluntary surrender of her Virginia insurance producer's license in lieu of a formal hearing that could lead to revocation of her license. *Id.* at 64, ¶¶ 7, 10–12. She attached an NIPR report to her Affidavit, which indicated that no adverse administrative action had been taken against her. *Id.* at 69–71.

The circuit court assumed that Coomes had good reason not to introduce the evidence earlier. ECF 74-10 at 36 (hearing transcript); *id.* at 57 (order). But, the court denied the Additional Evidence Motion on the basis that the Brown affidavit was "not material." *Id.* at 36.

S.G. § 10-222(f) provides, in part (emphasis added):

(f)(1) Judicial review of disputed issues of fact shall be confined to the record for judicial review supplemented by additional evidence taken pursuant to this section. (2) The court *may* order the presiding officer to take additional evidence on terms that the court considers proper if:
    (i) before the hearing date in court, a party applies for leave to offer additional evidence; and

77

(ii) the court is satisfied that:
1. the evidence is material; and
2. there were good reasons for the failure to offer the evidence in the proceeding before the presiding officer.

As the CSA observed, S.G. § 10-222(f)(2) states that the circuit court "may" order the administrative agency to consider additional evidence. *Coomes*, 232 Md. App. at 314, 157 A.3d at 381. The word "may" means that the circuit court judge had discretion whether or not to allow the introduction of new evidence. *Id.* at 313, 157 A.3d at 381; *see also Gigeous v. E. Corr. Inst.*, 132 Md. App. 487, 506, 752 A.2d 1238, 1248 (2000) (noting that S.G. § 10-222(f) "confers upon the court complete discretion to allow additional evidence" or not), *aff'd*, 363 Md. 481, 769 A.2d 912 (2001). In general, a judge abuses discretion "when the discretion was 'manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons,' or when 'no reasonable person would take the view adopted by the [trial] court.'" *Wilson-X v. Dep't of Hum. Res.*, 403 Md. 667, 677, 944 A.2d 509, 515 (2008) (citations omitted; alteration in *Wilson-X*). But, "an abuse of discretion should only be found in the extraordinary, exceptional, or most egregious cases." *Wilson v. John Crane, Inc*., 385 Md. 185, 199, 867 A.2d 1077, 1084 (2005).

In Defendants' Motion, they argue, ECF 74-1 at 21 (internal citation omitted): "[T]he additional evidence Plaintiff sought to introduce, an affidavit from Caren Brown, a former Virginia insurance producer (and convicted felon), testifying about her case before the Virginia Insurance Bureau and her understanding as to whether the voluntary surrender of her license was 'adverse,' was wholly irrelevant and immaterial to Plaintiff's proceeding before the MIA."

Notably, like the arguments pertaining to Double Jeopardy, the rule of lenity, and the doctrine of merger, Coomes has failed to respond to defendants' arguments concerning the Additional Evidence Motion. Therefore, she has abandoned her contention. *See United Supreme*

*Council*, 329 F. Supp. 3d at 292; *McRae*, 2017 WL 1239682, at *3; *Stenlund*, 172 F. Supp. 3d at 887; *Ferdinand-Davenport*, 742 F. Supp. 2d at 777; *Kissi*, 664 F. Supp. 2d at 123.

Even if Coomes had responded, I am satisfied that the COA would have determined that the circuit court did not err or abuse its discretion in denying the Additional Evidence Motion. In short, Brown's experience, or her understanding of what constitutes an adverse administrative action within the meaning of Maryland's statute, is not probative. And, the fact that Brown did not have an adverse administrative action on her NIPR report is, at best, only marginally relevant.

### 5. Remedy

In light of the Court's determinations, the question arises as to the appropriate remedy here. Coomes contends that "the MIA's ruling" on Sections 10-126(f), (a)(1), (6), and (13) of the Insurance Article "should be reversed" and she seeks an order that she did not violate those sections. ECF 77-1 at 19. Coomes also asserts that "revocation of [her] license was an inappropriate sanction, especially at the summary judgment stage." *Id.* at 17. Thus, she asserts: "[T]he matter should be set in for a full evidentiary hearing as Ms. Coomes originally requested to allow [her] to present mitigating evidence." *Id.* at 18.[29] Moreover, with respect to § 10-126(a)(12), plaintiff "seeks a reversal of the MIA's ruling on the issue and an order that Ms. Coomes is entitled to a full evidentiary hearing to provide testimony regarding mitigation." *Id.* at 19.[30]

---

[29] S.G. § 10-210 does not provide for a separate "mitigating evidence hearing." In any event, Coomes presented significant mitigating evidence during the administrative proceedings. In particular, the Commissioner considered two of plaintiff's affidavits, numerous letters, and her hearing testimony, all of which included mitigating evidence. *See* ECF 74-6 at 17.

