**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

ELIZABETH HARING COOMES,
   *Plaintiff,*

   v.

MICHAEL J. MORAN, ET AL.,
   *Defendant.*

Civil Action No. ELH-22-2639

**MEMORANDUM**

This Memorandum addresses a motion to compel a neuropsychological evaluation in regard to a legal malpractice case. *See* ECF 96.

Plaintiff Elizabeth Haring Coomes filed suit against defendants Michael J. Moran, Esquire ("Mr. Moran") and The Law Offices of Michael J. Moran, P.C. (the "Firm") (collectively, "Moran"), asserting "Professional Negligence" as to Mr. Moran (Count I) and the Firm (Count II). ECF 35 (Amended Complaint).[1]  In addition, she claims that defendants are liable for a violation of the automatic stay in connection with plaintiff's filing of a Chapter 13 bankruptcy petition (Count III).[2]

The case is rooted in Moran's representation of plaintiff between May 2015 and March 2018 with respect to a matter litigated in the Maryland courts, and which had made its way to the Maryland Court of Appeals ("COA"), now known as the Supreme Court of Maryland ("SCM").[3]

---

[1] Jurisdiction is predicated on diversity of citizenship under 28 U.S.C. § 1332. ECF 35, ¶ 5.

[2] The Amended Complaint fails to identify the provision of the Bankruptcy Code that defendants allegedly violated.

[3] In the general election held in Maryland in November 2022, the voters of Maryland approved a constitutional amendment to change the name of the Maryland Court of Appeals to the Supreme Court of Maryland.  And, the voters also approved a change in the name of the State's intermediate appellate court, from the Maryland Court of Special Appeals to the Appellate Court

The matter concerned plaintiff's challenge to a decision of the Maryland Insurance Administration ("MIA"), revoking Coomes's insurance producer's license.   However, while the matter was pending before the COA, Moran failed to submit an appellate brief, allegedly because plaintiff owed legal fees to Moran.  *See* ECF 78, ¶ 9.  As a result of that failure, on March 8, 2018, the COA dismissed plaintiff's case.  *See* ECF 74-14 at 43; ECF 35, ¶ 71.  This suit followed, in which plaintiff seeks compensatory and punitive damages, as well as prejudgment interest, costs, and attorneys' fees.  ECF 35 at 11, 12, 13.  In particular, she contends that she would have prevailed in the COA and seeks damages related to her inability work as an insurance producer.  ECF 35, ¶¶ 90, 91, 100, 101

By Memorandum Opinion and Order of July 28, 2025 (ECF 84, ECF 85), the Court denied defendants' motion for summary judgment (ECF 74).[4] The Court also denied plaintiff's motion for partial summary judgment.  ECF 77.

Discovery closed on February 23, 2026.  ECF 92.  During discovery, defendants moved to compel responses to defendants' interrogatories and requests for production of documents.  ECF 93 (the "Discovery Motion").   Defendants also moved to compel Coomes to undergo a neuropsychological evaluation, pursuant to Fed. R. Civ. P. 35.   ECF 96 (the "Motion").  Defendants appended seventeen exhibits to their Motion.  ECF 96-2 to ECF 96-18; *see also* ECF

---

of Maryland.  These changes went into effect on December 14, 2022.  *See* Press Release, Maryland Courts, *Voter-approved constitutional change renames high courts to Supreme and Appellate Court of Maryland* (Dec. 14, 2022), https://perma.cc/TL89-QFKR.  But, I shall refer to the courts by the names that were in effect when the cited decisions were issued.

[4] To the extent relevant, I incorporate here the Factual Summary set forth in ECF 84.

100 to ECF 100-16.[5]   Before filing the Motion, defendants sought to arrange a neurological evaluation with plaintiff's counsel, but plaintiff's counsel did not respond to defendants' request. ECF 96 at 5–6; *see* ECF 100-12; ECF 100-13; ECF 100-15.