[30] Aside from defendants' contention that they are entitled to summary judgment as a matter of law, defendants do not discuss the appropriate remedy. *See generally* ECF 74-1; ECF 81. Nor do they respond to plaintiff's request for a full evidentiary hearing. *See generally* ECF 74-1; ECF 81.

As stated, I have concluded that the COA would have determined that the Commissioner committed an error of law by improperly granting summary disposition to the MIA as to the alleged violations of I.A. §§ 10-126(a)(1), (6) and (13). *See Brawner Builders, Inc.*, 476 Md. at 30–31, 258 A.3d at 226 (stating that "the propriety of granting a motion for summary disposition is a legal question"). But, the COA likely would have affirmed the MIA on all other grounds, including as to the violations of I.A. §§ 10-126(a)(12) and (f).[31] However, because the COA would have rejected part of the MIA's decision, I am of the view that the case would have been remanded to the MIA for further proceedings. In the briefing, neither side accounts for the possibility of a remand or the implications of a remand.

The COA has explained: "When an administrative function remains to be exercised at the end of the day, we hold generally that a court must remand the case to the administrative agency." *Cnty. Council of Prince George's Cnty. v. Zimmer Dev. Co.*, 444 Md. 490, 581, 120 A.3d 677, 732 (2015); *see also Maryland Bd. of Pub. Works v. K. Hovnanian's Four Seasons at Kent Island, LLC*, 425 Md. 482, 522, 42 A.3d 40, 63 (2012) ("The error committed by the Board was one of law—applying the wrong standard in formulating its decision. The appropriate remedy in such a situation is to vacate the decision and remand for further proceedings designed to correct the error."); *Bereano v. State Ethics Comm'n,* 403 Md. 716, 756, 944 A.2d 538, 561 (2008) ("As it is not properly our role to determine whether the agency's decision, absent this unavailable justification, otherwise would have been the same, reversal shall be the result and a remand for further proceedings before the Commission."); *O'Donnell v. Bassler*, 289 Md. 501, 509, 425 A.2d 1003, 1008 (1981) (stating that "if an administrative function remains to be performed after a

_____

[31] As explained, I conclude that the Commissioner properly granted the MIA's motion for summary disposition as to I.A. § 10-126(a)(12), in part.

reviewing court has determined that an administrative agency has made an error of law, the court ordinarily may not modify the agency order.  Under such circumstances, the court should remand the matter to the administrative agency without modification . . . .").[32]

As explained, I believe Coomes would have prevailed in the COA to the extent of entitlement to a remand to the MIA.  Presumably, the MIA would have proceeded to a full hearing on remand as to the provisions of the Insurance Article for which summary disposition was not appropriate.  However, I cannot say whether, on remand, the Commissioner would have reached the same results, either as to the merits or the penalty.  But, I note that when the MIA issued an amended order on June 30, 2014, adding the violations of I.A. §§ 10-126(a)(1), (6), and (12), the administrative penalty was increased from $500 to $1,250.  ECF 74-6 at 2.  Therefore, it appears that the penalty was tied to the number of violations of the Insurance Article.  The MIA's sanction was also predicated, at least in part, on the ground that Coomes engaged in fraudulent or dishonest practices in the insurance business, in violation of I.A. § 10-126(a)(6).  But, with fewer violations, and in the absence of fraudulent or dishonest practices, the MIA may well have imposed a reduced sanction.

Critically, I am not aware of any authority that would allow me, in the context of this legal malpractice case, to order the MIA, a Maryland State agency, to conduct proceedings on remand.