Plaintiff filed an opposition to the Discovery Motion (ECF 93).  *See* ECF 104.  She also moved for a temporary stay of this case.  ECF 101 ("Stay Motion").  For reasons not relevant to the resolution of this Motion, by Order of December 11, 2025, I granted plaintiff's Stay Motion through April 2, 2026.  ECF 109.  However, the Order specifies that the Stay does "not apply to Defendants' Rule 35 Motion for Mental Examination" (ECF 96).  *See* ECF 109 at 2.

Additionally, I denied defendants' Discovery Motion (ECF 93), without prejudice to "Defendants' right to re-file the Motion on or after March 18, 2026, if Plaintiff has not responded to Defendants' Interrogatories and Request for Production of Documents, and produced responsive records, by that time."  ECF 109 at 2.   Defendants filed a second motion to compel on March 20, 2026, concerning discovery matters.  ECF 114.  However, because that motion is not yet fully briefed, it is not addressed in this Memorandum.

As noted, this Memorandum addresses only the Motion to compel a neuropsychological evaluation of plaintiff.  Defendants appended the Curriculum Vitae ("CV") of Dr. David Schretlen, a psychologist.  ECF 100-14.  Plaintiff filed an opposition to the Motion.  ECF 112 ("Opposition"). Defendants replied.  ECF 113 (the "Reply").  Notably, defendants appended to their Reply the Affidavit of Dr. David Schretlen, the psychologist they have identified to conduct the proposed

---

[5]   Defendants moved to seal these exhibits.  ECF 99.  However, I denied defendants' motion to seal.  ECF 107.  The unsealed exhibits are associated with docket entries ECF 100 to ECF 100-16.

evaluation, along with another copy of his CV. *See* ECF 113-1 at 1–2 ("Schretlen Affidavit"); *id.* at 3–47 ("Schretlen CV" or "CV").[6]

In his Affidavit, Schretlen claims that if he examines plaintiff, he "will be able to characterize both her current and past neurocognitive functioning based on . . . reliable and valid methods." ECF 113-1, ¶ 2. Schretlen also asserts that if he examines Coomes, he could determine "to a reasonable degree of neuropsychological certainty . . . whether [plaintiff] suffers from such deficits that would likely prevent her from engaging in high level and/or complex tasks." *Id.* ¶ 3.

---

[6] Defendants did not submit the Schretlen Affidavit as an exhibit to their Motion. Indeed, the Schretlen Affidavit is dated January 23, 2026, and clearly was prepared after the Motion was filed. *See* ECF 113-1 at 2. The failure to include the Schretlen Affidavit with the Motion is a troubling omission. In effect, plaintiff has had no opportunity to address it.

A court need not consider arguments made for the first time in a party's reply. *See, e.g.*, *United States v. Al–Hamdi,* 356 F.3d 564, 571 n. 8 (4th Cir. 2004) (declining to consider argument first raised in reply brief); *see also United States v. Williams,* 445 F.3d 724, 736 n.6 (4th Cir. 2006) (declining to consider an argument raised for the first time in the reply brief); *Hanlin–Cooney v. Frederick Cnty., Md.*, WDQ-13-1731, 2014 WL 576373, at *11 n.32 (D. Md. Feb. 11, 2014) (declining to consider an argument first raised in the reply brief). The rationale behind this general principle is that that the opposing party would be prejudiced by a consideration of the argument, because of a lack of opportunity to respond. *See Clawson v. FedEx Ground Package Sys., Inc.*, 451 F.Supp.2d 731, 735 (D. Md. 2006) (citing *United States v. Head*, 340 F.3d 628, 630 n. 4 (8th Cir. 2003)).

However, plaintiff has failed to complain about the belated filing of such an important submission. And, as the Supreme Court has explained, "[i]n our adversarial system of adjudication, we follow the principle of party presentation." *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020). In particular, courts "rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." *Greenlaw v. United States*, 554 U.S. 237, 243 (2008). The "courts 'call balls and strikes'; they don't get a turn at bat." *Clark v. Sweeney*, 607 U.S. 7, 9 (2025) (per curiam); *see also Beaudett v. City of Hampton,* 775 F.2d 1274, 1278 (4th Cir. 1985) (stating that, in the context of pro se plaintiffs, the Court "will not . . . require the district courts to anticipate all arguments that clever counsel may present in some appellate future. To do so . . . would . . . transform the district court from its legitimate advisory role to the improper role of an advocate seeking out the strongest arguments and most successful strategies for a party.").