---

[32] A "court need not remand . . . if the remand would be futile."  *Cnty. Council of Prince George's Cnty.*, 444 Md. at 581, 120 A.3d at 732.  The Commissioner in the Summary Disposition Order stated that plaintiff's violations of I.A. §§ 10-126(a)(13) and (f), standing alone, were sufficient to uphold the MIA's decision.  ECF 74-6 at 33 n.2 ("Even if there are genuine issues of material facts related to the violation of §§ 10-126(a)(1), (6), and (12), the revocation and administrative penalty are supported by Respondent's violation of §§ 10-126(a)(13) and 10-126(a)(13) [sic], and the MIA is still entitled to summary disposition in this matter.").  But, there are genuine disputes of material fact concerning whether Coomes violated I.A. § 10-126(a)(13) (*i.e.*, that she demonstrated a lack of competence or trustworthiness to act as an insurance producer).  Therefore, a remand would not be futile.

The prospect of a do-over with regard to the underlying proceedings before the MIA evaporated when the COA dismissed the appeal.

The ordinary remedy in a legal malpractice action is monetary damages. To prevail on her malpractice claims, Coomes "must prove by a preponderance of the evidence that, but for [Moran's] misconduct," she "would have obtained a more favorable judgment in the previous action." *Suder*, 413 Md. at 241, 992 A.2d at 420; *see S. Farm Bureau Cas. Ins. Co.*, 118 S.W.3d at 530 ("To show damages and proximate cause, the plaintiff must show that, but for the alleged negligence of the attorney, the result in the underlying action would have been different.").

The unusual posture of the case raises three questions: (1) Is the fact that Coomes would have obtained a remand to the MIA sufficient to show causation/damages for purposes of plaintiff's legal malpractice claims, or must Coomes further show that she would have received a more favorable sanction on remand?; (2) If Coomes is required to show a more favorable result on remand, is the inquiry one of causation or damages?; and (3) If Coomes is required to show a more favorable result on remand, who is charged with making that determination: the Court as a matter of law or a federal jury as a matter of fact? The parties do not address these critical questions.

The case of *Oteiza v. Braxton*, 547 So. 2d 948 (Fla. Dist. Ct. App. 1989), is informative as to the first and second questions. There, a physician hired an attorney to represent him in an appeal of an order entered by the Florida Board of Medical Examiners ("Board"), suspending the physician's medical license for three years. *Id.* at 949. The appeal was dismissed due to the attorney's failure to timely file a petition for judicial review. *Id.* Subsequently, the physician filed a legal malpractice suit against the attorney. *Id.* The trial court granted summary judgment to the attorney on the basis that any appeal would have been unsuccessful. *Id.* The plaintiff appealed. *Id.*

Because the Board improperly considered certain evidence, the appellate court determined that, if the attorney had properly filed a petition for judicial review, the appellate court "most probably would have reversed and remanded the case to the board for reconsideration of the penalty imposed.[]" *Id.* at 950. Therefore, the court reversed the grant of summary judgment and remanded to the trial court. *Id.* at 951. Significant here, the court said, *id.* at 950–51 (emphasis added):

> In order to prevail on the merits of his legal malpractice claim, [the plaintiff] must, of course, also demonstrate that he would most probably have obtained relief after remand to the Board of Medical Examiners. If the physician shows that the board most probably would have imposed a reduced penalty on remand, then he will have demonstrated *injury* by his being deprived of his appeal; if, however, the board most probably would have reimposed the same penalty, then the legal malpractice action must fail, for no *injury* will have been shown.

*Oteiza* makes clear that a remand is insufficient in and of itself to show "injury." Rather, to show "injury," a plaintiff must show that the result of the proceedings on remand would have been more favorable to the plaintiff.

Judge Smalkin applied the *Oteiza* Court's reasoning in the case of *Royal Ins. Co. of Am. v. Miles & Stockbridge, P.C.*, 133 F. Supp. 2d 747, 768 (D. Md. 2001), *on reconsideration*, 138 F. Supp. 2d 695, *amended in part*, 142 F. Supp. 2d 676. Citing *Oteiza*, the federal court recognized that, to recover for legal malpractice in Maryland, the plaintiff must show not only that the plaintiff would have prevailed on appeal, but also that a different result would have occurred on remand. 133 F. Supp. 2d at 768. But, unlike in *Oteiza*, the court viewed the inquiry as one of causation, not damages. *See id.* at 767–68. And, unlike in this case, there was testimony from the presiding

trial court judge in the underlying case, indicating that "the outcome would have likely been the same on remand." *Id.* at 768.[33]