Accordingly, I will consider the Schretlen Affidavit.

No hearing is necessary to resolve the Motion (ECF 96). *See* Local Rule 105.6. For the reasons that follow, I shall deny the Motion.

## I.    Legal Standards

Pursuant to Fed. R. Civ. P. 35, defendants ask this Court to compel plaintiff to undergo a neuropsychological evaluation.  ECF 96.  Rule 35(a) states:

(a) Order for an Examination.

> (1) *In General.* The court where the action is pending may order a party whose mental or physical condition—including blood group—is in controversy to submit to a physical or mental examination by a suitably licensed or certified examiner. The court has the same authority to order a party to produce for examination a person who is in its custody or under its legal control.

> (2) *Motion and Notice; Contents of the Order.* The order:

>> (A) may be made only on motion for good cause and on notice to all parties and the person to be examined; and

>> (B) must specify the time, place, manner, conditions, and scope of the examination, as well as the person or persons who will perform it.

Under Rule 35, "a court may order the physical or mental examination of a party where there is good cause for the examination and the party's physical or mental condition is in controversy." *Levy v. Green,* TDC-18-01291, 2024 WL 3090367, at *4 (D. Md. June 21, 2024). These are the "dual requirements" that must be satisfied for the Court to compel a mental evaluation under Rule 35. *Shipley v. Disney*, SAG-21-3173, 2024 WL 128778, at *1 (D. Md. Jan. 11, 2024) (Abelson, M.J.).[7] "At bottom, analysis of both aims . . . balance[s] the need for an examination against the burdens it imposes." *Nicholson v. Balitmore Police Dep't*, DKC-20-3146, 2022 WL 1104575, at *2 (D. Md. Apr. 13, 2022).

---

[7] Judge Abelson is now a U.S. District Judge but authored the opinion as a magistrate judge.

"[B]y adding the words 'good cause,' the Rules indicate that there must be greater showing of need under Rule . . . 35 than under the other discovery rules." *Schlagenhauf v. Holder*, 379 U.S. 104, 118 (1964) (cleaned up) (internal citation and quotation marks omitted). "Rule 35 imposes those heightened requirements 'given the potentially serious invasion of privacy called for by a mental or physical examination.'" *Shipley,* 2024 WL 128778, at *1 (quoting *Rich v. Diana Consulting Servs. LLC*, SAG-21-1670, 2022 WL 1289663, at *3 (D. Md. Apr. 29, 2022)). Moreover, the movant must affirmatively demonstrate good cause. *Id.* at 117. And, it is a "rather high hurdle[.]" *Mark Levy v. Howard Cty., Maryland,* CDA-24-3580, 2025 WL 3223762, at *2 (D. Md. Nov. 19, 2025).

"'[G]ood cause' requires demonstrating more than 'mere relevance' of the examination to the issues in the case." *Schlagenhauf*, 379 U.S. at 118; *see Peltier v. Charter Day Sch., Inc.*, KAS-16-30, 2017 WL 4582459, at *1 (E.D.N.C. Jan. 6, 2017). "Whether good cause exists generally turns on whether 'the average lay person would have difficulty evaluating the nature, extent, and cause of the claimant's injuries.'" *Shipley,* 2024 WL 128778, at *2 (quoting *Jones v. Campbell Univ., Inc.*, BO-20-29, 2020 WL 4451173, at *4 (E.D.N.C. Aug. 3, 2020)).

Notably, "'[a] compelled exam . . . may not be justified if the information sought could have been obtained through less invasive tools of discovery.'" *Shipley*, 2024 WL 128778, at *2 (quoting *Nicholson*, 2022 WL 1104575, at *2) (internal quotation marks omitted). Indeed, "[t]he moving party's ability 'to obtain the desired information by other means'" is "relevant" because "the Supreme Court has emphasized that a party seeking a physical or mental examination must make a 'showing of need' for such an examination." *Shipley*, 2024 WL 128778, at *2 (quoting *Schlagenhauf*, 379 U.S. at 118).