The two courts differed on the question of whether the inquiry is a matter of causation or damages.[34]  Regardless, the key takeaway from *Royal Ins. Co. of Am.* and *Oteiza* is that, in order to prevail, Coomes must show that, had the case been remanded, in part or for a full evidentiary hearing, the result would have been more favorable for her.  *See also* Ronald E. Mallen, *Legal Malpractice* § 33:118 (2025 ed.) ("If the appeal should have been successful, the plaintiff must next prove that there should have been a better result.[]  This burden can be satisfied if the appeal itself would have resulted in a judgment in the client's favor without the need for a retrial.[]  If a retrial is the result of appellate review, then the client must next persuade the trier of fact that the client should have done better at the new trial.[]  There must be a compensable injury since negligence without damage is not actionable.[]").

*Suder*, 413 Md. 230, 992 A.2d 413, is helpful to the question of who is to decide what would have occurred on remand.  There, the plaintiff, Suder, sued Whiteford, Taylor & Preston, LLP ("Whiteford"), a law firm that formerly represented Suder, alleging that Whiteford "committed legal malpractice when it missed the deadline to request" a fifth "extension of time to file [the plaintiff's] request to elect her statutory share of her late husband's estate." *Id.* at 233, 992 A.2d at 415.  The Orphan's Court denied the plaintiff's motion for statutory election because

---

[33] In *Suder*, 413 Md. at 246, 992 A.2d at 422, the COA said: "'[T]he judges or jurors who heard or would have heard the original trial or appeal may not be called as witnesses to testify as to how they would have ruled.  That would constitute an inappropriate burden on the judiciary and jurors and an unwise personalization of the issue of how a reasonable judge or jury would have ruled.'"  (Quoting Restatement § 53 cmt. b).

[34] Both causation and damages are necessary elements of a legal malpractice claim.  *Suder*, 413 Md. at 239, 992 A.2d at 418.  Here, the line between causation and damages may be blurred.  But, the difference is not particularly important in this case.

it was untimely. *Id.* at 235, 992 A.2d at 416. Therefore, the plaintiff lost her right to disclaim her husband's will and elect a statutory share of his estate, resulting in the plaintiff's receipt of less money under the will than she would have received from an elective share. *Id.* at 237, 992 A.2d at 417.

In the malpractice case, Whiteford did not dispute that it breached its duty of care by failing to request an extension until after the deadline. *Id.* at 233, 992 A.2d at 415. Nevertheless, Whiteford argued that the complaint should be dismissed, because Whiteford was not the proximate cause of the plaintiff's damages. *Id.* at 237, 992 A.2d at 417.

Specifically, Whiteford argued that the plaintiff "lost the right to elect a statutory share of her husband's estate when her first *pro se* request for an extension was not granted by the Orphans' Court until after the expiration of the election period . . . ." *Id.* In other words, according to Whiteford, the Orphans' Court could not have granted the fifth extension request, "because its earlier order granting a previous extension was void." *Id.* at 233, 992 A.2d at 415. And, Whiteford argued that the decedent's son and sole surviving beneficiary of the residuary trust "would have challenged the validity of the first extension, and would have prevailed, had the Circuit Court not already denied Suder's fifth extension as untimely." *Id.* at 240, 992 A.2d at 419. Notably, there was no dispute that the first extension request was erroneously granted, making it voidable by the son at any time. *Id.* at 244, 992 A.2d at 421.

The trial court granted summary judgment to the plaintiff. But, the CSA reversed and remanded for entry of judgment in favor of Whiteford. *Id.* at 233–34, 992 A.2d at 415.

On certiorari, the COA first determined that the trial-within-a-trial doctrine was applicable and that "Whiteford is limited to those defenses that [the son] *would have* raised in the underlying action if he could not attack the fifth petition, rather than those he *actually* raised." *Id.* at 245, 992

A.2d at 421 (emphasis in *Suder*).  Then, the COA considered how the case should proceed.  The court said, *id.* at 246, 992 A.2d at 422: "Whether [the son] would have actually challenged the first extension if the defense of the improperly granted fifth extension was not available to him, is a question of fact.  As Comment b to Section 53 of the [Restatement] explains, 'What would have been the result of a previous trial presenting issues of fact normally is an issue for the factfinder in the negligence . . . action.'  To ascertain what would have happened, the trier of fact should examine the record of the underlying controversy and hear testimony from the parties and counsel."  The court observed: "Perhaps [the son] would have proceeded against Suder in a different manner if he believed that he could not attack the fifth extension.  Or maybe he was simply oblivious to the invalidity of the first extension . . . ."  *Id.* at 246, 992 A.2d at 422–23.  Accordingly, the COA reversed the CSA and remanded to the trial court for a trial.  *Id.* at 247, 992 A.2d at 423.