"For the 'in controversy' requirement, courts put significant weight on whether the party whose examination is sought was the party to put the condition at issue." *Shipley,* 2024 WL 128778, at *2. "Courts are more skeptical of examination requests where the person's condition was 'placed in issue by other parties.'" *Id.* (quoting *Schlagenhauf*, 379 U.S. at 119). "In a negligence action, '[a] plaintiff . . . who asserts mental or physical injury . . . places that mental or physical injury clearly in controversy and provides the defendant with good cause for an examination to determine the existence and extent of such asserted injury.'" *Rich*, 2022 WL 1289663, at *4 (quoting *Schlagenhauf*, 379 U.S. at 119).

"Determining the propriety of a court-ordered mental examination is an 'intensely fact– specific' enterprise", *Shipley,* 2024 WL 128778, at *2 (quoting 8B Charles A. Wright, *et al.*, Federal Practice and Procedure § 2234.1 (3d ed.)). Indeed, the Rule 35 analysis "eludes simple encapsulation." *Shipley,* 2024 WL 128778, at *3. But, if one or more of the following factors is present, courts have consistently held that a plaintiff's mental condition is in controversy:

> (1) the plaintiff has asserted a specific cause of action for intentional or negligent infliction of emotional distress; (2) the plaintiff has claimed unusually severe emotional distress; (3) the plaintiff has alleged a specific type of disorder or other psychiatric injury; (4) the plaintiff has offered her own expert testimony to supplement her claim of emotional distress; or (5) the plaintiff concedes that her medical condition is "in controversy" pursuant to Rule 35.

*Meyler v. Town of Ocean City*, JKB-23-00082, 2023 WL 5984406, at *7 (D. Md. Sept. 14, 2023); *see e.g., S.P. by & through Sherlin v. St. David's Sch.,* FL-22-201, 2024 WL 1291504, at *1 (E.D.N.C. Mar. 26, 2024) (same); *Roe v. Marshall Univ. Bd. of Governors,* CAE-22-00532, 2024 WL 712868, at *4 (S.D.W. Va. Feb. 21, 2024) (same); *Zayre-Brown v. N. Carolina Dep't of Pub. Safety,* MOC-22-191, 2023 WL 3874035, at *2 (W.D.N.C. June 7, 2023) (same); *Hughley v. Baltimore Cnty. Gov't,* CCB-19-1578, 2021 WL 6655870, at *2 (D. Md. May 13, 2021) (same)*; Fox v. Gates Corp.*, 179 F.R.D. 303, 307 (D. Colo. 1998) (same).

## II.    Discussion

The defense claims that any malpractice on their part was not the cause of plaintiff's inability to work as an insurance producer.  Rather, they insist that plaintiff was unable to work as an insurance producer due to her cognitive impairment.  In their view, this contention is pertinent to the issue of damages.

Accordingly, defendants seek to compel plaintiff to undergo a neurological evaluation by Dr. David Schretlen, in order to establish her cognitive impairment.  ECF 96 at 5–7.  Dr. Schretlen "is Board Certified in Clinical Neuropsychology and is a Fellow of the American Psychological Association and a Fellow of the Association for Psychological Science[.]"  *Id.* at 6.  Defendants have identified the location for the evaluation and anticipate the evaluation will last approximately seven hours.  *Id.*  According to defendants, the evaluation will be "limited to . . . testing of Plaintiff to determine her cognitive functioning," *id.*, based on "a series of widely used, reliable, and well-validated tests of cognitive functioning and symptom inventories."  *Id.* at 6, n.3.