Although *Suder* does not address the precise scenario of this case, the import of *Suder* is that, under the trial-within-a-trial doctrine, questions of law are decided by the court, while questions of fact are decided by the factfinder.  *See id.* at 246, 992 A.2d at 422 ("'What would have been the result of a previous trial presenting issues of fact normally is an issue for the factfinder in the negligence . . . action.'") (citation omitted); *see also, e.g.*, *N. Am. Cath. Educ. Programming Found., Inc. v. Womble Carlyle Sandridge & Rice, PLLC*, 800 F. Supp. 2d 239, 244 (D.D.C. 2011) ("Plaintiff correctly points out that if the Court determines that the D.C. Circuit would have vacated and remanded, the determination of what would have happened on remand is a question of fact for the jury to decide."); *Hickey*, 796 F. Supp. 2d at 4 ("Whether the issue of proximate cause in a legal malpractice action should be decided by the judge or the jury thus depends 'not on whether the original action is tried before a jury, but, rather, whether the issue

remaining in the malpractice action is one of law or one of fact.'"); *Blanks v. Seyfarth Shaw LLP*, 171 Cal. App. 4th 336, 357–58 (Cal. App. Ct. 2009) ("If the underlying issue originally was a factual question that would have gone to a tribunal rather than a judge, it is the jury who must decide what a reasonable tribunal would have done."); *Phillips v. Clancy*, 733 P.2d 300, 307 (Ariz. Ct. App. 1986) (explaining that, under the-trial-within-a trial doctrine, "legal issues are to be decided by the judge; factual issues are to be decided by the jury.").

As stated, I conclude that the COA would have determined that summary disposition was improper as to the violations of I.A. §§ 10-126(a)(1), (6) and (13).  Therefore, the case would have been remanded to the MIA for further proceedings.  An "administrative function" remained to be performed by the MIA—an evidentiary hearing at least as to the alleged violations of I.A. §§ 10-126(a)(1), (6) and (13), and/or a determination of whether the penalty assessed against Coomes was warranted.  The Commissioner was not required to reach the same result or reimpose the original penalty, particularly in light of a review of the contentions.

The questions of whether Coomes willfully violated the Insurance Article, I.A. § 10-126(a)(1); engaged in fraudulent or dishonest practices, I.A. § 10-126(a)(6); or was incompetent or untrustworthy to act as an insurance producer, I.A. § 10-126(a)(13), are questions of fact or mixed questions of law and fact.  Under the trial-within-a-trial doctrine, a federal jury must decide these questions, *i.e.*, liability for the three charged statutory violations and the appropriate penalty.  *See, e.g.*, *Hickey*, 796 F. Supp. 2d at 4 n.4 ("Where, as here, the proximate cause issue in the malpractice action only requires an application of law to facts, 'there is no reason why the jury cannot replicate the judgment of another factfinding tribunal, whatever its composition.'") (citation omitted); *id.* at 5 (determining that, under the trial-within-a-trial doctrine, "[t]he jury will be instructed on the applicable law applied in determining an attorney's entitlement