In support of the Motion, defendants have submitted the Schretlen CV.  ECF 100-14; ECF 113-1 at 3–47. The CV demonstrates that Dr. Schretlen has enjoyed a long and distinguished career in the field of psychology.  He is currently Professor Emeritus at the Departments of Psychiatry and Radiology at Johns Hopkins University School of Medicine and has published numerous peer reviewed studies on cognitive disorders.  *See* ECF 113-1 at 3–18.  As to the length of the evaluation, other courts have held that seven hours is an appropriate length for a Rule 35 evaluation.  *See, e.g., Walton v. N. Carolina Dep't of Agric. & Consumer Servs.,* LWF-09-302, 2011 WL 883579, at *4 (E.D.N.C. Mar. 11, 2011) (ordering that "plaintiff submit to a psychiatric examination . . . to last not longer than eight hours in one day, however said examination and testing may continue, if necessary, to a second day, not to last longer than eight hours on the second day").

Plaintiff does not lodge any objections to Dr. Schretlen's credentials or to the length of the proposed evaluation. Therefore, I shall confine my analysis to the questions of whether Coomes's mental capacity is in controversy and, even if it is, whether there is good cause and need for a neurological evaluation.

Defendants maintain that plaintiff has placed her "mental capacity . . . at issue in this case" and that her mental capacity "is relevant to the issue of damages."  ECF 96 at 1.  They point to several allegations in plaintiff's Amended Complaint (ECF 35) to support the assertion.  *Id*.  In particular, they cite ECF 35, ¶¶ 100, 101, which state:

> 100.   If the Law Firm had not breached the standard of care owed to Ms. Coomes, the rulings of the MIA revoking her license would have been reversed and her license reinstated.

> 101.   As a direct and proximate result of the negligence of the Law Firm, Ms. Coomes has suffered substantial and irreversible damages in that she can no longer operate as an insurance producer, operate her insurance business, or hold another high paying job.

*See also* ECF 35, ¶¶ 90, 91.

As indicated, defendants contend that plaintiff lacks or lacked the cognitive ability to perform the job of an insurance producer.  They state:  "Plaintiff's ability to act as an insurance producer (or otherwise 'hold high paying jobs') is not only at issue in this case; it is a central element to the damages claimed in this litigation."  ECF 96 at 2.

To support their contention, defendants point to allegations plaintiff has made "in other Federal cases and Bankruptcy actions," in which plaintiff has represented that "she is cognitively impaired (and at times incapable of performing any work, including that of an insurance producer/agent) and is a disabled person under the Americans with Disabilities Act ('ADA')", 42 U.S.C. §§ 12101, *et seq*.  *Id.*  Defendants have included a "chart detailing Plaintiff's own allegations regarding her cognitive functions, ADA status and ability to work."  *Id.*; *see* ECF 96 at

2–4.  In addition, defendants have submitted copies of filings made by plaintiff in other cases, as well as transcripts of hearings from some of those cases.  ECF 100 to ECF 100-11; ECF 100-16.[8]

Defendants note that in these filings, Coomes has claimed that she "was not able to work in the insurance industry (or in any other profession) for over 4 years and . . . at times has been totally disabled.[]"  ECF 113 at 2 (citing ECF 100-4 (Response to motion to dismiss, April 9, 2018), ¶ 7 (Coomes stating she was unable to work for four years after being injured by a toxic gas leak in 2011)).  Defendants reason that if Coomes's "assertions" in these filings "are true, then Defendants were not the proximate cause of at least part, if not all, of Plaintiff's damages," because she would have been unable "to act as an insurance agent/producer due to injuries she suffered as a result of the unrelated toxic fumes exposure," and not because of defendants' actions.  *Id.* at 2–3.

The filings were made by plaintiff, without counsel, beginning in 2012 and as recently as 2023.  They reveal a variety of medical ailments from which Coomes claims to have suffered, and from which she may continue to suffer.  In these submissions, Coomes asserts that these conditions rendered her disabled under the ADA.