87

to [attorney's fees]. The jury will then have to decide, based on the Court's instruction as to the law and its own assessment of the facts, whether a reasonable [Equal Employment Opportunity Commissioner administrative law judge] would have awarded [attorney's fees] if [the plaintiff] sought them."); *Phillips*, 733 P.2d at 302, 307 (attorney failed to timely appeal Social Security Administration's denial of client's claim for disability insurance; directing proceedings on remand, as follows: "[O]n remand, in the 'case within the case,' the jury should be instructed on the applicable Social Security law and regulations and be asked if, based on the facts presented, but for the alleged negligence, [the plaintiff] would have been entitled to disability benefits."); *Helmbrecht v. St. Paul Ins. Co.*, 362 N.W.2d 118, 136–37 (Wis. 1985) (explaining that once a jury is "properly instructed on the law," it can "reasonably apply the law to the particular facts involved and resolve the issue of what a reasonable judge would have awarded"); *see also Hickey*, 796 F. Supp. 2d at 4 ("[A]s long as the earlier case does not hinge on a disputed issue of law, but only involves an application of law to facts, the jury should perform its traditional function of applying law to facts—'even when the earlier factfinder was a judge, an administrative hearings officer, an arbitrator, a court-martial, or any tribunal deciding on factual grounds.'") (citation omitted); *Blanks v. Shaw*, 171 Cal. App. 4th 336, 357–58 (Cal. App. Ct. 2009) ("The identity or expertise of the original trier of fact (i.e., a judge or an arbitrator or another type of adjudicator) does not alter the jury's responsibility in the legal malpractice trial within a trial").

Based on the foregoing, neither side is entitled to summary judgment as to Counts I and II.

## B. Count III (Violation of the Automatic Stay)

As noted, on or about October 17, 2017, plaintiff filed a chapter 13 bankruptcy petition in the United States Bankruptcy Court for the Eastern District of Virginia. ECF 78 (Coomes Affidavit of October 23, 2024), ¶ 6; ECF 35, ¶ 51. Plaintiff owed Moran approximately $1,120 for pre-

bankruptcy petition legal services, ECF 35, ¶ 56, making defendants creditors of Coomes.  ECF 78, ¶ 8.  On this basis, plaintiff alleges in Count III that defendants "were subject to the automatic stay of the United States Bankruptcy code."  ECF 35, ¶ 55.

The Amended Complaint alleges, *id.* ¶ 103: "Defendants received actual notice of the automatic stay . . . from the bankruptcy noticing center and from Ms. Coomes."  According to the Amended Complaint, defendants willfully violated the automatic stay because, "[a]fter receiving actual notice of the automatic stay, Defendants intentionally harassed Ms. Coomes with coercive tactics to pay pre-petition debts."  *Id.* ¶ 104; *see id.* ¶ 108.

In connection with plaintiff's summary judgment motion, she asserts in her Affidavit of October 23, 2024, ECF 78, ¶ 9: "Defendants refused to prepare and file the opening brief in my [COA] appeal unless and until I paid a modest balance due for pre-petition legal fees . . . ."  Further, Coomes alleges: "Not withstanding [sic] informing defendants I was in bankruptcy then and was unable to fully pay my debt to them . . . at that time, defendants refused to begin preparing my opening brief."  ECF 78, ¶ 11; *see also* ECF 77-2, ¶ 4 (alleging that after Coomes advised Mr. Moran of the bankruptcy filing, "Defendants continued his [sic] efforts to collect pre-petition fees that I owed to him [sic] . . . as a condition to prepare and file my brief" with the COA).  She adds, ECF 78, ¶ 12: "When I inquired again about the status of the opening brief, [Mr.] Moran emailed me an invoice for outstanding pre-petition legal fees, and wrote, 'This is what I have so far' (referring to the invoice)."[35]  Plaintiff seeks "compensation for actual damages, proportional punitive damages, and reasonable fees and costs . . . ."  ECF 35, ¶ 109.

Defendants do not dispute Coomes's sworn statement (ECF 78, ¶ 9) that defendants refused to file an opening brief in the COA unless plaintiff paid outstanding legal fees.  Nor do they dispute

---

[35] Coomes did not submit this email as an exhibit.

Coomes's sworn statement (*id.* ¶ 12) that Mr. Moran sent plaintiff an email invoice when she inquired about the status of her appellate brief. Nevertheless, defendants claim that they are entitled to summary judgment as to Count III because any violation of the automatic stay was not "willful," as is required for liability under the bankruptcy code. ECF 74-1 at 22. They explain that they "did not have notice of the Bankruptcy filing." *Id.* Moreover, defendants assert, *id.* at 23: "[T]he only 'damages' Plaintiff claims are by their very nature speculative and not allowed under the Bankruptcy Code."

The Amended Complaint fails to cite a particular statutory provision under which Count III arises. But, in her motion, Coomes relies on 11 U.S.C. § 362. ECF 77-1 at 19. Section 362(a) states, in relevant part (emphasis added):

> (a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970, operates as a stay, applicable to all entities, of--
>
> *       *       *
>
> (6) any act to collect, assess, or recover a claim against the debtor that *arose before* the commencement of the case under this title . . .