To illustrate, Coomes recounted that she suffered from slow neurocognitive functioning as a result of her exposure in 2011 to a toxic gas leak.  *See, e.g.,* ECF 100-3 (Transcript of hearing held on Aug. 3, 2016), at 19 (Coomes stating that she was "seriously injured in January 2011, and since that time . . . had twelve surgeries [and] . . . was unable to work for almost four years."); ECF 100-4 (Response to motion to dismiss, April 9, 2018), ¶ 7 (Coomes stating that in January 2011 she "was grievously injured when a code violation caused sewer gases to enter her office through

---

[8] These submissions pertain to various bankruptcy proceedings in which Ms. Coomes was the debtor.  ECF 100 to 100-11.  Additionally, the defendants present a filing submitted by Ms. Coomes in a civil case in federal court in which Coomes was a codefendant.  ECF 100-16.

the HVAC vents . . . [Coomes] was unable to work for nearly four years due to her medical problems which caused a loss of function."); *see also, e.g.,* ECF 100-1 (Debtor's motion to reconsider, Nov. 27, 2012), at 2–3 (Coomes claiming that "because of serious illness" she was on "bed rest," could not drive, and was "rendered . . . disabled pursuant to the [ADA]."); ECF 100-5 (Debtor's motion to reconsider orders dated July 27, 2018, July 31, 2018, Aug. 10, 2018), at 4 (Coomes stating that she is "disabled pursuant to the ADA," she "is contending with serious health problems", and that in 2013 she "was diagnosed with neurotoxicity and neurocognitive loss," which "adversely impacts" her "processing speed and executive skills"); ECF 100-2 (Transcript of hearing held on June 1, 2016), at 14 (Coomes requesting "a reasonable accommodation under the ADA because [she has] been disabled [by a] cognitive impairment" and claiming she has "abnormally slow processing speed"); ECF 100-6 (Motion/Request for reasonable accommodation under ADA, Oct. 17, 2018), at 1–2 (Coomes stating that she "is disabled pursuant to the ADA" and describing numerous medical conditions).

Moreover, as recently as 2023, after this suit was already filed, Coomes claimed in a civil case in the Eastern District of Pennsylvania that she continues to suffer from a variety of maladies. ECF 100-16 at 1–2. As plaintiff puts it, these conditions have led plaintiff to experience "extraordinary fatigue, sleep attacks and hypersomnia during the day, and also severely impaired [her] processing speed, concentration, ability to focus, and overall functioning." *Id.*; *see id* at 1 (indicating that plaintiff "has been totally work disabled since mid-March 2023.").

In plaintiff's Opposition, she contends that she has "not put her mental abilities in controversy." ECF 112 at 3. She explains that she "has not alleged any emotional or psychological damage because of Defendants' breaches of the standard of care and violation of the automatic stay." *Id.* Therefore, plaintiff claims that a cognitive evaluation is not warranted. *Id.* at 4.

In addition, plaintiff disputes defendants' characterization of the filings she made in other cases regarding her mental capacity. According to plaintiff, "Coomes's cognitive abilities shine through in these filings. She is articulate and analytical in her writing. She does not demonstrate cognitive decline or impairment." *Id.* at 1. Furthermore, plaintiff notes that, "except for the filing made in 2023, Plaintiff's pro se papers were filed from 2012 to 2020, more than six years ago." *Id.* at 3. Plaintiff also asserts: "Other than a reference to a slowing down of [plaintiff's] ability to process information . . . and a reference that she stayed in a neurological recovery house . . . there is no 'evidence' of a mental deficiency which would render Plaintiff incapable of being an insurance producer." *Id.* Rather, plaintiff claims that the "medical issues" that plaintiff describes in the filings that defendants attached "are physical in nature." *Id.*

It is true that plaintiff does not seek to recover damages related to mental distress or other emotional issues.[9] She alleges that, because of defendants' breach of the standard of care, "she can no longer operate as an insurance producer, operate her insurance business, or hold another high paying job." *See, e.g., id.* ¶ 91. In other words, plaintiff contends that she lost her ability to work because of defendants' malpractice, and not because of her exposure to toxic fumes in 2011.