Section 362(k) of Title 11 of the United States Code provides a mechanism for the recovery of damages. It states, *id.* (emphasis added):

> (k)(1) Except as provided in paragraph (2), an individual *injured by any willful violation of a stay* provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.

In sum, an individual seeking to recover damages for violation of the automatic stay must establish three elements: "(1) that the defendant violated the stay imposed by § 362(a), (2) that the violation was willful, and (3) that the plaintiff was injured by the violation." *Houck v. Substitute Trustee Services, Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *see also In re Lyle*, 662 B.R. 229, 234

(Bankr. E.D.N.C. 2024) (plaintiff must establish: "1) a violation of the stay occurred; 2) the violation was willful; and 3) the violation caused actual damages.").

Defendants appear to concede that they violated the stay.   But, the second and third elements are contested.

### 1.  Willful Violation

As explained, defendants contend that they did not willfully violate the automatic stay. ECF 74-1 at 22.   "To constitute a willful act, the creditor need not act with specific intent but must only commit an intentional act with knowledge of the automatic stay."  *In re Strumpf*, 37 F.3d 155, 159 (4th Cir. 1994), *rev'd on other grounds sub nom. Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16 (1995); *see also In re Defeo*, 635 B.R. 253, 262 (Bankr. D.S.C. 2022) ("A willful violation of the automatic stay occurs when a 'creditor knows of the pending bankruptcy petition and intentionally attempts to continue collection procedures in spite of it.'") (citation omitted); *In re Bennett*, 317 B.R. 313, 316 (Bankr. D. Md. 2004) ("'A violation of the stay is willful if the creditor knew of the automatic stay and intentionally performed the actions that violated the stay[.]'") (quoting *Barnett v. Edwards (In re Edwards),* 214 B.R. 613, 620 (9th Cir. BAP 1997)) (alteration in *In re Bennett*).   However, "[t]here is no requirement that the creditor be given written notice of the bankruptcy; actual notice of the bankruptcy is sufficient."   *In re Davis*, 651 B.R. 192, 194 (Bankr. D.S.C. 2023) (citing *Houck*, 791 F.3d at 486); *see also In re Lyle*, 662 B.R. at 235 ("Once a creditor or other actor learns—or is put on notice of—debtor's bankruptcy filing, any actions intentionally taken thereafter in violation of the automatic stay are in nature, 'willful' stay violations.").

Defendants contend that they "were not told about the Chapter 13 filing until January 2018, i.e., after they allegedly attempted to collect the pre-petition debt."  ECF 74-1 at 22 (citing ECF

35, ¶¶ 47–60).  In Mr. Moran's Affidavit of September 5, 2024, (ECF 74-17), he avers, *id.* ¶ 4: "At no time prior to January 2018 did Ms. Coomes inform me that she had filed for bankruptcy." Further, he states, *id.* ¶ 5: "I did not receive any notices, from either Ms. Coomes or the Bankruptcy Court, regarding Ms. Coomes' Chapter 13 Bankruptcy Filing."  Without notice of the Bankruptcy filing, defendants assert that "any violation of the automatic stay on their part could not have been 'willful.'"  ECF 74-1 at 22 (citation omitted).

In his Affidavit (ECF 74-17), Mr. Moran concedes that Coomes advised him of her bankruptcy status in January 2018.  *Id.* ¶ 4.  Therefore, any violation of the automatic stay post-January 2018 was willful.  *See In re Lyle*, 662 B.R. at 235 ("Once a creditor or other actor learns— or is put on notice of—debtor's bankruptcy filing, any actions intentionally taken thereafter in violation of the automatic stay are in nature, 'willful' stay violations.").

Coomes asserts that she filed for bankruptcy in October 2017, and that she "notified Mr. Moran of [t]he filing."  ECF 77-1 at 19 (citing ECF 77-2, Coomes Affidavit, docketed 10/23/24). Her Affidavit states, in relevant part, ECF 77-2, ¶¶ 2, 3: "I filed for bankruptcy on October 17, 2017.  After I filed, I advised Mr. Moran that I had filed.  He advised me that the filing would stay the appeal."  She does not specify precisely when she told Mr. Moran that she had filed for bankruptcy.  Nor has she produced any documentation to support her assertion.