As I understand it, based on the MIA's ruling, plaintiff is barred from working as an insurance producer indefinitely. Therefore, the result of any alleged malpractice is arguably ongoing. And, plaintiff apparently has recovered from the effects of her exposure to toxic gas. For example, some of Coomes's prior submissions, on which Moran relies, indicate that by 2015 plaintiff recovered from the injuries she sustained due to the toxic fumes exposure and that she

---

[9] In Count III, titled "Violation of the Automatic Stay", plaintiff asserts: "Defendants' conduct as alleged above caused Ms. Coomes sleepless nights and other significant emotional harm distinct from the inherent stress of the normal bankruptcy process." ECF 35, ¶ 105. But, defendants do not rely on this allegation as a basis for the Motion.

was able to work for at least some period of time, beginning in 2015. ECF 100-4 (Response to motion to dismiss, April 9, 2018), ¶ 7 (Coomes stating that she "completed a lengthy multi-disciplinary rehabilitative program at Mayo Clinic in early 2014 . . . was rehabilitated and able to return to work in December 2015. [Coomes] also obtained a second job in March 2017"). And, disability for purposes of the ADA does not mean that an individual is unable to work at all. *See U.S. Equal Emp. Opportunity Comm'n v. Big Lots Stores, Inc.,* JPB-17-73, 2018 WL 4656413, at *3 (N.D.W. Va. Sept. 27, 2018) ("[T]he ADA does not require that a claimant be unable to work to support a claim."). Nevertheless, Moran is entitled to attempt to show at trial that plaintiff's cognitive limitations precluded her at some point from working as an insurance producer.

Dr. Schretlen claims that, in "conducting neuropsychological assessments," he can "evaluate a person's current psychological and cognitive functioning" and "derive an informed estimate, based on sound, reliable, valid, and peer reviewed methods of the person's cognitive function before the person developed a brain disease, sustained a brain injury, or acquired another neuropsychiatric condition." ECF 113-1, ¶ 2. Further, he claims that he "will be able to characterize" plaintiff's "current and *past* neurocognitive functioning[.]" *Id.* (emphasis added). Dr. Schretlen also claims that he will be able to "form opinions to a reasonable degree of neuropsychological certainty regarding . . . whether [Coomes] suffers from such deficits that would likely prevent her from engaging in high level and/or complex tasks." *Id.* ¶ 3.

Plaintiff experienced a toxic fumes exposure in 2011. The COA dismissed the case in 2018. The question is whether a neuropsychological evaluation in 2026 will establish the impact of the 2011 toxic gas exposure on plaintiff's cognitive abilities in 2017, 2018, or beyond. *See* ECF 35, ¶¶ 47–81.

The Court surmises that Dr. Schretlen's ability to form opinions about plaintiff's cognitive status before 2018, in 2018, and after 2018 would depend on the reason for any mental impairment. For example, IQ may be static, so if a person has a low IQ now, that same IQ presumably would have been present years earlier. However, if an individual suffers from a recent traumatic brain injury, it is not clear how an expert could determine cognitive ability years prior to that injury. If an individual currently suffers from a form of dementia, the Affidavit does not explain how an evaluation of current mental status would enable the expert to look back in time to determine a person's cognitive abilities a decade earlier. Simply put, there is nothing in the Affidavit, beyond bald conclusions, that would enable the Court to determine that cognitive testing in 2026 will enable the expert to determine plaintiff's cognitive ability at the time of the alleged malpractice.

In my view, defendants fail to show good cause for the requested evaluation. Indeed, defendants do not mention good cause once in the Motion. But, in their Reply, defendants assert that there is good cause to compel Coomes to submit to a neurological evaluation because "determining the nature and extent of Plaintiff's cognitive impairment is clearly beyond the keen [sic] of the average lay person, and in fact requires specialized medical training to perform and interpret the applicable cognitive tests." ECF 113 at 5.