Notably, Coomes did not list defendants as creditors on her bankruptcy schedules.  *See generally* ECF 74-15.  Nor do defendants appear on Coomes's creditor matrix.  *See* ECF 74-16. Therefore, the only evidence pertaining to when Coomes advised Mr. Moran of her bankruptcy filing are the parties' competing affidavits.  This presents a matter of credibility, which cannot be decided on summary judgment.  *See Black & Decker Corp.*, 436 F.3d at 442; *Dennis*, 290 F.3d at 644–45.

I note that in Coomes's Affidavit of October 23, 2024 (ECF 78), she appears to aver that in February and March of 2018 (*i.e.*, post-January 2018), defendants refused to prepare the opening brief until she paid pre-petition fees. *Id.* ¶¶ 17, 24, 28. These statements are uncontroverted. But, Coomes has not moved for summary judgment as to Count III.

### 2. Damages

Defendants contend, ECF 74-1 at 22: "Plaintiff did not suffer any damages from Defendants' alleged violation of the automatic stay." According to defendants, "Plaintiff merely states that she suffered from sleepless nights and emotional harm." *Id.* at 23 (citing ECF 35, ¶ 105). In defendants' view, ECF 74-1 at 23, "the only 'damages' Plaintiff claims are by their very nature speculative and not allowed under the Bankruptcy Code."

In her brief, Coomes states that Mr. Moran's "collection efforts caused her tremendous stress a[n]d anxiety and medical issues, for which she has received treatment." ECF 77-1 at 19. She adds, *id.*: "Mr. Moran's conduct was egregious, entitling Ms. Coomes [to] compensation for her stress and anxiety, for fees and punitive damages."

Coomes has also submitted a 67-paragraph Affidavit in which she details the damages she allegedly suffered as a result of defendants' alleged violations of the automatic stay and legal malpractice. ECF 78. I will not attempt to summarize the entire Affidavit. But, in general, Coomes's alleged damages include: (1) "mental anguish and emotional distress," ECF 78, ¶ 14; (2) physical injury, such as heart palpitations, chest pain, and deterioration of her gastrointestinal systems, *id.* ¶¶ 14; (3) past and future medical expenses, *id.* ¶¶ 55–58; (4) "tuition and related expenses," *id.* ¶ 37; (5) difficulty "secur[ing] new employment," *id.* ¶ 44; and (6) reputational injury, *id.* ¶ 46.

As noted, 11 U.S.C. § 362(k)(1) provides that an individual injured by a violation of the automatic stay may recover "actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages."  "Courts traditionally view 'actual damages' as a broad umbrella term, including, but not limited to, lost time damages, out-of-pocket expenses, and emotional damages."  *In re Ojiegbe*, 539 B.R. 474, 479 (Bankr. D. Md. 2015).

With respect to Count III, plaintiff requests three categories of damages in her suit: (1) "actual damages"; (2) "punitive damages"; and (3) attorneys' "fees and costs."  ECF 35, ¶ 109;[36] *see also* ECF 77-1 at 19 (requesting compensation for Coomes's "stress and anxiety, for fees and punitive damages."); ECF 78, ¶ 65 ("Defendants intentional violations of the automatic stay have caused me irreparable harm for which I seek actual damages, costs, funds for future related damages, and punitive damages.").  Defendants primarily take issue with Coomes's assertion of emotional distress damages.[37]

As noted, defendants are not entitled to summary judgment because the question remains as to whether any violation of the stay was willful.  Because the matter of damages is premature, I decline to address it.

## V.  Conclusion

For the foregoing reasons, Defendants' Motion (ECF 74) and Plaintiff's Motion (ECF 77) are denied.  An Order follows.

---

[36] Attorneys' fees and costs are a form of actual damages.  *See* 11 U.S.C. § 362(k)(1).

[37] In Defendants' Motion and Reply, they do not directly advance any argument pertaining to attorneys' fees or costs.  *See* ECF 74-1; ECF 81.  Nor do they raise specific arguments concerning the other damages claimed by plaintiff, such as physical injury, past and future medical expenses, and tuition and related expenses.  *See* ECF 78, ¶¶ 29, 34, 37, 55–58.

Date:    July 28, 2025

                                  /s/
                              Ellen Lipton Hollander
                              United States District Judge