Plaintiff counters that "there is no good cause to order a mental health examination" because her "mental health is not an issue[.]" ECF 112 at 4. But, she also claims that, even if the Court finds that her mental ability is in controversy, "defendants can secure evidence of Ms. Coomes's mental abilities in a less intrusive manner." *Id.*

To be sure, there is no shortage of evidence regarding Coomes's mental health at the time of the alleged malpractice and afterwards. Defendants' exhibits to their Motion manifestly prove

that point.  Plaintiff's pro se submissions provide considerable documentation of plaintiff's mental struggles due to the toxic fumes exposure in 2011.

Coomes's medical records, if available, may provide important information on this matter, in a far less intrusive way than a neurological evaluation.  *See Shumaker v. West*, 196 F.R.D. 454, 457 (S.D.W. Va. 2000) (concluding defendants "has not shown good cause . . . because there is ample medical evidence relating to Plaintiff's PTSD").  However, defendants fail to address the matter of obtaining such records.

As of September 5, 2025, defendants submitted interrogatories and requests for production of documents, seeking Coomes's medical records.  *See, e.g.,* ECF 93-2 at 6 (Moran requesting "[a]ll reports and bills for any medical or mental health treatment that [Coomes] received from January 1, 2011, to the present."); *id.* (Moran requesting "[a]ny and all documents relating to commitments for Plaintiff, including, but not limited to psychological, psychiatric, or criminal incarcerations of any duration for the last twenty (20) years."); *id.* at 11 (Moran requesting that plaintiff "[i]dentify all surgeries, health conditions, afflictions and/or medical treatments that have prevented [plaintiff] from working full-time (i.e., at least 40 hours per week) from January 1, 2011, to the present, including in your answer the dates on which you were unable to work."); *id.* at 25 (Moran requesting "[a]ll documents that support [plaintiff's] claim that as a result of the alleged acts of the Defendants [plaintiff] suffered and/or will continue to suffer damages as described in [the] Amended Complaint.")  As of March 20, 2026, defendants claim that "Plaintiff has not provided any Answers to Defendants' Interrogatories or written Responses to Defendants' Request for Production of Documents; nor has she produced any documents in response to Defendants' written discovery requests."  ECF 114 at 1.

Compelling an individual to undergo a neurological evaluation is an intrusive discovery tool. *See Guilford Nat. Bank of Greensboro,* 297 F.2d at 924. And, as stated, "[g]ood cause does not exist if the party could have obtained the information sought 'through less invasive tools of discovery.'" *Machie v. Manger*, CBD-09-2196, 2012 WL 2092814, at *5 (D. Md. June 7, 2012) (quoting *Maha Prabhu*, 2008 WL 2559417, at *2).

The evidence that defendants have marshalled in support of the Motion supports their contention that their alleged breach of the standard of care did not cause the damages Coomes claims because, despite the malpractice, Coomes was unable to work as an insurance producer, due to her cognitive limitations, for at least some period of time. Although a neurological evaluation of plaintiff might be useful evidence for defendants, that is not the standard the court applies to determine whether a Rule 35 evaluation is warranted. Moreover, "mere relevance" is not enough to compel a Rule 35 evaluation. *Asanov v. Merchan*, FL-24-514, 2025 WL 417281, at *1 (E.D.N.C. Jan. 31, 2025). Because of the privacy concerns necessarily entailed in compelling a neurological evaluation, defendants must show there is a need for this evidence that cannot be met with less invasive discovery tools.

### III.    Conclusion

Moran is entitled to attempt to establish at trial that, regardless of any malpractice by Moran, plaintiff was incapable of performing the job of an insurance producer because of cognitive impairment. But, from what has been presented, Moran has not demonstrated good cause or need for a neuropsychological evaluation. Defendants can rely on plaintiff's own statements in other court proceedings and they can pursue their attempt to procure copies of plaintiff's medical records.

The Court's analysis of defendants' request for a compelled evaluation under Rule 35 assumes that plaintiff will participate in the discovery process and provide relevant medical

records, to the extent available.  If plaintiff fails to do so, without good cause, then defendants may renew their Motion.

For the foregoing reasons, the Motion (ECF 96) is denied, without prejudice.

An Order follows.


Date:   March 31, 2026                          _____/s/_____
                                                Ellen Lipton Hollander
                                                United States District Judge